**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| Boston Hannah International LLC, | ) | |
| | ) | |
| Plaintiff/Counter Claim Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 10-2510-CM-JPO |
| | ) | |
| American Academy of Family Physicians, | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |
| | ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
BY THE AMERICAN ACADEMY OF FAMILY PHYSICIANS**

Respectfully submitted,

STINSON MORRISON HECKER LLP

By:   *s/Brian R. Markley*
        Brian R. Markley, KS 17485
        bmarkley@stinson.com
        (816) 691-3215 - phone
        (816) 412-1259 - fax
        Christina D. Arnone, KS 24522
        carnone@stinson.com
        (816) 691-2469 - phone
        (816) 412-1005 - fax
        1201 Walnut, Suite 2900
        Kansas City, MO 64106

ATTORNEYS FOR THE AMERICAN ACADEMY OF
FAMILY PHYSICIANS

**Table of Contents**

Table of Contents ............................................................................................................. i

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 3

I.     AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON BOSTON HANNAH'S BREACH OF CONTRACT CLAIM. .................................................................... 3

    A.    AAFP did not breach the written terms of the 2005 Agreement. ........................ 4
    B.    The 2005 Agreement was not amended. .......................................................... 4

        1.    Boston Hannah is bound by § 9.1 of the 2005 Agreement, which requires any amendment to be in writing and signed by both parties ....................... 5
        2.    Boston Hannah's asserted amendments are not in writing signed by both parties. ..................................................................................................... 7

            a.    February/March 2009 email exchange ............................................ 8
            b.    The development process .............................................................. 8
            c.    Media packs ................................................................................. 9

        3.    The alleged amendments were not supported by any additional consideration. ..................................................................................... 10
        4.    The alleged amendments are barred by the statute of frauds. ................... 13
        5.    AAFP is not equitably estopped from denying that there were amendments to the 2005 Agreement. ......................................................................... 14

    C.    Even if the 2005 Agreement were amended, AAFP did not breach it. ................ 18
    D.    Boston Hannah cannot establish it has suffered any damages. ......................... 19

II.    AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON BOSTON HANNAH'S CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING. ................................................................................................. 20

III.   AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON BOSTON HANNAH'S TORTIOUS INTERFERENCE CLAIMS. ............................................................. 23

    A.    AAFP did not tortiously interfere with Boston Hannah's existing contracts. ........ 23
    B.    AAFP did not tortiously interfere with Boston Hannah's prospective Business Relations ..................................................................................................... 24

IV.   AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM ............................................................................ 28

Conclusion ..................................................................................................................... 30

Statements Of Fact ("SOF") ........................................................................................... 31

I.     THE PARTIES ................................................................................................... 31

II.    THE WRITTEN CONTRACTS AND WRITTEN AMENDMENTS ............................. 31

    A.    2002 Production and Licensing Agreement ..................................................... 31
    B.    2003 Addendum ............................................................................................ 33

i

C.      2005 Production and Licensing Agreement...........................................................34

III.    THE PROPOSED, BUT NEVER EXECUTED, 2010 AGREEMENT. ...........................36

IV.     THE 2009 AND 2010 PUBLICATIONS .........................................................48

V.      BOSTON HANNAH'S ALLEGED AMENDMENTS TO THE 2005 AGREEMENT....56

A.      Additional Magazines .........................................................................59
B.      Placement of a Digital Version on FamilyDoctor.org ...........................................61
C.      Advertisements on FamilyDoctor.org....................................................63

VI.     THE CONSUMER ALLIANCE PROGRAM ....................................................66

VII.    TERMINATION OF THE 2005 AGREEMENT ...........................................73

VIII.   BOSTON HANNAH AND ITS ADVERTISERS ...........................................77

IX.     BOSTON HANNAH'S ADVERTISING REVENUES ....................................80

X.      BOSTON HANNAH'S FAILURE TO PAY ROYALTIES AND COSTS....................82

BOSTON HANNAH'S ADDITIONAL STATEMENTS OF FACT ...........................................86

Certificate of Service .................................................................................111

ii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bandy v. United States*,
   2008 WL 1867991 (D. Kan. April 24, 2008) .................................................................37

*Boehner v. Heise*,
   734 F. Supp. 2d 389 (S.D.N.Y. 2010)...................................................................24, 26

*Boyer v. Bd. of County Comm'rs of Johnson County*,
   922 F. Supp. 476 (D. Kan.1996) ..........................................................................4

*Car-X Serv. Sys., Inc. v. Kidd-Heller*,
   927 F.2d 511 (10th Cir. 1991) .........................................................................6, 7

*Carvel Corp. v. Noonan*,
   818 N.E.2d 1100 (N.Y. 2004)...........................................................................26, 27

*Cincinnati Ins. Co. v. Transport Graphics, Inc.*,
   2011 WL 2083960 (W.D. Mo. May 19, 2011) ......................................................31

*Comeau v. Mt. Carmel Medical Center, Inc.*,
   869 F.Supp. 858 (D. Kan. 1994) .......................................................................15

*Custom Energy, LLC v. Liebert Corp.*,
   No. 98-2077, 2000 WL 876905 (D. Kan. June 12, 2000)........................................6

*Davis v. Seiter*,
   No. 96-3316, 1998 WL 404354 (D. Kan. June 30, 1998)........................................4

*Deghand v. Wal-Mart Stores, Inc.*,
   926 F. Supp. 1002 (D. Kan. 1996) .....................................................................7

*Eads ex rel. Eads v. Unified School Dist. No. 289, Franklin County, Kan.*,
   184 F. Supp. 2d 1122 (D. Kan. 2002) .................................................................7

*EDO Corp. v. Beech Aircraft Corp.*,
   911 F.2d 1447 (10th Cir. 1990) .........................................................................6

*Entz v. B & B Airparts, Inc.*,
   92 P.3d 613, 2004 WL 1489076 (Kan. App. July 2, 2004) ....................................13

*Fitzmorris v. Shaffer*,
   No. 99,010, 2008 WL 4291642 (Kan. App. Sept. 19, 2008) ................................6, 7

*Fleetwood Enterprises v. Coleman Co.*,
   161 P.3d 765 (Kan. App. 2007) .........................................................................15

iii

*Gillespie v. Seymour*,
823 P.2d 782 (Kan. 1991) ............................................................................................15, 17

*Hanson v. Beloit Newspapers, Inc.*,
No. 94-4023, 1995 WL 646808 (D. Kan. Sept. 15, 1995) ...........................................7

*Hartford Underwriters Ins. Co. v. Kansas Dept. of Human Resources*,
32 P.3d 1146 (Kan. 2001) ............................................................................................14

*Hullman v. Board of Trustees of Pratt Community College*,
732 F. Supp. 91 (D. Kan. 1990) ....................................................................................8

*Hutton Cont. Co. v. City of Coffeyville*,
487 F.3d 772 (10th Cir. 2007) ....................................................................................14

*Idaho Timber Corp. v. A.G. Spanos Const., Inc.*,
No. 93,270, 2005 WL 2665763 (Kan. App. Oct. 14, 2005) ......................................14

*In re Indep. Serv. Org's. Antitrust Lit.*,
85 F. Supp. 2d 1130 (D. Kan. 2000) ........................................................................4, 45

*Israel v. Wood Dolson Co.*,
134 N.E.2d 97 (N.Y. 1956) ........................................................................................23

*Jayhawk Capital Mgmt, LLC v. LSB Indus.*,
08-2561, 2011 WL 1626581 (D. Kan. Apr. 28, 2011) ................................................6

*Lama Holding Co. v. Smith Barney Inc.*,
668 N.E.2d 1370 (N.Y. 1996) ....................................................................................23

*Law v. Law Co. Bldg. Assoc.*,
210 P.3d 676 (Kan. App. 2009) ..................................................................................21

*M West, Inc. v. Oak Park Mall, LLC*,
234 P.3d 833 (Kan. App. 2010) ..................................................................................21

*NBT Bancorp. v. Fleet/Norstar Fin. Group*,
664 N.E.2d 492 (N.Y. 1996) ......................................................................................26

*New Jersey v. Sprint Corp.*,
No. 03-2071, 2010 WL 610671 (D. Kan. Feb. 19, 2010).....7, 8, 9, 34, 36, 38, 39, 57, 58, 61, 63,
..............................................................................................66, 74, 76, 84, 86

*Penncro Assoc., Inc. v. Sprint Spectrum, L.P.*,
499 F.3d 1151 (10th Cir. 2007) ............................................................................5, 6, 7

*Penncro Assocs., Inc. v. Sprint Spectrum L.P.*,
04-2549, 2006 WL 1320252 (D. Kan. May 15, 2006) ................................................5

iv

*Pizza Mgmt., Inc. v. Pizza Hut, Inc.*,
   737 F. Supp. 1154 (D. Kan. 1990) ........................................................................21, 23

*Raynor Mfg. Co. v. Raynor Door Co., Inc.*,
   No. 07-2421, 2008 WL 913286 (D. Kan. Mar. 31, 2008) .......................................13

*Reno v. Beckett*,
   555 F.2d 757 (10th Cir. 1977) .................................................................................17

*RF Stakeholders, LLC v. McGreevy's Midwest Meat Co., Inc.*,
   No. 10-1107-KHV, 2011 WL 1666914 (D. Kan. May 3, 2011) ............................10

*Riffel v. Dieter*,
   157 P.2d 831 (Kan. 1945) ........................................................................................13

*Riley State Bank v. Spillman*,
   750 P.2d 1024 (Kan. 1988) ........................................................................................5

*Rockers v. Kansas Turnpike Authority*,
   991 P.2d 889 (Kan. 1999) ..................................................................................15, 17

*Saddlewood Downs, L.L.C. v. Holland Corp.*,
   99 P.3d 640 (Kan. App. 2004) ...................................................................................6

*Schmid, Inc. v. Zucker's Gifts, Inc.*,
   766 F. Supp. 118 (S.D.N.Y. 1991) .........................................................................26

*Shaffer v. City of Topeka*,
   57 P.3d 35 (Kan. App. 2002) ...................................................................................15

*Sigg v. Coltrane*,
   253 P.3d 781 (Kan. App. 2010) ...............................................................................14

*Sunflower Bank, N.A. v. Kindsvater*,
   No. 95,308, 2006 WL 3000764 (Kan. App. Oct. 20, 2006) .......................................6

*T.S.I. Holdings, Inc. v. Jenkins*,
   924 P.2d 1239 (Kan. 1996) ......................................................................................30

*Talley v. Lamm*,
   No. 90,046, 2004 WL 235452 (Kan. App. Feb. 6, 2004) ........................................14

*The Law Co., Inc. v. Mohawk Constr. & Supply Co.*,
   702 F. Supp. 2d 1304 (D. Kan. 2010) ................................................................10, 21

*Ullmannglass v. Oneida, Ltd.*,
   927 N.Y.S.2d 702 (App. Div. 2011) ..................................................................23, 24

v

*Varney Bus. Servs., Inc. v. Pottroff*,
    59 P.3d 1003 (Kan. 2002) ......................................................................10

*Zenda Grain & Supply Co., v. Farmland Indus.*,
    894 P.2d 881 (Kan. App. 1995) ...............................................................6

**STATUTES**

K.S.A. § 33-106 ...........................................................................................13, 14

K.S.A. § 84-2-102, 105, 106 ................................................................................14

K.S.A. § 84-2-201 ...............................................................................................14

**OTHER AUTHORITIES**

Black's Law Dictionary .........................................................................................27

D. Kan. R. 56.1(b)(1) ...........................................................................................31

D. Kan. Rule 7.1(e) ................................................................................................3

Rule 26(a)(1) .........................................................................................................82

Rule 30(b)(6).........................................7, 32, 39, 45, 47, 56, 57, 61, 63, 65, 73, 74, 77, 83, 84, 86

vi

**<u>Introduction</u>**

AAFP asks the Court to enter summary judgment in favor of AAFP on all claims in the case.  As demonstrated in AAFP's opening brief and herein, AAFP complied with all of its obligations under the 2005 Agreement.  Boston Hannah's contention that the 2005 Agreement was amended to grant Boston Hannah additional rights—for which it paid AAFP absolutely nothing—is specious.  The 2005 Agreement was never amended.  Furthermore, the conduct by AAFP that Boston Hannah challenges was expressly authorized by the written terms of that contract.  And, Boston Hannah has not been damaged.  There is no evidence of lost profits.  Boston Hannah published all of the magazines authorized by the 2005 Agreement and received all of the revenue from them.  For each of these reasons, Boston Hannah's claims for breach of contract and violation of the implied duty of good faith and fair dealing fail.

Boston Hannah's claims for tortious interference are likewise without merit.  AAFP did not interfere with any contracts or proposed contracts between Boston Hannah and its advertisers.  In fact, AAFP never communicated with those advertisers, much less induced any of those advertisers to breach their agreements with Boston Hannah.  AAFP engaged in no "wrongful conduct" and Boston Hannah has suffered no damages.  In short, Boston Hannah cannot establish the essential elements of these claims.

AAFP's counterclaim for breach of contract is also ripe for summary judgment.  The relevant portions of the record are not in dispute and Boston Hannah's arguments to evade its obligations under the 2005 Agreement are untenable.  Consequently, AAFP asks the Court to grant its motion and enter summary judgment for AAFP on each claim in the case.

The grounds for this relief are fully explained in AAFP's opening brief and in the following pages.  To assist the Court, the statements of fact section at the back of this brief is comprehensive.  It restates the statements of fact from AAFP's opening brief, provides Boston

1

Hannah's responses and additional statements, and adds AAFP's replies.  AAFP has organized this information by statement of fact.  Thus, if the Court needs to view any statement of fact cited by any party in its briefing, the Court will have a single, organized resource that includes both parties submissions.

Including this resource lengthens this brief considerably, but hopefully for the benefit of the Court.  Notwithstanding the brief's overall length, the argument section is less than 30 pages as required by the Court's local rules and the Pretrial Order.

2

<u>**Argument**</u>

Each claim in the case is ripe for summary judgment in favor of AAFP.  Boston Hannah has not refuted AAFP's legal arguments, nor raised a disputed question of fact as to the essential points in the record.  Indeed, despite submitting a brief that egregiously violates the page limitations set by the local rules and the Pretrial Order,[1] Boston Hannah did not even address many of AAFP's arguments.  Accordingly, AAFP asks the Court to grant its motion.

## I.  AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON BOSTON HANNAH'S BREACH OF CONTRACT CLAIM.

As AAFP stated in its opening brief (Doc. 139) ("AAFP Motion"), Boston Hannah's breach of contract claim targets two communications that AAFP sent to Boston Hannah.  Specifically, Boston Hannah argues that, "The contents of the [2/3/10 Email] and the [3/5/10 Letter], and particularly the prohibition on the acceptance of advertising for beverages and dietary supplements and beverage and dietary supplement companies constitutes a breach of the parties' Production and Licensing Agreement."   AAFP Motion at 29 (quoting from Boston Hannah's interrogatory responses,[2] AAFP Ex. 46).  This claim is untenable.

---

[1] Under D. Kan. Rule 7.1(e), the arguments and authorities section of a brief may not exceed 30 pages without a court order.  Moreover, the Pretrial Order (Doc. 116), at 33, specifically prohibits the parties from filing any brief containing an arguments and authorities section in excess of 30 pages, absent a court order.  The arguments and authorities section of Boston Hannah's response (Doc. 155) ("Response") is 47 pages long.  Boston Hannah neither sought nor obtained leave to submit an argument section of that length.  By way of comparison, the arguments and authorities section of AAFP's summary judgment brief is 25 pages long.  There is no legitimate reason why Boston Hannah could possibly need nearly twice that many pages to respond.  Apparently, Boston Hannah's strategy is to substitute volume for merit.  This tactic imposes an unjustifiable burden on the Court and prejudices AAFP by placing it at a disadvantage for complying with the local rules and Court orders.  The appropriate remedy would be to consider the first 30 pages of Boston Hannah's argument, but not the final 17 pages.  Out of an abundance of caution, AAFP has replied to all of Boston Hannah's arguments, although space limitations do not permit AAFP to respond to all of Boston Hannah's many misstatements and false accusations.

[2] Boston Hannah served its original responses to AAFP's first interrogatories on January 21, 2011, and its amended responses on August 10, 2011.  Certificates of Service (Doc. 34, 129).  The scope of this claim was thus established at the outset of discovery and reaffirmed after the Pretrial Order was entered.

In its Response, Boston Hannah asserts that AAFP breached the 2005 Agreement by entering into the consumer alliance agreements with ███████████████████ and ████████  Response at 75.  If this is meant literally, Boston Hannah would be alleging a different breach from that specified in its interrogatory responses.  Boston Hannah cannot, however, change its sworn interrogatory responses by making different (and

3

**A.    AAFP did not breach the written terms of the 2005 Agreement.**

As required by the written terms of the 2005 Agreement, the parties produced a consumer-oriented health magazine each year from 2006 through 2010.  SOF 14-15, 33, 40.  The length of the magazines varied as did the distribution date, and these variations were permitted by the terms of the 2005 Agreement.  2005 Agreement at §§ 2.13, 3.2.  For each magazine, AAFP approved the selection of advertisers and the content of each advertisement.  SOF 70.  In short, AAFP complied with the written terms of the 2005 Agreement.  Boston Hannah admits this, reconfirming in its response that it does not allege that AAFP breached the 2005 Agreement with respect to any of the magazines that Boston Hannah published.  BH Response to SOF 45.

**B.    The 2005 Agreement was not amended.**

The accusations leveled by Boston Hannah are inextricably tied to additional terms that Boston Hannah claims were grafted onto the 2005 Agreement.[3]  Specifically, Boston Hannah maintains that AAFP's two communications breached provisions in the 2005 Agreement that purportedly (a) granted Boston Hannah the right to publish five additional magazines in 2010;

---

unsworn) assertions in its response to summary judgment.  *See Boyer v. Bd. of County Comm'rs of Johnson County*, 922 F. Supp. 476, 482 (D. Kan.1996) ("It is inappropriate to use a response to a motion to dismiss to essentially raise a new claim for the first time."); *Davis v. Seiter*, No. 96-3316, 1998 WL 404354, at *8 (D. Kan. June 30, 1998) (holding that court will not consider new claims raised for the first time in a response to summary judgment*); cf. In re Indep. Serv. Org's. Antitrust Lit.*, 85 F. Supp. 2d 1130, 1156 (D. Kan. 2000) (noting that courts will disregard even sworn declarations which are inconsistent with prior sworn testimony if the changes attempt to create a sham fact issue to prevent summary judgment).  Boston Hannah remains bound by its sworn interrogatory responses.

Moreover, the assertion that executing a consumer alliance agreement breached the 2005 Agreement is a non-starter.  The essence of Boston Hannah's claim is that AAFP breached § 2.2 of the 2005 Agreement by unreasonably withholding approval of advertising content.  Response at 76.  Section 2.2 does not prohibit AAFP from entering into contracts with other parties.  Nor does any other term of the 2005 Agreement.  Section 2.2 refers to the approval or rejection of the content of an advertisement proposed by Boston Hannah for placement in the magazine.

[3] To be clear, Boston Hannah does claim that AAFP breached § 2.2 of the 2005 Agreement.  But, this claim is dependent on the alleged amendments.  Boston Hannah does not allege that AAFP unreasonably withheld its approval of any advertisements in the printed magazines.  Nor could it.  AAFP approved all of those advertisements.  SOF 70.  Boston Hannah instead claims, for example, that AAFP breached § 2.2 by unreasonably withholding approval of banner advertisements on FamilyDoctor.org.  BH Response to SOF 70.  But, the 2005 Agreement does not grant Boston Hannah the right to place banner advertisements on FamilyDoctor.org.  SOF 57.  Thus, this contention, like all of Boston Hannah's breach of contract allegations, is dependent on the assertion that additional rights were granted to Boston Hannah through amendments to the 2005 Agreement.

4

(b) granted Boston Hannah the right to sell advertising on AAFP's website, FamilyDoctor.org; and (c) required AAFP to place an electronic version of the magazine on FamilyDoctor.org. *See* SOF 46, 47, 49, 53, 57.  None of these provisions, however, is in the 2005 Agreement.  SOF 46, 47, 49, 53, 57; 2005 Agreement (AAFP Ex. 19).  Nonexistent contract terms, of course, cannot be breached.  Thus, the threshold issue is whether the 2005 Agreement was amended as Boston Hannah alleges.  It was not, which compels summary judgment in favor of AAFP.

1.    **Boston Hannah is bound by § 9.1 of the 2005 Agreement, which requires any amendment to be in writing and signed by both parties.**

The 2005 Agreement explicitly and unambiguously addresses amendments to the contract.  Section 9.1 provides:  "*This Agreement may not be modified or amended except in writing signed by both parties hereto.*"[4] (emphasis supplied).  As noted in AAFP's opening brief, at 31-32, Boston Hannah and AAFP fully understood this requirement and repeatedly chose to commit themselves to it.   Under Kansas law, plain and unambiguous language must be interpreted according to its ordinary meaning.  *Riley State Bank v. Spillman*, 750 P.2d 1024, 1028 (Kan. 1988) (holding that, where a contract clause required a waiver to be in writing, course of conduct could not cause waiver).  Courts will not consider "extrinsic evidence—including the parties' course of conduct—to construe … documents" that are unambiguous.  *Penncro Assoc., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155 (10th Cir. 2007).

Citing the unpublished district court opinion in *Penncro Assocs., Inc. v. Sprint Spectrum L.P.*, 04-2549, 2006 WL 1320252 (D. Kan. May 15, 2006), Boston Hannah argues that, notwithstanding its unambiguous language, § 9.1 was modified by the parties through their course of dealing.  Response at 55.  Boston Hannah's reliance on this decision is misplaced.

---

[4] In § 9.1 the parties agreed to the criteria for an amendment.  These criteria are not meaningless technicalities.  They provide the parties with clarity and certainty about their rights and obligations as well as changes to those rights and obligations.

5

When *Penncro* was appealed, the Tenth Circuit reached a decision contrary to the district court on the precise issue for which Boston Hannah cites the district court opinion. Specifically, the Tenth Circuit rejected the assertion that course of dealing modified a contract, noting that the contract contained a clause that explicitly required any modification to be in writing. *Penncro*, 499 F.3d at 1159. As a result, the district court's opinion is not good law on this issue.

That conclusion is reinforced by a subsequent decision by the Kansas Court of Appeals. The district court's 2004 opinion in *Penncro* relies primarily on *Saddlewood Downs, L.L.C. v. Holland Corp.*, 99 P.3d 640, 646-47 (Kan. App. 2004), which involved a construction contract. In 2008, the Kansas Court of Appeals reexamined its decision in *Saddlewood Downs* and concluded that its holding and rationale were properly limited to the construction contract context:

> While, as [plaintiff] points out, there is ample authority to support the proposition that parties to a written contract may orally amend their contract, we find no authority outside the context of a construction contract that renders ineffective the clear expression of the parties that amendments to their written contract must also be in writing and signed by the parties. Accordingly, the district court did not err in finding that the written agreement was unambiguous and parol evidence was not admissible to alter the terms of the writing.

*Fitzmorris v. Shaffer*, No. 99,010, 2008 WL 4291642, at *4 (Kan. App. Sept. 19, 2008) (affirming the grant of summary judgment for defendant). Since *Fitzmorris* was decided in 2008, no Kansas decision has been to the contrary. No Kansas decision has since held that a non-construction contract containing a term like § 9.1 was amended by oral agreement or course of dealing. Boston Hannah certainly has cited none.[5] In sum, Boston Hannah is bound by § 9.1

---

[5] On pages 55 and 56 of its Response, Boston Hannah cites *EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447 (10th Cir. 1990); *Jayhawk Capital Mgmt, LLC v. LSB Indus.*, 08-2561, 2011 WL 1626581 (D. Kan. Apr. 28, 2011); *Custom Energy, LLC v. Liebert Corp.*, No. 98-2077, 2000 WL 876905 (D. Kan. June 12, 2000); *Sunflower Bank, N.A. v. Kindsvater*, No. 95,308, 2006 WL 3000764 (Kan. App. Oct. 20, 2006); and *Zenda Grain & Supply Co., v. Farmland Indus.*, 894 P.2d 881 (Kan. App. 1995). None of these cases involves a contract that contains a clause similar to § 9.1 in the 2005 Agreement. Boston Hannah also cites *Car-X Serv. Sys., Inc. v. Kidd-Heller*, 927 F.2d 511 (10th Cir. 1991), which did involve a contract with a clause similar to § 9.1. As discussed in the text, since the

6

and its requirement that any amendment to the 2005 Agreement be in writing and signed by both parties.

<p style="text-align:center"><strong>2.      Boston Hannah's asserted amendments are not in writing signed by both parties.</strong></p>

Appearing as Boston Hannah's Rule 30(b)(6) designee, Mr. Harrington testified that Boston Hannah contends there was one written amendment to the 2005 Agreement, the February/March 2009 email exchange.  SOF 46, 49; AAFP's reply to SOF 46.  In its Response, Boston Hannah tries to add two more alleged written amendments.  First, Boston Hannah argues that the development process used to produce the magazines was a written amendment of the 2005 Agreement.  Response at 57, 59.  Second, Boston Hannah claims that "media packs" were actually written amendments.  Response at 54, 64.

Boston Hannah is bound by the testimony of its Rule 30(b)(6) witness Mr. Harrington. *New Jersey v. Sprint Corp.*, No. 03-2071, 2010 WL 610671, *2 (D. Kan. Feb. 19, 2010). Accordingly, Boston Hannah's attempts to inject two new purported written amendments into the case at the summary judgment stage is impermissible.  *See Eads ex rel. Eads v. Unified School Dist. No. 289, Franklin County, Kan.*, 184 F. Supp. 2d 1122, 1131 (D. Kan. 2002) ("The plaintiffs' efforts to avoid summary judgment by asserting new claims and allegations will not find success in this court."); *Deghand v. Wal-Mart Stores, Inc.*, 926 F. Supp. 1002, 1015 (D. Kan. 1996) (on defendant's motion for summary judgment, court would not consider new facts and issues first alleged in plaintiff's response to summary judgment motion as they were not properly pleaded and appeared to be offered only in effort to avoid summary judgment); *Hanson v. Beloit Newspapers, Inc.,* No. 94-4023, 1995 WL 646808, at *11 n. 1 (D. Kan. Sept. 15, 1995) (A party may not amend its claims merely by arguing new facts and theories in opposition to the

1991 decision in *Car-X*, Kansas law has evolved as established and recognized by the Kansas Court of Appeals decision in *Fitzmorris* and the Tenth Circuit's opinion in *Penncro*.

<p style="text-align:center">7</p>

summary judgment motion); *Hullman v. Board of Trustees of Pratt Community College,* 732 F. Supp. 91, 93 (D. Kan. 1990) (A party cannot avoid the binding effect of the pretrial order by arguing new issues in its response to summary judgment).  Furthermore, contrary to Boston Hannah's claims, none of these is a written amendment signed by both parties.

### a.       February/March 2009 email exchange

The February/March 2009 email exchange is not a written amendment.  As noted in AAFP's opening brief, at 33, the February/March 2009 email exchange contains no signatures. Boston Hannah does not respond to this fact, which precludes a finding that the February/March 2009 email exchange amended the 2005 Agreement.  Furthermore, given the parties' track record of executing written amendments in hard copy format with handwritten signatures, SOF 7, 9, Boston Hannah had no basis to believe that an email exchange would suffice.

AAFP also demonstrated in its opening brief that the February/March 2009 email exchange began a dialogue between the parties that eventually resulted in the exchange of a draft written amendment.  AAFP Motion at 33-35.  That draft was never executed, however.  SOF 31. The parties' decision not to execute Proposed 2010 Agreement does not transform the February/March 2009 email exchange into a written amendment.   Indeed, in the most revealing statement in its Response, Boston Hannah writes that none of the alleged modifications to the 2005 Agreement—including those related to digital versions of the magazines, online advertising sales and multiple publications each year—was ever set forth in a written addendum.  Response at 53.  AAFP agrees.

### b.       The development process.

In addition to being barred by Mr. Harrington's testimony, *New Jersey,* 2010 WL 610671, at *2, the development process does not and could not constitute a signed, written amendment of the 2005 Agreement.  Boston Hannah admits as much.  Boston Hannah's list of the purported contract

8

modifications that were never part of a written addendum includes the development and scheduling of publications.  Response at 53.

Furthermore, Boston Hannah erroneously equates the evolution of the content of a magazine with amendments to the 2005 Agreement.  AAFP does not deny that in the course of developing a magazine there was give-and-take over the contents or that one of AAFP's editors was supposed to approve the final draft copy of the magazine.  In the course of that process, content of the magazine was revised, moved, edited, etc.  But, while that process modified the drafts of the magazine, it did not amend the 2005 Agreement.  Indeed the 2005 agreement provides for this development process at § 3.4.  Also, there is no evidence that any version or draft of any magazine, including the final version, contains the signatures of both parties.

AAFP does not deny that the parties worked together to produce a quality product.  But, the parties worked together within the overarching structure of the 2005 Agreement.  If the parties wanted to change a term of the contract or add a new right or obligation, that required a written amendment signed by both parties.  That did not occur.

### c.      Media packs

Boston Hannah's argument that media packs were a written amendment to the 2005 Agreement is also foreclosed by Mr. Harrington's testimony.  *New Jersey,* 2010 WL 610671, at *2. Furthermore, there is no admissible evidence of the contents of a media pack.  Boston Hannah attached BH Ex. 30 to its Response, but that exhibit and any assertions about the contents of that exhibit are inadmissible for the reasons stated in AAFP's reply to SOF 54.  Consequently, Boston Hannah's argument has no basis in the evidentiary record.  Furthermore, Boston Hannah has not offered any evidence that any media pack contained the signatures of both parties.  Although Boston Hannah claims that AAFP approved or, to use Boston Hannah's clever language, "signed

9

off on" the media packs, there is no evidence that either AAFP or Boston Hannah affixed their respective signatures onto any media pack.

Finally, even if BH Ex. 30 were admissible, it nowhere mentions the 2005 Agreement or otherwise purports to be an amendment to the contract.  To illustrate, Boston Hannah seeks to use BH Ex. 30 to show that advertisers were offered the ability to buy banner advertisements on FamilyDoctor.org.  Response at 64.  But, as Boston Hannah admits, "The only way for Boston Hannah to sell Banner Ads on FamilyDoctor.org was through its arrangement with AnswersMedia."  BH Response to SOF 58.  Thus, while Boston Hannah could tell advertisers that they could purchase advertisements for placement online, as well as in the printed *Family Doctor* magazines, Boston Hannah's ability to offer those options stemmed from two different sources:    (a) AAFP for the printed magazines, and (b) AnswersMedia for the online advertisements.  For that reason as well, Boston Hannah offering banner advertisements to advertisers is not evidence that the 2005 Agreement was amended.

> **3.     The alleged amendments were not supported by any additional consideration.**

Independent consideration is necessary for a modification to a written contract, or a waiver of its terms.  *The Law Co., Inc. v. Mohawk Constr. & Supply Co.*, 702 F. Supp. 2d 1304, 1330 (D. Kan. 2010).  "A promise is without consideration when it is given by one party to another without anything being bargained for and given in exchange for it."  *RF Stakeholders, LLC v. McGreevy's Midwest Meat Co., Inc.*, No. 10-1107-KHV, 2011 WL 1666914, at *3 (D. Kan. May 3, 2011) (citing *Varney Bus. Servs., Inc. v. Pottroff*, 59 P.3d 1003 (Kan. 2002)).  The modifications alleged by Boston Hannah are not supported by independent consideration and therefore are not amendments to the 2005 Agreement.

To begin with, Boston Hannah did not pay AAFP anything in exchange for the alleged amendments. Boston Hannah instead alleges that other benefits were conferred on AAFP. In its Response at 66-67, Boston Hannah cites to BH-SOF 108 and 113 to support this assertion. Because Boston Hannah's description of the evidence marshalled for those paragraphs is grossly inaccurate, AAFP turns directly to the evidence cited.

In BH-SOF 108, Boston Hannah cites BH Ex. 8, the February/March 2009 email exchange about Boston Hannah's totally different concept. In that exchange, Mr. Harrington and Mr. Springer both opine that the concept would be more attractive to advertisers. Boston Hannah also cites to excerpts from Mr. Springer's deposition during which he similarly stated that the concept of multiple publications should overcome one objection that ████████████ ████████ had to the magazines and make it more attractive to advertisers. Springer Dep. at 38:12-39:13; 41:11-42:3. Boston Hannah also cites the testimony of Ms. White, who stated that the patient education content that AAFP puts on its website, including the *Family Doctor* magazines, is good content for patients. White Dep. at 31:23-32:5. Patients were also mentioned in BH Ex. 65. Specifically, Mr. Springer wrote that a constant flow of health and wellness information would benefit patients. Boston Hannah's final citation is to a passage from the deposition of Mr. Harrington in which he asserts that the multiple publications would have a larger reach than the annual publication. Harrington 30(b)(6) Dep. at 309:14-24. In the testimony that followed, which Boston Hannah did not cite, Mr. Harrington went on to explain that he meant that he thought more patients would read the single-topic magazines. *Id.* at 310:4-21.

In BH-113, Boston Hannah cited to passages from the depositions of Mr. Harrington and Mr. Springer. Mr. Harrington stated that Mr. Springer introduced Boston Hannah to

11

AnswersMedia.  Mr. Springer testified that a multi-channel advertising offering would maximize appeal to advertisers, which he thought would be good for everyone including AAFP.  Mr. Springer also stated that he wanted to integrate the the *Family Doctor* magazines more closely with AAFP's business plan.

None of this is consideration to AAFP.  The hopes of Mr. Harrington and Mr. Springer about how advertisers would react to multiple magazines is not admissible evidence.  It is speculation.  There is no evidence of how any advertiser reacted to or viewed this concept. There is no evidence that advertising increased.  And, if it had, Boston Hannah, not AAFP, would reap the benefits.  If, as Boston Hannah claims, multiple magazines had been published under the terms of the 2005 Agreement, Boston Hannah would retain the proceeds from increased advertising sales that Mr. Harrington and Mr. Springer hoped would occur.  SOF 11.

As for patients, there is no evidence that any patient was in fact benefited by multiple magazines and no evidence that more patients read them as compared to prior offerings.  These asserted benefits are more inadmissible speculation.  If patients did benefit, that is not consideration to AAFP.  While AAFP certainly hopes that patients find the information AAFP provides to be helpful, benefits given to patients are not benefits received by AAFP.

In addition to citing to BH-SOF 108 and 113, Boston Hannah claims AAFP benefitted by receiving a digital version of the magazines, which "helped promote AAFP's Patient Education Program and FamilyDoctor.org."  There is no evidence of this, however.  For its argument, Boston Hannah cites to the 2005 Agreement, which nowhere mentions digital versions of any magazine, and BH Ex. 8, the February/March 2009 email exchange, which provides no support for Boston Hannah's argument as discussed above.

In sum, Boston Hannah has not presented any admissible evidence that AAFP received consideration in exchange for any of the modifications that Boston Hannah alleges. Lacking consideration, the alleged modifications were not valid and enforceable amendments and Boston Hannah's breach of contract claim fails as a matter of law.

### 4.        The alleged amendments are barred by the statute of frauds.

Boston Hannah does not dispute that the initial term of the 2005 Agreement was for longer than one year. BH Response to SOF 9. The 2005 Agreement is therefore subject to the statute of frauds. K.S.A. § 33-106. As a result, to be enforceable, the amendments alleged by Boston Hannah must be in writing and signed by AAFP. *See Riffel v. Dieter*, 157 P.2d 831, 838 (Kan. 1945); *Entz v. B & B Airparts, Inc*., 92 P.3d 613, 2004 WL 1489076 (Kan. App. July 2, 2004). Boston Hannah argues that the "written agreement in place between the parties" (presumably the 2005 Agreement), the February/March 2009 email exchange, and "the subsequent conduct of the parties" together satisfy the statute of frauds. Response at 69. They do not.

Boston Hannah cannot satisfy the signature requirement.[6] Although the 2005 Agreement is signed by AAFP, that will not supply the requisite signature for the alleged amendment. *Riffel*, 157 P.2d at 638. "A contrary rule would defeat the very purpose of the statute." *Id*. The February/March 2009 email exchange is not signed.[7] Boston Hannah does not contend

---

[6] For the reasons stated in AAFP's opening brief, at 37-38, Boston Hannah also cannot show that these documents "state the contract with reasonable certainty, so that the substance can be understood from the writing itself 'or by direct reference to some extrinsic instrument or writing, without having recourse to parol proof.'" *Raynor Mfg. Co. v. Raynor Door Co., Inc*., No. 07-2421, 2008 WL 913286, at *2 (D. Kan. Mar. 31, 2008).

[7] Rather than address the signature requirement, Boston Hannah devotes its argument to an inaccurate description of the February/March 2009 email exchange. For example, Boston Hannah claims Mr. Harrington "explained to Mr. Springer that he would like to publish two mini publications from each of the two areas in the first year, in lieu of the Fourth Edition of the Book." Response at 69. The exchange contained no indication that the magazines were to replace anything. Mr. Harrington simply wrote: "[f]or the first year, I would look to publish two mini publications from each of the two areas . . .." BH Ex. 8. As for the 2010 edition, the February/March 2009 email exchange said nothing at all.

13

otherwise.  Nor could it.  *Sigg v. Coltrane*, 253 P.3d 781, 784-85 (Kan. App. 2010) (an email exchange did not satisfy the statute of frauds' signature requirement).  As for the alleged "conduct of the parties," Boston Hannah does not specify to what this refers, cite any authority holding that conduct can satisfy the statute of frauds, nor demonstrate any conduct that constitutes a signature by AAFP.  Lacking the requisite signature, the alleged amendments fail to satisfy the statute of frauds.[8]

### 5.  AAFP is not equitably estopped from denying that there were amendments to the 2005 Agreement.

Boston Hannah's final attempt to avoid the plain language of the 2005 Agreement is its claim that, even if that there were no amendment to the 2005 Agreement, AAFP should be equitably estopped from denying that the contract was modified.  Response at 72-75.  Equitable estoppel exists when a party by its acts, representations, admissions, or silence induces another party to believe certain facts existed upon which the other party detrimentally relies.  *Hartford Underwriters Ins. Co. v. Kansas Dept. of Human Resources*, 32 P.3d 1146, 1155 (Kan. 2001).  Boston Hannah's equitable estoppel argument is without merit because AAFP never made any representations that the 2005 Agreement had been modified or that a written amendment was unnecessary.  Moreover, even if there were evidence of such representations, Boston Hannah could not have reasonably relied upon them under the circumstances.

---

[8] The primary case cited by Boston Hannah in its statute of frauds section is *Idaho Timber Corp. v. A.G. Spanos Const., Inc.*, No. 93,270, 2005 WL 2665763 (Kan. App. Oct. 14, 2005).  One issue in that case was the statute of frauds of the Uniform Commercial Code for written confirmations.  *Id.* at *6-9.  The U.C.C. does not apply to this case.  *See* K.S.A. § 84-2-102, 105, 106.  Moreover, the U.C.C.'s statute of frauds is different than K.S.A. § 33-106, and contains exceptions that are not recognized outside of the U.C.C. setting.  *Compare* K.S.A. § 33-106 *with* K.S.A. § 84-2-102.

Furthermore, most of Boston Hannah's citations to *Idaho Timber* are drawn from a portion of the opinion that addresses contract formation, not the (U.C.C.'s) statute of frauds.  Boston Hannah also cites to *Hutton Cont. Co. v. City of Coffeyville*, 487 F.3d 772 (10th Cir. 2007), and *Talley v. Lamm*, No. 90,046, 2004 WL 235452 (Kan. App. Feb. 6, 2004).  Neither decision involves the statute of frauds.  Boston Hannah's citation to *Talley* is additionally problematic because Boston Hannah's parenthetical description is of an issue that the Court held to be moot.  2004 WL 235452, at *3.

The party asserting equitable estoppel bears the burden to establish the following elements, each of which is necessary to prevail on such a claim: (1) the party was induced to believe certain facts as a result of another person's acts, representations, admissions, or silence when that person was under a duty to speak; (2) the party relied and acted upon those facts; and (3) the party would be prejudiced if the other person were allowed to deny the existence of those facts.[9]  *Fleetwood Enterprises v. Coleman Co.*, 161 P.3d 765, 777 (Kan. App. 2007) (citing *Rockers v. Kansas Turnpike Authority*, 991 P.2d 889, 894 (Kan. 1999)).  The right to estoppel must be clear under the circumstances of the case; the facts cited in support of equitable estoppel cannot be ambiguous or subject to more than one construction.  *Rockers,* 991 P.2d at 894. Furthermore, if any essential element thereof is lacking or is not satisfactorily proved, there can be no equitable estoppel. *Gillespie v. Seymour*, 823 P.2d 782, 789 (Kan. 1991).

Boston Hannah cannot show that it was induced to believe the 2005 Agreement had been amended by either AAFP's representations or by silence when AAFP was under a duty to speak. Boston Hannah argues that "[s]ignificantly, AAFP never told Boston Hannah that a modification was needed."  Response at 74.  However, Boston Hannah cannot establish that AAFP had a "duty to speak" concerning the need for a written, signed amendment, because Boston Hannah already knew this was required under § 9.1 of the 2005 Agreement.  *See Rockers,* 991 P.2d at 895-96 (denying claim for equitable estoppel by silence because the material information at issue was available to both parties); *see also Shaffer v. City of Topeka*, 57 P.3d 35, 39 (Kan. App. 2002) (no equitable estoppel where plaintiffs were not ignorant of the true facts concerning whether the statute of limitations had been complied with).  Boston Hannah, a signatory to the

---

[9] Boston Hannah's reliance on federal law to argue for equitable estoppel is misplaced, as the equitable estoppel doctrine is a matter of substantive state law.  *See, e.g., Comeau v. Mt. Carmel Medical Center, Inc.*, 869 F. Supp. 858, 863 (D. Kan. 1994) (applying Kansas law at summary judgment to claimed equitable estoppel in breach-of-contract action).

2005 Agreement, cannot in good faith argue that it was ignorant as to the true facts whether a modification of that agreement required a writing signed by both parties.  Indeed, the facts are undisputed that Boston Hannah was aware of § 9.1 when it executed the 2005 Agreement and had no problem with the provision.  SOF 12.  Boston Hannah also concedes that it cannot identify any right under the 2005 Agreement, including § 9.1, that AAFP relinquished.  SOF 13.  In other words, Boston Hannah knew that the contract required written and signed amendments and knew that AAFP had not waived that right.[10]

Boston Hannah's knowledge of § 9.1 forecloses its equitable estoppel claim.  In addition, even if the 2005 Agreement had no § 9.1, the result would not change.  Boston Hannah cannot show that AAFP's acts or representations induced it to believe the 2005 Agreement had been modified.  Mr. Springer clearly stated in the March 1, 2009 email to Mr. Harrington that he would "take a look at the contract" to see if an amendment was necessary, SOF 18, and Boston Hannah never inquired further about the matter.  Mr. Springer never represented to Boston Hannah that an amendment was unnecessary.  SOF 25.  On the contrary, in the fall of 2009, Mr. Springer let Mr. Harrington know that they would proceed with an amendment to the 2005 Agreement.  SOF 25.  And, Boston Hannah is bound by Mr. Harrington's testimony that he received a draft of the Proposed 2010 Agreement from Mr. Springer.  SOF 25.  Boston Hannah has not presented any admissible evidence of the contents of any media packs or shown that they communicate anything about Boston Hannah's rights under the 2005 Agreement.  Further, Boston Hannah has made an entirely unfounded allegation in claiming that AAFP represented that "if a formal addendum was needed AAFP would provide it to Boston Hannah."  Response at 74.  There is no evidence to support that statement.  That did not happen.

---

[10] Boston Hannah also knew that § 4.3 of the 2005 Agreement granted AAFP approval rights over the selection of advertisers.  See Argument § I.C., *infra*.

Under these circumstances, Boston Hannah has not clearly shown that AAFP misrepresented the facts concerning amendment of the 2005 Agreement. *Rockers,* 991 P.2d at 894 (the right to estoppel must be clear under the circumstances of the case; the facts cited in support of equitable estoppel cannot be ambiguous or subject to more than one construction). On the contrary, the facts suggest that Boston Hannah was derelict in its duties by not diligently pursuing a signed writing to preserve any rights it now claims under the "modified" contract. A party cannot base a claim of estoppel on its own acts or omissions induced by the party's own conduct. *Gillespie,* 823 P.2d at 785 ("A party may not properly base a claim of estoppel in its favor on its own wrongful act or dereliction of duty, or for acts or omissions induced by its own conduct.").

In the end, AAFP's acts and representations have consistently affirmed the importance and applicability of § 9.1. The parties chose to include § 9.1 in the original 2002 contract, then followed its requirements in amending the contract. In 2005, the parties again adhered to § 9.1 when they executed the 2005 Agreement. Thus, the parties showed their clear understanding of § 9.1 by following it. That the parties were working to put together a new Proposed 2010 Agreement further underscores their intention to be bound by § 9.1. Further, AAFP never represented that it waived the protections of § 9.1 or the statute of frauds. While the statute of frauds is not a categorical bar to equitable principles, equitable estoppel should not be lightly used to estop a party from asserting the protections and requirements of the statute of frauds in response to a claimed contract modification. *See Reno v. Beckett*, 555 F.2d 757, 767-69 (10th Cir. 1977) (applying Kansas law) (disallowing equitable estoppel argument to enforce a contract modification that did not comply with the Statute of Frauds). The circumstances of this case preclude Boston Hannah's claim for equitable estoppel.

17

### C.     Even if the 2005 Agreement were amended, AAFP did not breach it.

AAFP did not breach the 2005 Agreement even if it were amended, because § 4.3 of the 2005 Agreement expressly granted AAFP approval rights over the selection of advertisers.  SOF 11.  Boston Hannah has made no response to this argument, except to *concede* that § 4.3 "states that selection of advertisers is subject to the approval of AAFP."  BH Response to SOF 11.  The 2/3/10 Email and 3/5/10 Letter notify Boston Hannah that AAFP has approved ███████ and ███████ as the advertisers of beverages and supplements, respectively.[11]  No reasonable juror could conclude that these two communications were about the content of advertisements.  They do not instruct Boston Hannah to change the claims made in the ad copy or to airbrush a picture or anything else with respect to the pictorial or editorial content of an ad.  Put differently, after the two communications, if an ad of acceptable content was submitted from ██████, that ad would be approved.  But the same ad from another advertiser would not.  The issue addressed by the two communications is the advertiser, not advertising content.

Boston Hannah's failure to address § 4.3 is particularly notable because AAFP's reliance on it is not new.  AAFP expressly notified Boston Hannah of § 4.3 back in April of 2010 when the parties were trying to work out their dispute.  AAFP Ex. 27.  AAFP also highlighted it in its opening brief.  AAFP Motion at 38-39.  Nevertheless, Boston Hannah chose not to dispute or even respond to this argument.  Accordingly, whether or not the 2005 Agreement was amended,

---

[11] In its Response, Boston Hannah expresses indignation that AAFP discusses the advertising provisions in the consumer alliance agreements as relating to advertisements for beverages and supplements.  Such consternation is misplaced.  AAFP discusses this issue in the same manner that the parties did back in 2010.  For example, in the 4/8/10 Letter laying out his accusations against AAFP, Mr. Harrington describes the consumer alliance advertising provisions as banning any competitive drink or supplement advertisements.  SOF 72.  Boston Hannah also cannot dispute that AAFP never took the position that the provisions should be applied or interpreted more broadly.  SOF 72.  The expansive interpretation that Boston Hannah now insists is unreasonable was injected into the case when Boston Hannah filed its Second Amended Complaint very late in the discovery period.  Boston Hannah's motivation for such an expansion is clear.  The actual impact of ████████████ on the print magazines was negligible.  The four books published from 2008 to 2010 contain a grand total of two advertisements for beverages.  SOF 84.  The ████████████ did not apply to the print magazines at all.  SOF 67.

18

and it was not, the actions challenged by Boston Hannah did not breach the terms of the parties' contract.

### D.      Boston Hannah cannot establish it has suffered any damages.

As AAFP stated in its opening brief, at 39, Boston Hannah cannot establish that it has suffered any damages because there is no admissible evidence of any lost profits.  Boston Hannah has not presented any disputed issue of fact based in admissible evidence concerning its alleged lost profits.  For the numerous reasons stated in AAFP's Motion to Exclude any Report and Testimony of Douglas Miller (Doc. 136 and 137), as well as AAFP's Motion to Strike (Doc. 119, 120, 126, 132), the report of Boston Hannah's damages expert, Mr. Miller, is inadmissible. Undeterrred, Boston Hannah claims that under certain circumstances, lay witnesses can testify to a company's alleged lost profits.  *See* Response at 80.   Boston Hannah, however, does not attempt to identify what those circumstances are or show that they apply to this case.  In contrast, AAFP's opening brief presented caselaw supporting its argument that "[u]nder circumstances like those alleged here, damages for lost profits must be based on specialized knowledge."  AAFP Motion at 39.   Boston Hannah does not address this caselaw or otherwise respond to this position.   Furthermore, Boston Hannah has not presented any declaration, affidavit or other submission from any lay witness about Boston Hannah's alleged lost profits.  The record remains as it was:  devoid of admissible evidence of any lost profits.  Consequently, Boston Hannah has not shown any disputed factual issue on the damages element of its claim for breach of contract. Summary judgment in favor of AAFP is therefore warranted.

Even if there were evidence of lost profits, Boston Hannah has waived any right to publish additional 2010 magazines and to recover damages for allegedly being denied that right.

The waiver occurred through Boston Hannah's April 8, 2010 termination letter and cessation of work.  AAFP Motion at 40-41; SOF 73-74.[12]

Boston Hannah does not deny that it *could* have waived its rights to lost profits by terminating the 2005 Agreement and failing to perform further.  Instead, Boston Hannah claims the letter did not constitute a waiver because Boston Hannah did not have all information about the scope of the restrictions until litigation began.  Response at 81-82.  This is inaccurate.  When Mr. Springer notified Boston Hannah of the ███████████████, he attached a statement from AAFP setting forth the language of the exclusivity.  SOF 65.  Further, AAFP clarified the scope of the ██████████████ on a conference call on March 24, 2010.  SOF 71.  Mr. Harrington testified that he understood during this conference call that the restrictions on ███████ ██████████████████████████.  SOF 71.  Therefore, the record provides no support for Boston Hannah's assertion that it did not have sufficient information to waive its rights to lost profits.

## II.  AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON BOSTON HANNAH'S CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.

Boston Hannah misconstrues AAFP's arguments as to why Boston Hannah cannot establish any breach of the implied duty of good faith and fair dealing.  AAFP does not contend that the implied duty of good faith and fair dealing is always duplicative where there is some alleged contractual violation.   Rather, Boston Hannah is precluded *in this case* from claiming breach of the implied duty of good faith and fair dealing because:  (1) Boston Hannah relies

---

[12] Boston Hannah claims that it was forced send the letter, and to discontinue work, because AAFP had "destroyed all the potential of profitable publications."  BH Response to SOF 73.  AAFP has demonstrated that this is false. SOF 83, 85.  Moreover, Boston Hannah inaccurately claims that the "risk of AAFP coming up with another banned advertising area" and that the "massive limitation" by the existing restrictions "would make it impossible for Boston Hannah to continue to perform."  BH Response to SOF 74.  This is mere speculation.  And, as discussed in greater detail in the section concerning AAFP's counterclaim, Boston Hannah's failure of performance is not excused by legal impossibility or impracticability.  *See* Argument, § IV., *infra*.  At any rate, Boston Hannah did not make these assertions in the 47 page argument section of its brief.

20

exclusively upon the purported breach of contract to establish a breach of the implied duty of good faith and fair dealing; (2) AAFP complied with all of its contractual obligations; and (3) the implied duty of good faith and fair dealing does not create or supply new contract terms.[13] *See Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1179 (D. Kan. 1990).

Furthermore, Boston Hannah cannot establish that AAFP's actions were commercially unreasonable, as required to demonstrate a breach of the implied duty of good faith and fair dealing.[14] *See Pizza Mgmt.*, 737 F. Supp. at 1179. Boston Hannah asserts that AAFP breached the implied duty by "unreasonably and unjustifiably" imposing advertising restrictions on not just the content of advertising, but also the types of companies Boston Hannah could solicit advertising from. Response at 84. In asserting this claim, Boston Hannah erroneously relies upon § 2.2 of the 2005 Agreement, which states "AAFP shall have the right to approve (such approval not to be unreasonably withheld) all advertising content prior to its acceptance for inclusion in the Book."

As AAFP explained in its opening brief and in § Argument § I.C., *supra*, § 2.2 does not govern the propriety of the alleged advertising provisions in the consumer alliance agreements. As Boston Hannah appears to recognize, those terms did not impact advertising *content*, but rather set forth the approved advertisers for certain product categories, namely beverages and

---

[13] Boston Hannah cites to *Law v. Law Co. Bldg. Assoc.*, 210 P.3d 676 (Kan. App. 2009) in support of its assertion that a party may establish a breach of the implied duty of good faith and fair dealing even if no express provisions of the contract have been breached. Response at 84. In *Law*, the court found it improper to collapse together claims for breach of the implied duty and for reformation of contract for purposes of determining the statute of limitation. *Id.* at 682-83. The court noted, however, that some of the assertions concerning the implied duty were dependent upon the reformation claim, while others were independent, in that they had no basis in the allegations concerning reformation. *Id.* at 682. Here, on the other hand, Boston Hannah's implied duty claim is entirely dependent upon the breach of contract allegations. *Law* is therefore inapplicable to the facts presented.

[14] Boston Hannah erroneously asserts that certain factors from *M West, Inc. v. Oak Park Mall, LLC*, 234 P.3d 833, 849 (Kan. App. 2010) are applicable to the analysis of whether a party breached the implied duty of good faith and fair dealing. The cited portion of *M West, Inc.* sets forth factors to consider in determining whether there is justification for a party's tortious interference with contract. *Id.* That portion of the opinion has nothing to do with the implied duty of good faith and fair dealing.

dietary supplements.  *See* Response at 84-85.  Thus, the alleged restrictions fell under another provision of the 2005 Agreement, § 4.3, which grants AAFP an unqualified right to approve or disapprove advertisers.  Because the right granted under § 4.3 contains no limitation, Boston Hannah is incorrect in asserting that the alleged restrictions exceeded AAFP's approval rights, or what was contemplated by the parties.[15]  *See* Response at 85.  Boston Hannah has failed to even respond to AAFP's argument concerning § 4.3, let alone present any genuine issue of material fact concerning the applicability of § 4.3.

Boston Hannah appears to suggest that AAFP breached the implied duty by acting in "bad faith."  *See* Response at 84-85.  Specifically, Boston Hannah states that AAFP demonstrated bad faith by not telling Boston Hannah about the advertising provisions in the consumer alliance agreements ███████████████████████████████████████ ██████████████  Response at 85.  However, Boston Hannah concedes that AAFP did not notify Boston Hannah of ███████████████ until February 2010 because ████████████████ ██████████████████ ██████████████████████████████████████ ███████████████████████████████████.  SOF 164.  Moreover, Boston Hannah was not notified of the ██████████████████ "months" afterwards, because it became effective █████████████ and AAFP notified Boston Hannah by ███████████.  SOF 66, 68.  Finally, notwithstanding the consumer alliance agreements, AAFP approved all advertisements proposed by Boston Hannah for the printed magazines, including ads for beverages and supplements.[16]  SOF 69, 75, 84.  That is the opposite of "bad faith."  Accordingly, summary judgment is warranted.

---

[15]  Of course, AAFP's approval rights also were not restricted to "unhealthy" products or "untrustworthy" representations, as Boston Hannah contends.  *See* Response at 85.

[16]  The implied duty of good faith and fair dealing will not amend the 2005 Agreement to add the various terms that Boston Hannah seeks.  *Pizza Mgmt.*, 737 F. Supp. at 1179.

## III.   AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON BOSTON HANNAH'S TORTIOUS INTERFERENCE CLAIMS.

### A.   AAFP did not tortiously interfere with Boston Hannah's existing contracts.

AAFP has established three grounds for summary judgment on Boston Hannah's claim that AAFP tortiously interfered with Boston Hannah's existing advertising contracts: (1) AAFP did not induce any advertiser to breach its contract with Boston Hannah; (2) there was no breach of the advertising contracts; and (3) Boston Hannah did not suffer any damages.[17]   Because Boston Hannah cannot establish three of the required elements of its claim, AAFP should be granted summary judgment.

New York law is clear that a claim for tortious interference with existing contract requires proof that the defendant induced a third party to breach its contract with the plaintiff. *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996); *Israel v. Wood Dolson Co.,* 134 N.E.2d 97, 99 (N.Y. 1956).   Boston Hannah does not assert and fails to show that AAFP induced any advertiser to breach its contract with Boston Hannah.   Rather than adress that issue directly, Boston Hannah seeks to avoid it by restating the elements of the claim to omit the requirement.   Response at 87 (citing *Ullmannglass v. Oneida, Ltd*., 927 N.Y.S.2d 702 (App. Div. 2011), for the incorrect proposition that it need only establish that "AAFP intentionally and improperly procured the breach of those advertising contracts").   Although the lower court in *Ullmannglass* stated the elements of the claim in abbreviated terms, it applied the correct, long-established standard.   In denying a motion to dismiss, the *Ullmannglass* court found that the plaintiff had alleged that the defendant wrongly induced the third party to breach its contract with the plaintiff.   927 N.Y.S.2d at 705.

---

[17] Rather than respond to AAFP's arguments, Boston Hannah devotes most of its time to asserting that AAFP had knowledge of Boston Hannah's existing advertising contracts.  This is wasted breath.  AAFP did not seek summary judgment on the basis that it had no knowledge of the advertising contracts.

23

Boston Hannah wrongly asserts that the exclusivity clauses in the consumer alliance agreements were "completely directed towards" beverage and dietary-supplement advertisers.[18] That is incorrect.  There is no evidence of communications between AAFP and any advertiser, nor evidence that any advertiser knew that AAFP had entered into an agreement with ████ ████.  Boston Hannah's argument therefore fails.  *See Boehner v. Heise*, 734 F. Supp. 2d 389, 404 (S.D.N.Y. 2010) (defendants did not directly interfere with any contract by causing customs to delay inspection of plaintiffs' ships, resulting in the cancellation of customer's orders, because defendants did not direct any activity towards the customers themselves).

Boston Hannah does not claim and could never show that any third party advertiser breached its agreement with Boston Hannah.  As explained in AAFP's opening brief, by the express terms of each advertising contract (quoted in uncontroverted SOF 77), withholding or withdrawing approval of an advertisement does not breach the advertising contract.  Boston Hannah does not respond to this argument.

There is no disputed question of fact with respect to AAFP's argument that Boston Hannah cannot show any damages.  Boston Hannah has presented no evidence of any damages to its reputation or goodwill from the alleged interference.  Thus, summary judgment is warranted.

**B.    AAFP did not tortiously interfere with Boston Hannah's prospective Business Relations**

Because Boston Hannah fails to establish the requisite elements for its claim of tortious interference with prospective business relations, AAFP should receive summary judgment.

---

[18] As a basis for this assertion, Boston Hannah cites to its responses to SOF 63 and 67, which quote from the advertising provisions in the consumer alliance agreements.  None of the language quoted mentions or is directed to any of the seven advertisers.  Boston Hannah also cites the report of its expert Mr. Miller.  That report is not admissible and, to quote Mr. Miller, really "has nothing to do" with the consumer alliance agreements.

AAFP's opening brief, at 47, notes that Boston Hannah failed to identify any proposed contract between itself and a third party, let alone present evidence that AAFP had knowledge of it.  In response, Boston Hannah contends that it had prospective advertising contracts with "many of its advertisers."  Response at 89.  It claims that "the parties" and its damages expert have recognized that "a significant number of the advertisers who had historically placed advertising in the *Family Doctor* Books and mini-magazines were recurring clients of Boston Hannah year after year."  Boston Hannah does not identify the alleged recurring clients.

There is no evidence that "the parties" recognized anything.  The sole source cited for this contention is the latest report of Boston Hannah's damages expert, Mr. Miller.  Response at 89 (citing BH Ex. 56).  For the reasons stated in AAFP's pending motions to strike and exclude Mr. Miller, BH Ex. 56 is not admissible.  Furthermore, his report does not allege that Boston Hannah had a proposed contract with any advertiser.  Nor does his report address whether AAFP had knowledge of any proposed contract between Boston Hannah and an advertiser, much less any of the seven advertisers who are the subject of this claim.  Thus, Boston Hannah has failed to provide this Court with any evidence of the first element of its claim:  that AAFP had knowledge of a proposed contract between Boston Hannah and any of the seven advertisers[19] at issue. *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104-05 (N.Y. 2004) (stating elements).

Because AAFP did not have any knowledge of a proposed contract between Boston Hannah and any of the seven advertisers, Boston Hannah also cannot establish the second or

---

[19] Boston Hannah vaguely indicates that its claim for tortious interference with prospective relations might be based in part upon prospective relations it had with ▮▮▮▮▮▮▮▮▮.  For example, in asserting that AAFP "interfered," Boston Hannah states "AAFP intentionally bypassed Boston Hannah and went directly to ▮▮▮▮▮ ▮▮▮▮▮▮▮ in order to negotiate advertising deals."  Response at 90.  ▮▮▮▮▮▮▮▮ are not among the seven advertisers who are the subject of this claim.  *See* AAFP SOF 78 and BH Response to SOF 78.  Moreover, AAFP could not possibly have interfered with any prospective relations between Boston Hannah and ▮▮▮▮▮▮, since the alleged restriction had absolutely no effect upon Boston Hannah's ability to sell advertising to either of those companies.  *See* ▮▮▮▮▮▮▮▮▮ (AAFP Ex. 36); ▮▮▮▮▮▮▮▮▮ (AAFP Ex. 37).

25

third elements of its claim: that AAFP intentionally interfered with that proposed contract, and but for the interference, the proposed contract would have been entered into. *Id.* AAFP could not have intentionally interfered with a proposed contract of which AAFP was not aware. And, absent intentional interference, Boston Hannah cannot show that the proposed contract would have been entered into but for the (nonexistent) interference.

The fourth element, interference by "wrongful means," *id.*, is also absent. The "wrongful means" inquiry is particularly rigorous under New York law, and generally requires a showing of "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, [or] some degrees of economic pressure."[20]  *NBT Bancorp. v. Fleet/Norstar Fin. Group*, 664 N.E.2d 492, 497 (N.Y. 1996); *see also Boehner*, 734 F. Supp. 2d at 405 ("unless the 'defendant engaged in conduct for the sole purpose of inflicting intentional harm on plaintiffs,' a defendant's actions must amount to a crime or an independent tort, such as fraud or misrepresentation").

Boston Hannah's response is to put aside the decisions of New York courts and create a new standard based on the definition of "malice" in Black's Law Dictionary. Response at 90. It is frankly difficult to reply to such an argument other than note the obvious: that will not fly. Perhaps aware of that, Boston Hannah next argues that AAFP directed economic pressure towards ████████████ by entering into consumer alliance agreements with them. Response at 91. This argument is of similar ilk.

---

[20] Boston Hannah cites *Schmid, Inc. v. Zucker's Gifts, Inc.*, 766 F. Supp. 118, 120-22 (S.D.N.Y. 1991), for the proposition that "a party's scheme to deprive a distributor of the fruits of its exclusive distribution contract" suffices to demonstrate "wrongful means." Response at 91. In *Schmid*, the court found the allegations of tortious interference sufficient because the defendants were alleged to have engaged in fraud. *Id.* at 120. Indeed, the defendants in *Schmid* were not even parties to the distribution agreement that was allegedly interfered with, but rather were "gray marketers" of the product subject to the plaintiff's exclusive distribution agreement. *Id.* Boston Hannah has made no similar allegations of fraudulent or other tortious conduct in its response, and the record would support no such assertion. *See* Response at 90-91. Moreover, *Carvel Corp.* makes clear that a plaintiff must generally show criminal or independently tortious conduct, or sole intent to harm, even if the defendant's conduct allegedly violated an exclusive distribution arrangement between plaintiff and defendant. 818 N.E.2d at 1102-04.

██████████████████ are not among the seven advertisers who are the subject of this claim (and there is no proposed contract between Boston Hannah and either).  AAFP SOF 78 and BH Response to SOF 78.  Furthermore, under New York law, a plaintiff can establish "wrongful means" through economic pressure only by demonstrating "extreme and unfair" economic pressure directed at the third party.  *Carvel Corp.*, 818 N.E.2d at 1105.  Boston Hannah does not explain how a medical society like AAFP coerced ████████████████████████████ during contract negotiations.  In any event, those companies could have walked away from the table at any time.  AAFP did not bear down on them with extreme and unfair economic pressure. Boston Hannah's supposedly contrary evidence is nonexistent.

Finally, there is no evidence of any damage to Boston Hannah's reputation and goodwill. Arguing to the contrary, Boston Hannah cites to SOF 78, which is Boston Hannah's recitation of the seven advertisers who are the subject of this claim.  That list does not include ██████████. Nevertheless, without any citation, Boston Hannah also claims damage to its relationship with ████████.  There is no evidence of a relationship or proposed contract between Boston Hannah and ██████████.   There is also no evidence that ██████████ thinks less of Boston Hannah because ████████ entered into a consumer alliance agreement.  In sum, Boston Hannah cannot establish any element of this claim.

27

## IV.     AAFP SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM

In response to AAFP's motion for summary judgment on its counterclaim for breach of contract, Boston Hannah argues that:  (1) it was not obligated to pay the 2010 royalty payment because the Fifth Edition of the magazine was not published; (2) its nonperformance was justified by AAFP's preceding alleged breach; and (3) it was impracticable and impossible for Boston Hannah to perform.  Response at 92-96.  These arguments are without merit.

Boston Hannah's argument about the 2010 royalty payment is untenable.   Boston Hannah's obligation to make the 2010 royalty payment is not contingent on the publishing of the fifth edition of the magazine or the issuance of an invoice.[21]   Under § 7.1(e) of the 2005 Agreement, both installments of the base royalty payments for each year's magazine (the "guaranty," to use the contract language) are due before the deadline for publishing the magazine.  Moreover, the fifth edition of the magazine was published, as there was a consumer-oriented health magazine published in 2010, *Understanding Over the Counter Medicines*. Despite Boston Hannah's efforts to label this a 2009 publication, the publication date of late February or early March 2010 is not disputed.  SOF 40.  Even if the 2005 Agreement had made the 2010 guaranty contingent on publication, that contingency occurred and the 2010 royalty payment of $150,000 was owed.

Boston Hannah's argument that it was justified in failing to make the payments required under the 2005 Agreement because of AAFP's prior breach is also without merit.  The 2005

---

[21] Boston Hannah has conceded that the 2005 Agreement established the royalty payment deadline and did not make the royalty payment contingent upon the issuance of any invoice.  SOF 92.  Nonetheless, Boston Hannah states that AAFP "represented that the second royalty was due upon completion of the *Family Doctor* Books," citing SOF 179 in support.  Response at 93.  This statement appears to reference the second 2009 royalty payment, not the 2010 royalty that is the subject of Boston Hannah's argument.  Moreover, as its source for this assertion, Boston Hannah cites only inadmissible evidence, as described more fully in AAFP's response to SOF 179.

Agreement was never amended, and AAFP never breached its terms.  Moreover, as explained in

AAFP's opening brief, at 51, Boston Hannah's breaches pre-date the alleged breach by AAFP.

Boston Hannah breached the agreement when the deadlines for various obligations (*see*

SOF 86-91 and 2005 Agreement) passed without payment by Boston Hannah:

| Description of Payment | Amount of Payment | Deadline for Payment |
|---|---|---|
| First half of 2007 inflationary adjustment | $1,575 | July 1, 2006 |
| Second half of 2007 inflationary adjustment | $1,575 | February 1, 2007 |
| First half of 2008 inflationary adjustment | $3,225 | July 1, 2007 |
| Second half of 2008 inflationary adjustment | $3,225 | February 1, 2008 |
| Second installment of 2009 Guaranty royalty | $75,000 | February 1, 2009 |
| First installment of 2010 Guaranty royalty | $75,000 | July 1, 2009 |
| First half of 2010 inflationary adjustment | $1,950 | July 1, 2009 |
| Second installment of 2010 Guaranty royalty | $75,000 | February 1, 2010 |
| Second half of 2010 inflationary adjustment | $1,950 | February 1, 2010 |
| Reimburse AAFP for  costs associated with *Understanding Over the Counter Medicines* | $23,822.46 | May 24, 2010 |

Boston Hannah's breach-of-contract claim is based on the 2/3/10 Email and 3/5/10 Letter.

*See* Argument, § I, *supra*.  With the exception of the final payment in the chart above, all of the

payment deadlines that Boston Hannah violated predated these communications.

Boston Hannah's final argument also fails.  As just noted, with one exception Boston

Hannah's payment obligations accrued before the alleged breach by AAFP.  AAFP's actions

could not have rendered payment by Boston Hannah impossible or impracticable.  Further, a

party may be relieved of a contractual obligation under the doctrine of impracticability only if

there exists objective impracticability (a question of law), *i.e.* "the 'thing to be done' cannot be

DB04/001520.0138/5231935.4DD02

done by anyone." *T.S.I. Holdings, Inc. v. Jenkins*, 924 P.2d 1239, 1248 (Kan. 1996).  A party is not relieved of its contractual obligations for subjective impracticability.  *Id.*

As to the one payment deadline that post-dates the alleged breach by AAFP, it was not impossible for Boston Hannah to pay the amount it owed.  According to Boston Hannah's Third Disclosures (AAFP Ex. 33), Boston Hannah claims that it had a gross profit on the *Understanding Over the Counter Medicines* publication of ████████, more than ██ times the reimbursable costs that it owed to AAFP for helping to produce the magazine that generated those profits.  It was not impossible or impracticable for Boston Hannah to comply with its reimbursement obligation or to pay the other debts owed to AAFP.

<div align="center">*     *     *     *     *</div>

In response to AAFP's request for attorney's fees, Boston Hannah asserts that AAFP can recover only those attorneys fees associated with its counterclaim for breach of contract.  Response at 96.  Boston Hannah cites nothing to support this argument, and AAFP submits that this issue would be more appropriately briefed after judgment on AAFP's counterclaim is entered.

### <u>Conclusion</u>

For the forgoing reasons, AAFP asks the Court to grant its motion and enter summary judgment in AAFP's favor on Boston Hannah's claims.  AAFP also requests the Court to enter judgment for AAFP on its counterclaim and to award AAFP its damages, interest, costs and attorneys' fees.

DB04/001520.0138/5231935.4DD02

**Statements Of Fact ("SOF")**

I.    **THE PARTIES**

        **SOF 1.**    The American Academy of Family Physicians ("AAFP"), headquartered in Leawood, Kansas, is a medical organization that represents more than 100,300 family physicians, family medicine residents and medical students nationwide.  Declaration of Todd Dicus ("Dicus Dec.") (Ex. 12) at ¶ 2.   The AAFP's mission is to preserve and promote the science and art of Family Medicine and to ensure high-quality, cost-effective health care for patients of all ages.  *Id.* ¶ 3.

        BH Response:  Denied.  Boston Hannah is without knowledge to admit this fact and thus denies the same.

        AAFP Reply:  SOF 1 is uncontroverted.  Boston Hannah's asserted lack of knowledge does not create a genuine fact dispute.  *Cincinnati Ins. Co. v. Transport Graphics, Inc.*, 2011 WL 2083960, *1 n.3 (W.D. Mo. May 19, 2011); *See* D. Kan. R. 56.1(b)(1) (requiring a party who is attempting to dispute a fact to refer with particularity to evidence in the record on which the party relies).

        **SOF 2.**    Boston Hannah International, LLC ("Boston Hannah") is an international publishing company with offices in England and the United States.  Harrington 30(b)(6) Dep. (Ex. 1) at 17:17-18:10; 18:8-25; 19:1-3.

        BH Response:  Admitted.

II.   **THE WRITTEN CONTRACTS AND WRITTEN AMENDMENTS**

    A.    **2002 Production and Licensing Agreement**

        **SOF 3.**    In 2002, Boston Hannah and AAFP entered into a Production and Licensing Agreement ("2002 Agreement," attached as Ex. 17).  Pretrial Order at 2-3, 4.  This was the first agreement entered into by the parties.  Harrington 30(b)(6) Dep. at 32:11-18.  The 2002 Agreement is a hard-copy, written document that bears the handwritten signatures of executives of AAFP and Boston Hannah.  2002 Agreement at 9; Pretrial Order at 2-3.

        BH Response:  Admitted.

        **SOF 4.**    AAFP's practice and policy is for its legal counsel to review and approve contracts before AAFP executes them.  Robinett Dec. (Ex. 15) at ¶ 2; Springer Dep. (Ex. 5) at 121:20-23.  Boston Hannah was aware that AAFP's legal counsel had to be involved before the 2002 Agreement could be approved and signed.  Harrington 30(b)(6) Dep. at 38:23-39:5.  And, in fact, AAFP's legal counsel did review the 2002 Agreement before it was approved and signed.  Robinett Dec. at ¶ 3; Harrington 30(b)(6) Dep. at 38:23-39:1.

        BH Response:  Admitted in part.  Boston Hannah does not dispute that it was aware that AAFP's legal counsel was involved in preparation and review before the 2002

31

Production and Licensing Agreement ("2002 Agreement") was approved and signed, but Boston Hannah clarifies that it is unaware of the exact process AAFP employs when drafting new agreements.  (Ex. 1, Harrington Rule 30(b)(6) Depo. 49:16-21).

              <u>AAFP Reply</u>:   SOF 4 is uncontroverted.  Nothing in Boston Hannah's response attempts to dispute anything in SOF 4.  For purposes of this motion, AAFP does not dispute Boston Hannah's assertion that it was unaware of the "exact process" AAFP employs when drafting new agreements.

         **SOF 5.**     Under the terms of the 2002 Agreement, Boston Hannah agreed to produce, publish and distribute a "Book" each year, *i.e.* "an annual consumer-oriented health magazine, focusing on health and lifestyle issues of importance to consumers and family physicians."  2002 Agreement at §§ 1.1, 2.1.  Boston Hannah was responsible for distributing the magazines to the practices of AAFP's members.  *Id.* § 2.6.  The size of AAFP's membership assured a large circulation for each magazine.  Boston Hannah received the right to sell advertising space in each magazine, and to retain the proceeds from those sales.  *Id.* § 2.2.  Boston Hannah's right to sell advertising was subject to various limitations.  *E.g. Id.* § 2.2 (requiring Boston Hannah to ensure that all advertising conforms to the then-current AAFP advertising guidelines, and granting AAFP approval rights over advertising content), § 4.3 (granting AAFP approval rights over the selection of advertisers).

              <u>BH Response</u>:  Admitted in part.  This purported statement of fact does not represent the entirety of the particular sections of the 2002 Agreement and is therefore incomplete.  Boston Hannah does not dispute that under the terms of the 2002 Agreement, Boston Hannah agreed to produce, publish, and distribute a "Book," "an annual consumer-oriented health magazine, focusing on health and lifestyle issues on importance to consumers and family physicians."  Boston Hannah does not dispute that the 2002 Agreement stated Boston Hannah was responsible for distributing the magazine to the practices of AAFP's members, or that the 2002 Agreement required Boston Hannah to produce a minimum of 500,000 copies of the Book in the first year.  The phrase "the size of AAFP's membership assured a large circulation for each magazine" is a conclusory opinion statement that fails to cite to any evidence on the record and should be disregarded.  Boston Hannah does not dispute that the 2002 Agreement states that Boston Hannah received the right to sell advertising space in each magazine, and to retain the proceeds from those sales, and that Boston Hannah was to ensure that all advertising conformed to the then-current AAFP advertising guidelines, as provided by AAFP.  However, Boston Hannah denies that AAFP was granted unqualified approval rights over advertising content, and states that this interpretation of the 2002 Agreement implies that AAFP had approval rights for advertisements without any limitations whatsoever, which is not supported by the evidence.  AAFP had "the right to approve (**such approval not to be unreasonably withheld**) all advertising content prior to its acceptance for inclusion in the Book." (Ex. 2, 2002 Agreement, § 2.2 (emphasis added)).

              <u>AAFP Reply</u>:  SOF 5 is uncontroverted.  AAFP agrees that it did not quote entire sections of the 2002 Agreement in SOF 5.  With respect to the size of the circulation of the magazines, Boston Hannah admits in its response to SOF 2 that it was responsible for distributing the magazines to the practices of AAFP's members.  As noted in SOF 1, AAFP has

<div align="center">32</div>

over 100,000 members.  That is a large circulation.  For purposes of this motion, AAFP does not dispute that Boston Hannah accurately quoted a portion of § 2.2 of the 2002 Agreement, which relates to the approval of the content of advertisers, or that Boston Hannah unilaterally added emphasis to some of the quoted language.  Boston Hannah's response to SOF 5 does not address § 4.3 of the 2002 Agreement, which governs AAFP's approval rights over the selection of advertisers.

       **SOF 6.**    The 2002 Agreement also included numerous additional terms establishing the various rights and obligations of the parties.  *See generally* 2002 Agreement. The parties expressly agreed that the written terms of the 2002 Agreement could not be modified except through a written and signed amendment.  Specifically, § 9.1 of the 2002 Agreement provides:  "This Agreement may not be modified or amended except by a writing signed by both parties hereto."

       <u>BH Response:</u>  Admitted in part. Boston Hannah does not dispute that the 2002 Agreement speaks for itself.  However, Boston Hannah denies that the parties expressly agreed that the written terms of the 2002 Agreement could only be modified through a written and signed addendum as is evidenced by the many modifications the parties made to the 2002 Agreement. (Ex. 1, 44:2-45:14).

       <u>AAFP Reply:</u>  SOF 6 is uncontroverted.  As established by SOF 3, Boston Hannah and AAFP agreed to the terms of the 2002 Agreement.  One of those terms was § 9.1, which provides that the 2002 Agreement may not be modified or amended except by a writing signed by both parties.  In the testimony Boston Hannah cites, Mr. Harrington argues that, after execution, the 2002 Agreement was amended over the years.  As AAFP has demonstrated in SOF 7 and 9, the terms of the 2002 Agreement were changed in writing twice, once in 2003 and a second time in 2005.  To that extent alone, AAFP does not dispute that the 2002 Agreement was modified.  The occurrence of any other amendments is inadmissible argument.  In any event, Boston Hannah's assertions do not controvert the fact that, when enacting the 2002 Agreement, the parties expressly agreed that the 2002 Agreement could not be modified except through a written and signed amendment.

    **B.**    **2003 Addendum**

       **SOF 7.**    In 2003, the parties amended the 2002 Agreement.  Pretrial Order at 3, 4; Harrington 30(b)(6) Dep. at 40: 22-41:1.  Consistent with § 9.1 of the 2002 Agreement, this amendment ("2003 Addendum," attached as Ex. 18), was a hard-copy, written document bearing the handwritten signatures of executives of AAFP and Boston Hannah.  2003 Addendum at 3; Pretrial Order at 3, 4.

       <u>BH Response:</u>  Admitted.

       **SOF 8.**    Consistent with its policy and practice, AAFP's legal counsel reviewed the 2002 Addendum before it was approved and signed.  Robinett Dec. at ¶ 4.

       <u>BH Response:</u>  Denied.  Boston Hannah is without knowledge regarding AAFP's "policies and procedures" to admit this fact and thus denies the same.

<div align="center">33</div>

AAFP Reply:  SOF 8 is uncontroverted for the reasons stated in AAFP's Reply to SOF 1.

## C.     2005 Production and Licensing Agreement

SOF 9.     In 2005, Boston Hannah and AAFP executed a new Production and Licensing Agreement ("2005 Agreement, attached as Ex. 19).  Pretrial Order at 3, 4.  Like the 2002 Agreement and the 2003 Addendum, the 2005 Agreement is a hard-copy, written document that bears the handwritten signatures of executives of AAFP and Boston Hannah.   2005 Agreement at 10; Pretrial Order at 3.  The initial term of the 2005 Agreement was for longer than one year.  2005 Agreement at § 10.1.  The 2005 Agreement is not a construction contract. Harrington 30(b)(6) Dep. at 47:12-23.

BH Response:  Admitted in part.  The initial term of the 2005 Agreement was 60 months.  (Ex. 3, 2005 Agreement, § 10.1).  The determination whether the 2005 Agreement is a construction contract is a legal conclusion and therefore should be disregarded.

AAFP Reply:  SOF 9 is uncontroverted.  For purposes of this motion, AAFP does not dispute that the initial term of the 2005 Agreement was 60 months.  As for the 2005 Agreement not being a construction contract, that is the testimony of Boston Hannah's 30(b)(6) representative, testimony that is binding on Boston Hannah.  *New Jersey v. Sprint Corp.*, No. 03-2071, 2010 WL 610671, *2 (D. Kan. Feb. 19, 2010).

SOF 10.    AAFP's legal counsel reviewed the 2005 Agreement before AAFP entered into the agreement.  Robinett Dec. at ¶ 5.  And once again, Boston Hannah knew this. Harrington 30(b)(6) Dep. at 50:5-16.

BH Response:  Admitted in part.  Boston Hannah does not dispute that it knew that AAFP's legal counsel reviewed the 2005 Agreement before AAFP entered into it, but clarifies that Boston Hannah does not know the exact process, policies and procedures AAFP employs when drafting and entering into contracts.  (Ex 1, 49:16-21).

AAFP Reply:  SOF 10 is uncontroverted.  For purposes of this motion, AAFP does not dispute Boston Hannah's assertion that it was unaware of the "exact process, policies and procedures" AAFP employs when drafting and entering into contracts.  That does not create a disputed question of fact as to anything in SOF 10.

SOF 11.    The 2005 Agreement reiterated many of the terms contained in the 2002 Agreement.  Boston Hannah continued to be obligated to produce, publish and distribute a Book, which the 2005 Agreement defines the same as the 2002 Agreement did, each year.  2005 Agreement at §§ 1.1, 2.1, 2.6.  Boston Hannah had the right to sell advertising space in each magazine and to retain the proceeds from those sales.  *Id.* § 2.2.   That right continued to be limited in various ways.  *E.g. Id.* §§ 2.2., 4.3.  For example, § 4.3 of the 2005 Agreement provides:  "Selection of advertisers is subject to the approval of AAFP."

BH Response:  Admitted in part.  This purported statement of fact does not represent the entirety of the particular sections of the 2005 Agreement and is therefore incomplete.  Boston Hannah does not dispute that the 2005 Agreement contained many identical terms as the 2002 Agreement.  Boston Hannah does not dispute that the 2005 Agreement provided that Boston Hannah was obligated to produce, publish, and distribute a Book, which the 2005 Agreement defined the same as the 2002 Agreement, each calendar year.  Boston Hannah does not dispute that the 2005 Agreement provided Boston Hannah the right to sell advertising space in each magazine and to retain the proceeds from those sales.  While Boston Hannah does not dispute that right continued to be limited, Boston Hannah clarifies that the 2005 Agreement specifically states, "Boston Hannah shall ensure that all advertising placed in the Book conforms to the then-current AAFP Guidelines for Advertising Content as provided by AAFP. AAFP shall have the right to approve (**such approval not to be unreasonably withheld**) all advertising content prior to its acceptance for inclusion in the Book."  (Ex. 3, § 2.2 (emphasis added)).  Boston Hannah does not dispute that § 4.3 of the 2005 Agreement states that selection of advertisers is subject to the approval of AAFP; however, Boston Hannah clarifies that § 4.3 of the 2005 Agreement also specifically states that "all advertisements must meet the specifications set forth in the 'AAFP Advertising Guidelines,' shown in Exhibit 1."  However, Exhibit 1 was never attached to the 2005 Agreement. (Ex. 1, 231:25-234:7, 237:5-25, Ex. 3, § 4.3; Ex. 4, 5/25/10 Hanaway/Guzman Email thread).

AAFP Reply:  SOF 11 is uncontroverted.  AAFP agrees that it did not quote entire sections of the 2005 Agreement in SOF 11.  For purposes of this motion, AAFP does not dispute that Boston Hannah's response quotes a portion of § 2.2 of the 2005 Agreement, which relates to the approval of the content of advertisers, or that Boston Hannah unilaterally added emphasis to some of the quoted language.  For purposes of this motion, AAFP also does not dispute that Boston Hannah's response quotes a portion of § 4.3 of the 2005 Agreement.  Boston Hannah's exhibit ("BH Ex.") 4 is not supported by any foundation and, therefore, is not admissible.  For purposes of this motion, however, AAFP does not dispute that the AAFP Advertising Guidelines were not attached to the 2005 Agreement.

**SOF 12.**   As had been the case with the 2002 Agreement, Boston Hannah and AAFP agreed that the 2005 Agreement could not be modified except through a written and signed amendment.  Specifically, § 9.1 of the 2005 Agreement provides:  "This Agreement may not be modified or amended except by a writing signed by both parties hereto."   Kevin Harrington, Boston Hannah's CEO, understood that this provision was contained within the 2005 Agreement at the time of execution.  Harrington 30(b)(6) Dep. at 62: 24-63:2; 63:18-64:3.  He had no issue with that term.  *Id.* at 142:11-15.

BH Response:  Admitted in part.  Boston Hannah does not dispute that the selected language of § 9.1 of the 2005 Agreement cited by AAFP speaks for itself.  Boston Hannah denies that Boston Hannah and AAFP agreed that the 2005 Agreement could not be modified except through a written and signed amendment. (Ex.1, 60:23-62:20, 75:17-76:12, 144:24-145:14).  Furthermore, the terms of the 2005 Agreement were not negotiated. (Ex. 1, 53:12-22).

DB04/001520.0138/5231935.4DD02

AAFP Reply:  SOF 12 is uncontroverted.  As established by SOF 9, Boston Hannah and AAFP agreed to the terms of the 2005 Agreement.  One of those terms was § 9.1, which provides that the 2005 Agreement may not be modified or amended except by a writing signed by both parties.  In the testimony Boston Hannah cites, Mr. Harrington argues that, after execution, the 2005 Agreement was amended over the years.  Even if that argument and legal conclusion were admissible evidence, which it is not, that would not create a question of fact about whether the parties agreed to § 9.1 when executing the 2005 Agreement.  As for Boston Hannah's assertion that the parties did not negotiate the terms of the 2005 Agreement, AAFP does not dispute Mr. Harrington received a draft of the 2005 Agreement and did not seek to change any terms, including § 9.1.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 53:12-22.

**SOF 13.**  Boston Hannah cannot identify any contract right granted to AAFP under the 2005 Agreement that AAFP gave up.  Harrington 30(b)(6) Dep. at 107:21-24.

BH Response:  Denied.  This purported statement of fact is a legal conclusion and AAFP misstates Boston Hannah's deposition testimony, and therefore should be disregarded. (Ex. 1, 107:16-24).

AAFP Reply:  SOF 13 is uncontroverted.  AAFP did not misstate Mr. Harrington's testimony, which is not a legal conclusion.  Mr. Harrington's testimony is the admission of Boston Hannah's 30(b)(6) representative testifying about a topic for which he was appearing on behalf of the company.  Boston Hannah made no objection to the questions or answers AAFP cites and the testimony is admissible and binding on Boston Hannah.  *New Jersey,* 2010 WL 610671, at *2.

## III.   THE PROPOSED, BUT NEVER EXECUTED, 2010 AGREEMENT.

**SOF 14.**  As required by the 2005 Agreement, in 2006 and 2007, Boston Hannah published a consumer-oriented, health magazine each year.  Ford Dep. (Ex. 2) at 61:8-11; Harrington 30(b)(6) Dep. at 67:1-11.

BH Response:  Admitted.

**SOF 15.**  Boston Hannah also published a consumer-oriented, health magazine in 2008.  Harrington 30(b)(6) Dep. at 67:12-16.  The 2008 magazine, however, began a steep downward trend in the size of the magazine; it contained approximately half of the number of pages of the previous magazines.  Ford Dep. at 61:12-15.  That did not result in a corresponding reduction in the production cycle, however.  It took about ten months, from the earliest part of January through October of 2008 for Boston Hannah to produce and publish the 2008 magazine.  *Id.* at 76:5-8.

BH Response:  Admitted in part.  Boston Hannah does not dispute that it published a consumer-oriented health magazine in 2008 and that it contained approximately half of the number of pages of the previous magazines, but clarifies that this was so that the appropriate ratio of advertisements to editorial pages could be followed.  (Ex. 5, Charles Ford Depo. 62:7-20).  Boston Hannah denies that the 2008 magazine "began a steep downward trend in the size of the magazine" and adds that this is argumentative, improper opinion testimony, is

36

not supported by any cited evidence, and should be disregarded.\* Even though the 2008 publication was smaller there remained a significant amount of advertising. (Ex. 6, 2008 *Family Doctor* excerpts). Boston Hannah does not dispute that it took about ten months to produce and publish the 2008 magazine.

> \*A standing order of this Court precludes AAFP from drawing inferences or improperly making its arguments within the statement of facts. *Bandy v. United States*, 2008 WL 1867991, at \*3 (D. Kan. April 24, 2008). Thus the numerous argumentative statements AAFP has made within its statement of facts should all be disregarded.

AAFP Reply: SOF 15 is uncontroverted. Boston Hannah's assertion that the approximately 50% reduction in size of the 2008 magazine was to maintain the ratio of advertisements to editorial pages is not supported by the testimony cited, and must therefore be disregarded. Indeed, in the testimony cited, Mr. Ford states that he does not know why the 2008 magazine was half the size of prior years. Ford Dep. (AAFP Ex. 2) at 62:7-12. The approximately 50% reduction in length demonstrates the steep downward trend in the size of the magazine.

**SOF 16.** Boston Hannah's advertising sales for the 2008 magazine were not sufficient for Boston Hannah to publish a magazine comparable in size to previous years. Ford Dep. at 77:9-12. Mr. Harrington wanted something different that would be more focused for advertisers. Harrington 30(b)(6) Dep. at 81:7-10.

BH Response: Admitted in part. Boston Hannah does not dispute that its advertising sales for the 2008 magazine were insufficient for it to publish a magazine comparable in size to previous years, but states that this purported fact misconstrues the evidence and should be disregarded. The reason Boston Hannah sold less advertising in 2008 was at a minimum partly because of the economic downturn in the United States. (Ex. 1, 19:16-20:8). Boston Hannah does not dispute that it sought to focus the magazines' topics, and that part of the reason for this was to benefit the advertisers in the tight market. However, Boston Hannah also wanted to focus the magazines' topics for the benefit of AAFP and its members. (Ex. 1, 76:22-77:9, 309:14-310:3; Ex. 7, Michael Springer Depo. 29:14-30:7, 49:17-50:4; Ex. 8, 2/24/2009 Harrington/Springer email thread).

AAFP Reply: SOF 16 is uncontroverted. Boston Hannah's response makes no sense. It does not dispute that its ad sales were insufficient to publish a magazine that was as lengthy as those published in prior years, but states nevertheless that AAFP has misconstrued the evidence. Boston Hannah then asserts that it sold less advertising in 2008 than in prior years, which is the point AAFP made in SOF 16. Boston Hannah's assertion that it wanted to focus the magazines for the benefit of AAFP and its members is not supported by any Boston Hannah citations and must therefore be disregarded.

**SOF 17.** Mr. Harrington wrote an email to Michael Springer, who was then AAFP's Vice-President for Publishing and Communications. 2/24/09 Email from Harrington to Springer ("2/24/09 Email") (Ex. 20); Harrington 30(b)(6) Dep. at 76:22-77:9. Mr. Harrington described a "totally different" concept for the *Family Doctor* magazines. 2/24/09 Email. He suggested publishing a "series of mini magazines" that were "focused on a specific area" with

"far fewer pages" than the prior publications. *Id.* The idea was to come out with the magazines quarterly. Harrington 30(b)(6) Dep. at 81:16-18. In addition to publishing these magazines, Mr. Harrington wanted to place a copy of each on FamilyDoctor.org, one of the AAFP's websites. 2/24/09 Email. Mr. Harrington did not set forth any detail concerning the placement of the digital version on FamilyDoctor.org, such as the location or number of links, or their duration on the site. *See id.* In the 2/24/09 Email, Mr. Harrington also indicated that he wished to reach an arrangement with AnswersMedia for some sort of online advertising. *Id.*

          BH Response: Admitted in part. Boston Hannah does not dispute that Mr. Harrington wrote an email to Mr. Springer in February 2009 describing a new approach to the *Family Doctor* Books, but the phrase cited by AAFP is taken out of context and mischaracterizes Mr. Harrington's testimony. The concept was actually similar to the annual Book; it was basically breaking up the larger annual Book into the subheadings that were in the annual Book, in order to ensure that each topical subheading reached its particular audience. (Ex. 1, 89:13-90:4; Ex. 9, Ashley White Depo. 26:7-13, 29:25-30:22; Ex. 10, 11/6/2009 Email). The mini-magazines were the parts that made up the annual publication. (Ex. 1, 90:5-14). In fact, Ashley White, AAFP's project manager and editor of the *Family Doctor* mini-magazines, (Ex. 9, 15:19-21, 17:23-18:7) described the mini-magazines as "the same publication—the same ideas, the same audience (patients), and the same use (for the waiting rooms and offices of our members). The only difference is that we're publishing smaller, topic-focused publications more often each year rather than one large pub[lication]." (Ex. 9, 28:4-9, 29:12-24; Ex. 11, 11/16/09 White Email). Ms. White said that the mini-magazines were the same project as the Book, just evolving. (Ex. 9, 29:25-30:22). Boston Hannah and AAFP had discussed the concept of mini-magazines for years, and it was initially AAFP who had wanted to publish mini-magazines back in 2002, when the parties entered their first Agreement. (Ex. 7, 11:1-12:10, 38:5-39:13).

          AAFP Reply: SOF 17 is uncontroverted. AAFP's description of Mr. Harrington's concept as "totally different" is completely faithful to the record. Mr. Harrington wrote that exact phrase to describe his concept. 2/24/09 Email (AAFP Ex. 20). At his deposition, he testified that, by using that phrase, he meant that his concept was "totally different from before." Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 78:16-19. Mr. Harrington's testimony is the binding admission of Boston Hannah's 30(b)(6) representative. *New Jersey,* 2010 WL 610671, at *2. As noted in SOF 17, Mr. Harrington's totally different concept encompasses numerous ideas. One of his ideas was to publish multiple magazines each year rather than the annual publication specified by the 2005 Agreement. SOF 17. Boston Hannah's response characterizes this change as the entirety of Mr. Harrington's totally different concept, but that characterization is not supported by Mr. Harrington's 2/24/09 email and is refuted by the additional factual statements in SOF 17 that address other suggestions made by Mr. Harrington. Boston Hannah does not respond to these additional factual statements, which are therefore uncontroverted. For purposes of this motion, AAFP does not dispute that Ms. White wrote the emails that are cited by Boston Hannah. Those emails do not controvert anything in SOF 17, however. Finally, for purposes of this motion, AAFP also does not dispute Boston Hannah's assertion that, as early as 2002, Boston Hannah and AAFP had discussed the possibility of multiple publications each year. In fact, the 2002 Agreement, at § 2.3, provided that the parties would discuss the possibility of smaller publications that would cover specific areas, such as Healthy Living. Notwithstanding those discussions, however, in both the 2002 and 2005

Agreements, AAFP and Boston Hannah agreed to a single publication each year.  SOF 5, 11. The 2005 Agreement also removed entirely the language requiring the parties to discuss the possibility of smaller, targeted magazines.  Harrington 30(b)(6) Dep. (BH Ex. 1) at 55:1-11.

      **SOF 18.**   Mr. Springer replied to Mr. Harrington's email on March 1, 2009, stating that he liked Mr. Harrington's totally different concept, thought it would be more appealing to the advertisers, and he "look[ed] forward to working through the details with" Mr. Harrington and/or Charles Ford, Boston Hannah's Managing Director.   3/1/09 Email from Springer to Harrington ("3/1/2009 Email") (Ex. 20); Harrington 30(b)(6) Dep. at 76:22-77:9. Mr. Springer also wrote that he would look at the 2005 Agreement and see if an amendment was necessary.  3/1/09 Email.  Mr. Harrington then responded with his thanks and promised to have more to share with Mr. Springer later in the week.  3/2/09 Email from Harrington to Springer (Ex. 20); Harrington 30(b)(6) Dep. at 76:22-77:9.

      <u>BH Response:</u>  Admitted in part.  AAFP's use of the phrase "totally different" misstates the evidence and implies that Mr. Springer thought the mini-magazine concept was a totally different publication, which is not supported by the evidence and should be disregarded.  Boston Hannah does not dispute that Mr. Springer replied and assented to the proposal suggested by Mr. Harrington.  (Ex. 8).  In fact, Mr. Springer testified that he had always wanted the publications to be quarterly and that the parties had discussed the possibility of mini-magazines for years.  (Ex. 7, 11:1-20, 12:4-10, 38:5-39:13).  In Mr. Springer's response where he emphatically approved Mr. Harrington's proposal, he even suggested additional modifications, such as making the virtual digital format searchable on the FamilyDoctor.org website and featuring a digital edition that could be emailed to particular groups of AAFP's members.  (Ex. 8).  Boston Hannah does not dispute that Mr. Springer wrote that he would look at the 2005 Agreement and see if an addendum was necessary, and adds that Mr. Springer never followed up with Mr. Harrington stating that any addendum was necessary.  (Ex. 1, 63:24-64:24; Ex. 7, 41:2-10, 84:1-85:17; Ex. 8; Ex. 12, Harrington Aff., ¶ 8).  Boston Hannah relied on this representation. (Ex. 12, ¶ 8).

      <u>AAFP Reply:</u>  SOF 18 is uncontroverted.  For the reasons stated in AAFP's reply to SOF 17, describing Mr. Harrington's new concept as "totally different" is completely faithful to the record.  Boston Hannah, however, departs from the record by asserting that Mr. Springer's responsive email "emphatically approv[ed]" Mr. Harrington's concept.  As AAFP quoted in SOF 17, Mr. Springer wrote that he liked the concept, looked forward to working through the details, and he offered additional ideas for consideration, such as featuring a digital edition and a searchable site on FamilyDoctor.org.  3/1/09 Email (AAFP Ex. 20).  While that is a green light to additional discussions, one cannot reasonably infer that a specific proposal to amend any particular provision in the 2005 Agreement was made or accepted.  Boston Hannah's assertion that Mr. Springer never told Mr. Harrington that an addendum to the 2005 Agreement was necessary is barred by the record.  As Boston Hannah's Rule 30(b)(6) witness, Mr. Harrington testified that Mr. Springer sent him a proposed draft amendment to the 2005 Agreement.  SOF 25; Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 125:2-17.  That testimony is binding on Boston Hannah.  *New Jersey,* 2010 WL 610671, at *2.

<div align="center">39</div>

**SOF 19.**    The parties continued to communicate about Mr. Harrington's idea. On March 4, Karen Montemayor, the Senior Associate Editor at AAFP who was responsible for the *Family Doctor* magazines at that time, emailed Mr. Ford that the format of the magazine was still under discussion, with one option being several smaller, possibly topic-specific editions that are published throughout the year.  3/4/09 Email from Montemayor to Ford (Ex. ); Montemayor Dec. (Ex. 14) at ¶ 4; Ford Dep. at 77:21-78:1, 80:25-81:4.  In his March 5 response, Mr. Ford agreed, writing that "nothing has been firmly agreed as yet but I think by next week we may all have a clear understanding of the new direction."  3/5/09 Email from Ford to Montemayor (Ex. 38); Ford Dep. at 81:5-13.  As of March 5, there had been no agreement about any changes to the format of the *Family Doctor* publication.  Ford Dep. at 81:5-13.

        **BH Response:**  Admitted in part.  Boston Hannah does not dispute the contents of this email correspondence.  However, at the point in time this correspondence was written, Mr. Harrington and Mr. Springer, the liaisons for the parties, had reached an agreement regarding the publication of the mini-magazines, including how many were to be published, to make up the Fourth Edition of the *Family Doctor* Book.*  (Ex. 1, 308:2-316:1; Ex. 7, 10:12-16, 75:10-76:3, 60:15-20; 84:1-85:17).

        *Pursuant to the 2005 Agreement, each year that the *Family Doctor* Book was published it was termed an "Edition." (2005 Agreement, §§ 7.1(a)-(e). Thus, throughout this Response, Boston Hannah refers to the 2009 mini-magazines collectively as the "Fourth Edition" and refers to any *Family Doctor* publications that would have been published in 2010 as the "Fifth Edition." (See Ex. 12, ¶¶ 10 and 11).

        **AAFP Reply:**  SOF 19 is uncontroverted.  Nothing cited by Boston Hannah supports its assertion that, "at the point in time this correspondence was written," *i.e.* as of March 5, 2009, Mr. Harrington and Mr. Springer had agreed on the publication of mini-magazines, the exact number of mini-magazines or that certain mini-magazines would constitute the Fourth Edition of the Book.  This assertion must therefore be disregarded.  In the footnote added to its response, Boston Hannah states that the 2005 Agreement refers to "Edition[s]" of the publication.  Boston Hannah then unilaterally announces that "Fourth Edition" refers collectively to *Living with Diabetes*, *Healthy Living* and *Understanding Over the Counter Medicines*.  The 2005 Agreement does not define edition that way, however.  The 2005 Agreement (AAFP Ex. 19), at § 1.1, provides for the annual publishing of a "consumer oriented health magazine, focusing on health and lifestyle issues of importance to consumers and family physicians."  The first edition was required to be published by April of 2006, with subsequent editions to be produced and available for distribution no later than April in each calendar year.  2005 Agreement (AAFP Ex. 19) at § 2.1.  This is also reflected in the payment obligations stated in the subparagraphs to § 7 of the 2005 Agreement, which refer to each edition as the magazine and any updates published up to an including April of the year in question.  2005 Agreement (AAFP Ex. 19), at § 7.1(a)-(e).  Boston Hannah's attempt to define Edition differently than the 2005 Agreement does is not a statement of fact, is confusing and potentially misleading, is argumentative and does not controvert anything in SOF 19.

        **SOF 20.**    Not quite two months later, nothing had changed as reflected in an email Mr. Springer wrote to Mr. Ford:  "Our editors have been waiting with baited breath as we

figure out what the new format and approach will be."  4/22/09 Email from Michael Springer to Charles Ford (Ex. 40); Springer Dep. at 108:5-9; Ford Dep. at 88:18-89:21, 92:13-17.

BH Response:  Admitted in part.  Boston Hannah does not dispute the quoted material is contained within the email from Mr. Springer to Mr. Ford.  However, Boston Hannah denies that "nothing had changed," and states that this purported fact is actually an improper conclusory opinion that is unsupported by the cited evidence and contrary to the testimony, and therefore should be disregarded.  The actual testimony demonstrates that as soon as Mr. Springer told Boston Hannah that AAFP was comfortable with the formatting change from one Book to multiple mini-magazines, Boston Hannah began the planning and branding process for the mini-magazines, and thus, worked with AAFP very closely throughout that process, and as of late February/early March of 2009, both parties believed they had come to an agreement and were moving forward in regards to the new model.  (Ex. 1, 81:19-82:12; Ex. 7, 82:23-85:17, 121:4-19; Ex. 8, Ex. B, 6/13/09 Springer/Harrington Email thread, attached thereto).  Nothing in Mr. Ford's deposition testimony supports AAFP's purported fact and therefore it should be disregarded.

AAFP Reply:  SOF 20 is uncontroverted.  As noted in SOF 19, Mr. Ford wrote in early March 2009 that "nothing has been firmly agreed as yet."  In late April 2009, Mr. Springer wrote Mr. Ford that AAFP's editors were waiting as the parties figure out what the new format and approach would be.  SOF 20.  Thus, in that nearly two months, nothing had changed in terms of the lack of agreement between the parties.  For purposes of this motion, AAFP does not dispute that Mr. Springer testified that at some point in time the parties proceeded on the assumption that an agreement had been reached on a new model.  As noted, however, that point in time had to have been some point after April 22, 2009, when the same Mr. Springer wrote that the parties were still trying to figure out what the new format and approach would be.  Finally, AAFP agrees that the cite to Ford Dep. (AAFP Ex. 2) at 92:13-17 does not relate to the substance of SOF 20 and AAFP withdraws that citation.  The other Ford Dep. citation provides additional foundation for the 4/22/09 email.

**SOF 21.**   In the meantime, Mr. Springer spoke with Dr. Doug Henley, AAFP's CEO, and Todd Dicus, AAFP's COO, to lay out the idea for a new direction for the *Family Doctor* magazines.  Springer Dep. at 84:19-85:6.  No specifics were discussed; the conversation was "couched in the terms of we will probably need to update the [2005] agreement or do an addendum or something like that."  *Id.* at 122:8-123:4.

BH Response:  Denied.  Boston Hannah is without knowledge to admit this fact and thus denies the same.  Dr. Doug Henley, Executive Vice President of AAFP, and Todd Dicus, Deputy Executive Vice President at AAFP, approved the new model for the Book in February 2009 and Boston Hannah operated in reliance on that approval.  (Ex. 7, 121:4-19, 122:13-18; Ex. 12, ¶ 8, Ex. 13, 6/13/06 Springer Email with Henley Quote).

AAFP Reply:  SOF 21 is uncontroverted.  For the reasons stated in AAFP's reply to SOF 1, Boston Hannah's asserted lack of knowledge does not create a disputed question of fact as to anything in SOF 21.  Boston Hannah's assertion that Dr. Henley and Mr. Dicus approved the new model is not supported by the evidence cited.  In fact, examination of

41

the record demonstrates the opposite.  For example, Boston Hannah cites 122:13-18 from the Springer deposition (BH Ex. 7).  The testimony Boston Hannah cites, which is italicized, and the surrounding testimony is as follows:

> Q.      Now, the process of approving an amendment at the AAFP includes legal review; correct?
>
> A.      It does.
>
> Q.      Did you talk to legal counsel at AAFP about your proposed changes to the *Family Doctor* publication?
>
> A.      I don't recall having specific conversations with the general counsel about it.  I remember getting this communication with Mr. Dicus and sort of taking that as the lead of what a new agreement would look like.
>
> Q.      Okay.  Did you ever obtain approval from Mr. Dicus for the – any amendment to the 2005 agreement/
>
> A.      For the document itself?  No.  Beyond the exchange we had here.
>
> *Q.      So no approval from legal counsel or Mr. Dicus?*
>
> *A.      Other than the approval from Dr. Henley and Mr. Dicus in February when I told them we were proceeding with a new model and did that sound okay to them.*
>
> Q.      And to make sure that I understand that communication, was it as general as what you just described?
>
> A.      Yes, it was.
>
> Q.      Was it more specific as to any term that might be amended?
>
> A.      No, I don't believe we discussed any specifics.  It was more couched in the terms of we will probably need to update the agreement or do an addendum or something like that.

This testimony is not evidence that Dr. Henley and Mr. Dicus approved Mr. Harrington's totally different model.  Rather, as stated in SOF 21, Mr. Springer laid out the idea for a new direction, but did not discuss any specifics.  As explained in SOF 24, the eventual outcome of these discussions was a direction by Mr. Dicus that Mr. Springer should work on a new contract.

Boston Hannah also cites ¶ 8 from BH Ex.12, an affidavit by Mr. Harrington that Boston Hannah submitted with its response.  That paragraph does not assert that Dr. Henley and Mr. Dicus approved anything or that Boston Hannah relied on any approval by Dr. Henley or Mr. Dicus.  Furthermore, ¶ 8 is not admissible evidence.  It asserts that, in his 3/1/09 email, Mr. Springer "assented" and "approved" Mr. Harrington's concept.  The 3/1/09 email speaks for itself.  Mr. Harrington does not have personal knowledge for his contentions about what Mr. Springer meant by his email.  This aspect of his affidavit therefore is not admissible.

Finally, Boston Hannah cites BH Ex. 13.  That exhibit is not admissible either.  Boston Hannah has provided no foundation for the exhibit.  Even if foundation had been laid, the exhibit appears to contain multiple levels of hearsay.  Accordingly, BH Ex. 13 is not admissible.  Furthermore, BH Ex.13 purports to be an email from 2006.  Boston Hannah does not attempt to

42

explain how the exhibit allegedly from 2006 relates to the events in 2009 that are the subject of SOF 21.

SOF 22.   That conversation did not immediately result in a draft amendment. But, by August of 2009, Mr. Springer was again communicating with Mr. Dicus about amending the 2005 Agreement.  Springer Dep. at 111:3-112:13; 8/28/09 Email Exchange between Dicus and Springer ("8/28/09 Email Exchange") (Ex. 21).  Mr. Dicus asked Mr. Springer to provide him with all current agreements that relate to work Boston Hannah was doing for AAFP. 8/28/09 Email Exchange.  Mr. Springer promised to provide the "current agreement with Boston Hannah" and noted that Boston Hannah and AAFP had been intending to amend it to change the frequency and format of the publication.  *Id.*; Springer Dep. at 112:7-113:3.

BH Response:  Denied.  Boston Hannah is without knowledge to admit this fact and thus denies the same.  After the February 2009 email exchange, Boston Hannah and AAFP proceeded on the assumption that they had made an amendment, and were moving forward with the new model of publishing mini-magazines in place of the annual Books. (Ex. 1, 75:17-76:12; 81:11-82:4, 156:11-157:7; Ex. 7, 40:2-10, 121:4-19; Ex. 12, Ex. B attached thereto).  Mr. Springer testified that having the proper paperwork written up documenting the new arrangement between the parties was not a huge priority to him or AAFP (Ex. 1, 121:4-19), as the parties were operating in good faith. (Ex. 1, 44:12-25, 75:17-76:12; 190:5-191:18; Ex. 7, 121:4-19; Ex. 12, ¶¶ 4, 7 and 8).

AAFP Reply:   SOF 22 is uncontroverted.  For the reasons stated in AAFP's reply to SOF 1, Boston Hannah's asserted lack of knowledge does not create a disputed question of fact as to anything in SOF 22.  The remainder of Boston Hannah's response does not address anything in SOF 22.  As to the allegations in the remainder of Boston Hannah's response, for purposes of this motion, AAFP does not dispute that Mr. Springer testified that at some point in time the parties proceeded on the assumption that an agreement had been reached on a new model, that having "paperwork chase that new arrangement was not a huge priority," and that the parties were acting in good faith.  None of that, however, controverts anything in SOF 22.

SOF 23.   A few days later, Mr. Springer forwarded a copy of the 2005 Agreement to Mr. Dicus along with a note suggesting a possible amendment.  The note reads:

Todd, per your request, here is our contract with Boston Hannah.  The change we might consider is amending the definition of the "Book" from an annual.  We could say that AAFP and BH may decide to change the frequency of publication if you think it's necessary.

8/31/2009 Note from Springer to Dicus (Ex. 22); Dicus Dep. (Ex. 6) at 35:6-37:1; Springer Dep. at 114:24-116:22.

BH Response:  Denied. Boston Hannah is without knowledge to admit this fact and thus denies the same.

AAFP Reply:  SOF 23 is uncontroverted for the reasons stated in AAFP's reply to SOF 1.

43

SOF 24.    Following his receipt of this handwritten note, Mr. Dicus and Mr. Springer had conversations about the relationship between Boston Hannah and AAFP.  Dicus Dep. at 36:9-37:1.  They also exchanged another set of emails, which concluded with Mr. Springer writing:  "I'll let you know as soon as I have something, and we can figure out how we need to amend the agreement in light of the evolving market realities."  9/12/09 email from Springer to Dicus (Ex. 21); Springer Dep. at 111:3-9.  Mr. Dicus directed Mr. Springer to work on a new contract.  Dicus Dep. at 41:7-18.

BH Response:  Denied.  Boston Hannah is without knowledge to admit this fact and thus denies the same.

AAFP Reply:  SOF 24 is uncontroverted for the reasons stated in AAFP's reply to SOF 1.

SOF 25.    Mr. Springer let Mr. Harrington know that they were going to proceed with an amendment to update the 2005 Agreement.  Springer Dep. at 119:23-120:17.  Mr. Harrington never told Mr. Springer that an amendment was unnecessary.  Harrington 30(b)(6) Dep. at 110:19-111:7.  Mr. Springer and Mr. Harrington did not exchange a draft of a proposed amendment, however, until January of 2010.  *Id*. at 124:10-17; Springer Dep. at 129:18-130:4; 133:1-10; Proposed Production and Licensing Agreement ("Proposed 2010 Agreement") (Ex. 26).  The purpose of the Proposed 2010 Agreement was to capture the terms under which AAFP and Boston Hannah wanted to move forward.  Springer Dep. at 132:17-24.

BH Response:  Admitted in part.  After the February 2009 email exchange, AAFP never represented to Boston Hannah that an amendment to the 2005 Agreement was necessary. (Ex. 12, ¶ 8).  Boston Hannah denies that Mr. Harrington never told Mr. Springer that an amendment was unnecessary and states that AAFP has taken Mr. Harrington's testimony out of context and should therefore be disregarded.  Rather, Mr. Harrington left it up to AAFP to decide whether an amendment was necessary and Boston Hannah was more than happy to oblige any decision AAFP made regarding the same.  (Ex. 1, 94:4-17, 114:4-115:7).  Boston Hannah does not dispute that Mr. Springer and Mr. Harrington did not exchange a new 2010 draft agreement until January of 2010, but this fact is incomplete.  The reason a draft of a the proposed 2010 agreement was circulated in 2010 rather than any amendment to the 2005 Agreement in 2009 was because throughout 2009, AAFP intentionally stalled the drafting of any proposed amendment to the 2005 Agreement because of ███████████████████████ ████████████████████████████████████████████████████████████ █████████████  (Ex. 7, 123:10-124:15).

AAFP Reply:  SOF 25 is uncontroverted.  As AAFP noted in SOF 25, Mr. Springer testified that he told Mr. Harrington in the fall of 2009 that they were going to proceed with an amendment to update the 2005 Agreement.  Boston Hannah responds by citing to Mr. Harrington's affidavit (BH Ex. 12 at ¶ 8), which reads in relevant part:  "Following Mr. Springer's email communications in March 2009, I never received any correspondence from AAFP stating that a formal written addendum was necessary or preferred."  This carefully

44

drafted statement is limited by medium ("correspondence") and format ("formal written addendum"). It does not controvert Mr. Springer's testimony, which is not similarly restricted. *See, e.g.*, Springer Dep. (BH Ex. 7) at 123:10-18. Moreover, Mr. Harrington testified that he received a draft of the Proposed 2010 Agreement from Mr. Springer. SOF 25. Boston Hannah is bound by this testimony and cannot create a disputed question of fact by offering an affidavit that is contrary to the testimony of Boston Hannah's Rule 30(b)(6) witness, particularly an affidavit from the same individual who appeared as a 30(b)(6) witness. *In re Indep. Serv. Org's. Antitrust Lit.*, 85 F. Supp. 2d 1130, 1156 (D. Kan. 2000).

Contrary to Boston Hannah's argument, Mr. Harrington's testimony that he never told Mr. Springer that an amendment was unnecessary was not taken out of context. Indeed, the testimony of Mr. Harrington that Boston Hannah cites in response includes two additional places in the transcript where Mr. Harrington confirms that Boston Hannah never told AAFP that an amendment to the 2005 Agreement was unnecessary.

In the final sentence of its response, after attempting to disavow communications by Mr. Springer to Mr. Harrington about the need to amend the 2005 Agreement, Boston Hannah cites Mr. Springer's testimony about the substance of those communications. For purposes of this motion, AAFP does not dispute that Mr. Springer testified that, after September of 2009, he told Mr. Harrington that things at the AAFP were in flux given ███████████████████████████

████████████████████, and Mr. Springer described this as stalling for time to get clarity on ██ ████████████████ Springer Dep. (BH Ex. 7) at 123:10-125:5. Boston Hannah's assertion, however, that AAFP was intentionally stalling throughout 2009 is not supported by any evidence and must therefore be disregarded.

SOF 26. For example, had it been executed, the Proposed 2010 Agreement would have changed the definition of the publication in § 1.1 and the publication schedule in § 2.1. to permit multiple publications each year. *Compare* Proposed 2010 Agreement, at §§ 1.1. and 2.1., *with* 2005 Agreement, at §§ 1.1. and 2.1; Harrington 30(b)(6) Dep. at 130:6-12. The Proposed 2010 Agreement also would have changed the scope of the marketing license in § 4.4. to permit Boston Hannah to place the content of the magazines on FamilyDoctor.org. *Compare* Proposed 2010 Agreement, at § 4.4., *with* 2005 Agreement, at § 4.4.; Harrington 30(b)(6) Dep. at 135:3-136:11.

BH Response: Admitted in part. Boston Hannah does not dispute that the provisions in the proposed 2010 agreement could have changed the definition of the publication and the publication schedule, but clarifies that the purpose of the proposed 2010 agreement was a formality in the future to reflect the process the parties were already following pursuant to the 2005 Agreement and modifications thereto. (Ex. 1, 113:12-114:3). Boston Hannah denies that the proposed 2010 agreement changed the scope of the marketing license in § 4.4 to permit Boston Hannah to place the content of the magazines on FamilyDoctor.org. Boston Hannah already had that right since 2006, based upon § 4.4 of the 2005 Agreement and modifications thereto, as reflected in the conduct of the parties. (Ex. 1, 135:3-15, 191:7-18; Ex. 7, 55:6-14, 151:13-18; Ex. 9, 60:2-9, 64:12-18, 66:8-69:1; Ex. 14, YUDU & NXTBook Invoices and Tracking Reports; Ex. 15, 10/8/09 White Email thread).

45

AAFP Reply:  SOF 26 is uncontroverted.  For purposes of this motion, AAFP does not dispute that Mr. Harrington opined that, in his view, the proposed 2010 agreement was a formality.  His opinion, however, is not evidence of how AAFP viewed the situation.  Boston Hannah's assertions about § 4.4 are inadmissible argument.  Boston Hannah does not and cannot controvert that the language of § 4.4 is fundamentally different between the 2005 Agreement and the Proposed 2010 Agreement.  In both documents, § 4.4 appears under the heading "Marketing License."  In the 2005 Agreement, at § 4.4, "Boston Hannah and AAFP agree to discuss possible online applications for the content and as enhanced advertiser packages (at a premium price)."  2005 Agreement § 4.4 (AAFP Ex. 19).  That language is replaced in § 4.4 of the Proposed Agreement with "Boston Hannah has the right to distribute the content of the Books on line and in electronic formats to include usage on eReaders."  Proposed 2010 Agreement (AAFP Ex. 26).  Obviously, if the Proposed 2010 Agreement had been executed, it would change in the scope of the marketing license.  In the 2005 Agreement, the parties agreed to discussions, nothing more.  Under the Proposed 2010 Agreement, Boston Hannah would have been granted specific rights.  For purposes of this motion, AAFP does not dispute that it placed links to digital copies of various publications on FamilyDoctor.org.  That does not controvert anything in SOF 26, however.

**SOF 27.**   Had it been executed, the Proposed 2010 Agreement <u>would not</u> have changed § 9.1.  On the contrary, the Proposed 2010 Agreement contained the same language that appears in both the 2002 Agreement and the 2005 Agreement:  "This Agreement may not be modified or amended except in writing signed by both parties hereto."

BH Response:  Admitted in part.  The language in the proposed 2010 draft agreement speaks for itself.

AAFP Reply:  SOF 27 is uncontroverted.  Although Boston Hannah purports to admit only part of SOF 27, nothing in its response disputes any aspect of SOF 27.

**SOF 28.**   Shortly after Mr. Harrington and Mr. Springer exchanged the draft of the proposed amendment, Mr. Springer resigned from AAFP.  Springer Dep. at 135:8-15.  Susanna Guzman became the point person for AAFP for communications with Boston Hannah on most issues.  Guzman Dep. (Ex. 9) at 113:10-19, 115:5-7; 3/9/10 email from Guzman to Harrington ("3/9/10 Email") (Ex. 31); Guzman Dec. (Ex. 13) at ¶ 7.

BH Response:  Admitted.

**SOF 29.**   On February 12, 2010, Ms. Guzman emailed Mr. Harrington about updating the 2005 Agreement.  2/12/2010 Email from Guzman to Harrington (Ex. 23); Harrington 30(b)(6) Dep. at 111:10-14; Guzman Dep. at 99:22-101:21.  Mr. Harrington replied that he had been "working with Michael, at Mr. Dicus's request, on the new wording for our agreement."  2/12/10 Email from Harrington to Guzman (Ex. 24); Harrington 30(b)(6) Dep. at 112:7-10.  Mr. Harrington writes that the "way forward is to create a new agreement."  *Id*.  About two weeks later, Mr. Harrington sent Ms. Guzman a copy of the Proposed 2010 Agreement.  2/24/10 Email from Harrington to Guzman ("2/24/10 Email") (Ex. 26); Harrington 30(b)(6) Dep. at 124:10-125:9.

46

BH Response:  Admitted in part.  AAFP's statement that Ms. Guzman emailed Mr. Harrington about updating the 2005 Agreement implies that she was contacting him about a formal addendum to the 2005 Agreement, which is a mischaracterization of the evidence and should be disregarded.  Ms. Guzman contacted Mr. Harrington about the proposed language for a new 2010 agreement, not a formal addendum or amendment to the 2005 Agreement.  (Ex. 16, Guzman Rule 30(b)(6) Depo, 75:11-77:8; Ex. 17, 2/12/10 Guzman Email; Ex. 18, 2/12/10 Harrington Email).

AAFP Reply:  SOF 29 is uncontroverted.  Contrary to Boston Hannah's assertion, AAFP has not mischaracterized anything.  As reflected in the 2/12/2010 Email from Guzman to Harrington (AAFP Ex. 23), Ms. Guzman wrote Mr. Harrington about "a need to update the 2005 contract" to reflect at least a change to multiple publications each year, and she notes there may be other aspects that would also "need to be revised in an updated version of a contract."  Thus, the statement in SOF 29 that Ms. Guzman emailed Mr. Harrington about updating the 2005 Agreement is entirely faithful to this evidence.  Furthermore, while the distinction Boston Hannah is trying to draw between an amendment and a new contract is immaterial to this case, the evidence cited by Boston Hannah will not support its asserted distinction, which must therefore be disregarded.

SOF 30.   Consistent with its practices, AAFP informed Mr. Harrington that the Proposed 2010 Agreement needed to be reviewed by AAFP's counsel.   3/8/10 Email from Harrington to Guzman (Ex. 31); Harrington 30(b)(6) Dep. at 182:4-7, 191:21-192:2.

BH Response:  Admitted in part.  Boston Hannah does not dispute that Ms. Guzman for AAFP communicated to Mr. Harrington that the 2010 Agreement should be reviewed by AAFP's counsel.  Boston Hannah is without knowledge of the rest of this purported fact and therefore denies the same.

AAFP Reply:  SOF 30 is uncontroverted for the reasons stated in AAFP's reply to SOF 1.

SOF 31.   The parties never executed the Proposed 2010 Agreement.  Harrington 30(b)(6) Dep. at 123:2-25; 144:12-14.

BH Response:  Admitted in part.  Boston Hannah does not dispute that the parties never executed the proposed 2010 agreement, but in reality, the parties' working practices were far closer to the proposed 2010 agreement than the original 2005 Agreement.  (Ex. 1, 144:12-16; Ex. 18).

AAFP Reply:  SOF 31 is uncontroverted.  For purposes of this motion, AAFP does not dispute that Mr. Harrington has opined about the parties' working practices as Boston Hannah describes.  That does not controvert anything in SOF 31, however.

## IV.    THE 2009 AND 2010 PUBLICATIONS

**SOF 32.**    Eleven months elapsed between Mr. Harrington's 2/24/09 email, which floated his totally different concept for the *Family Doctor* book, and January of 2010, when Mr. Harrington and Mr. Springer exchanged a draft of the Proposed 2010 Agreement.  During that time, Boston Hannah published two magazines.

**BH Response:**  Admitted in part.  Boston Hannah does not dispute that eleven months had passed from the time Mr. Harrington emailed Mr. Springer on 2/24/09 and when Mr. Harrington and Mr. Springer exchanged a draft of the proposed 2010 agreement, and that during that time Boston Hannah published two mini-magazines, but clarifies that the reason that eleven months passed between the February/March 2009 emails and a draft of the 2010 Agreement was because Mr. Harrington was specifically told by AAFP that if an additional written addendum was necessary AAFP would provide one, and because AAFP was stalling the drafting of an amendment because of ███████████████████        ████████████. (Ex. 7, 84:1-85:17, 123:10-124:15). The rest of this purported fact is an improper opinion statement, is unsupported by the evidence on record, and mischaracterizes testimony, and therefore should be disregarded.

**AAFP Reply:**  SOF 32 is uncontroverted.  Boston Hannah's reply is an attempt to add different allegations and gloss, not controvert anything in SOF 32.  For purposes of this motion, AAFP does not dispute that Mr. Springer wrote Mr. Harrington that Mr. Springer would check and see if "we [i.e. AAFP and Boston Hannah] need to prepare an addendum." That said, Boston Hannah's assertion that Mr. Harrington was "specifically told by AAFP that if an additional written addendum was necessary AAFP would provide one" is not supported by any evidence and must therefore be disregarded.  For purposes of this motion, AAFP does not dispute that Mr. Springer testified that, after September of 2009, he told Mr. Harrington that things at the AAFP were in flux given the ████████████████████████████████████████████████████████████████████████████████. Springer Dep. (BH Ex. 7) at 123:10-125:5.

**SOF 33.**    In the latter part of March 2009, work began on a magazine titled *Living with Diabetes*.  Ford Dep. at 86:13-23.  Boston Hannah published that magazine seven months later in October of 2009.  *Id.* at 99:12-14.  Also in October, Boston Hannah published another magazine, *Healthy Living*.*  *Id.*

> *As discussed in [AAFP's Opening Brief] Argument § II.B., *infra*, the 2005 Agreement was never amended.  The written terms of the 2005 Agreement do not permit publication of multiple magazines in a calendar year.  As a result, Boston Hannah published *Healthy Living* without a contract or pursuant to something other than the 2005 Agreement.

**BH Response:**  Admitted in part.  Boston Hannah does not dispute that it published *Living With Diabetes* and *Healthy Living* in October of 2009.  Boston Hannah denies AAFP's contention in footnote [*] of its Motion for Summary Judgment that Boston Hannah published *Healthy Living* "without a contract or pursuant to something other than the 2005 Agreement" and states that it is an improper legal conclusion and therefore should be

48

disregarded.  Boston Hannah does not dispute that Mr. Ford did state in his deposition that work began on *Living With Diabetes* in March 2009, but clarifies that AAFP misstates Mr. Ford's testimony in his deposition and thus this purported fact is incomplete.  Mr. Ford clarified his previous statement to add that Boston Hannah sent Mr. Springer the Media Pack[**] for *Living With Diabetes* in March 2009, but the editorial process did not start until much later, in May, as Boston Hannah was waiting for AAFP's approval of the Media Pack.  (Ex. 5, 86:13-87:6).  Thus, work on *Living With Diabetes* and *Your Healthy Heart* really started in May of 2009, and began on *Healthy Living* in July of 2009. (Ex. 5, 93:4-6, 141:3-12).

> **"Media Pack"** refers to the set of marketing materials that Boston Hannah provided to potential advertisers, delineating what types of advertisements the advertisers could purchase.

AAFP Reply:  SOF 33 is uncontroverted.  AAFP agrees that footnote [*] of its opening brief expressly references a section of its Argument and is not a statement of fact. Contrary to Boston Hannah's assertion, AAFP did not misstate Mr. Ford's testimony.  As cited in SOF 33, Mr. Ford confirmed at his deposition that work began on that *Living with Diabetes* in the latter part of March 2009.  Ford Dep. (AAFP Ex. 2) at 86:21-23.  For purposes of this motion, AAFP does not dispute that Mr. Ford testified that he sent marketing materials to Mr. Springer around March of 2009 and that editorial work on the magazine began later, in perhaps May.  Ford Dep. (AAFP Ex. 2) at 86:24-87:16.  Both are aspects of working on *Living with Diabetes*.  Moreover, in March of 2009, Mr. Ford sent AAFP an outline of the proposed contents of the magazine.  3/18/09 Email (AAFP Ex. 39); Ford Dep. (AAFP Ex. 2) at 81:22-82:3.  Thus, Boston Hannah's assertion that work did not begin on *Living with Diabetes* until May of 2009 is refuted by the record.  Likewise, Boston Hannah's assertion that work on *Your Healthy Heart* began in May of 2009 has no support in the record and must therefore be disregarded.  That magazine, which was never published, is not directly or indirectly mentioned in any of the testimony cited by Boston Hannah.  For purposes of this motion, AAFP does not dispute that Mr. Ford stated at one point that work on *Healthy Living* began in May of 2009 and at another point he thought July of 2009 was the date.  Ford Dep. (BH Ex. 5) at 93:1-6, 141:3-142:19.  Neither date nor anything else in Boston Hannah's response controverts anything in SOF 33.  Finally, the definition of "Media Pack" in Boston Hannah's footnote is not supported by any citation to the record and must therefore be disregarded.

**SOF 34.**    On October 7, 2009, Charles Ford sent AAFP a proposed table of contents for new publications entitled *Understanding Over the Counter Medicines* and *Lowering Your Cholesterol*.  Ford Dep. at 99:21-100:11.  Boston Hannah proposed that it create all of the editorial content for both publications, and proceeded to do so.  Ford Dep. at 100:12-18.  This was a departure from prior publications, for which AAFP took the lead on editorial content.  *See* Ford Dep. at 88:18-89:21; 92:13-20.

BH Response:  Admitted in part.  Boston Hannah does not dispute that on October 7, 2009, Charles Ford sent AAFP a proposed table of contents for new the publications entitled *Understanding Over the Counter Medicines* ("*Over The Counter Medicines*") and *Lowering Your Cholesterol*.  Additionally, Boston Hannah proposed that it would take over the editorial content for both publications, but clarifies that it was willing to comply with whatever editorial process that AAFP deemed appropriate for the publications. (Ex. 5, 110:13-23; Ex. 19,

10/7/09 Ford Email thread).  AAFP has misconstrued the testimony to imply that Boston Hannah started drafting editorial content without AAFP's consent, which is not supported by the evidence on record and should be disregarded.  In reality, in 2009, Mr. Springer was concerned that AAFP's editorial group was stretched too thin by the growth of FamilyDoctor.org and thus they would not be able to sustain the writing and editing of the articles for the *Family Doctor* mini-magazines.  Therefore, Mr. Springer and Mr. Harrington agreed that they would try having Boston Hannah coordinate the editorial articles for the mini-magazines and working with the freelance authors.  (Ex. 1, 316:5-317:17; Ex. 7, 43:20-44:18, 15:11-16, 43:20-44:21; Ex. 9, 21:9-14, 34:14-19, 35:14-39:7; Ex. 5, 39:1-40:20; Ex. 16, 37:14-22, 46:16-47:2; Ex. 20, 3/18/2009 Managing Editor (Ford) Email thread; Ex. 21, 10/20/08 Motemayor/Hayes/Guzman Email; Ex. 22, Guzman/Ford Email thread).  Boston Hannah does not dispute that AAFP historically had drafted the majority of the editorial content for previous publications, but denies that much of the cited testimony supports this contention and such testimony should be disregarded.

       **AAFP Reply:**  SOF 34 is uncontroverted.  Contrary to Boston Hannah's accusation, AAFP did not misconstrue Mr. Ford's testimony about Boston Hannah taking over editorial content.  As AAFP described, Mr. Ford testified that Boston Hannah proposed that it create all of the editorial content for *Understanding Over the Counter Medicines* and *Lowering Your Cholesterol*, and proceeded to do so.  Ford Dep. (AAFP Ex. 2) at 100:12-18.  For purposes of this motion, AAFP does not dispute that AAFP gave Boston Hannah an opportunity to take the lead in preparing editorial content.  As noted in SOF 34, that was a different approach from prior publications.  AAFP also does not dispute that Boston Hannah came back with medically unsound articles on topics such as "Sunflower Seeds Cure Depression," the testimony about which is cited by Boston Hannah in its response to SOF 34.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 315:5-318:10.  Furthermore, as discussed below, see SOF 35, Boston Hannah's editorial work was also plagued by plagiarism and other problems.  Finally, contrary to Boston Hannah's nonspecific assertion, the testimony cited by AAFP does support the contentions in SOF 34.

       **SOF 35.**   When Boston Hannah began sending AAFP drafts of articles for *Lowering Your Cholesterol*, AAFP discovered that many articles were permeated with plagiarism and/or were not based on credible sources.  Guzman Dec. at ¶ 2; Ford Dep. at 107:15-21.  Although Mr. Harrington described the plagiarism as a "small problem," Harrington 30(b)(6) Dep. at 72:12-18, AAFP took the matter more seriously.  Guzman Dec. at ¶ 3.  AAFP informed Boston Hannah that AAFP would re-write the editorial content for the entire publication.  11/11/09 Email from Guzman to Ford (Ex. 41); Ford Dep. at 106:15-18, 111:18-112:12; Guzman Dec. at ¶ 3.

       **BH Response:**  Admitted in part.  Boston Hannah does not dispute that AAFP raised concerns that some of the editorial content in *Lowering Your Cholesterol* was not based on credible sources, but denies that Mr. Ford's cited testimony states anything about plagiarism.  Boston Hannah also denies that it considered the plagiarism to be a "small problem," denies that AAFP took the matter more seriously than Boston Hannah, and states that AAFP has completely misstated Mr. Harrington's testimony and has taken it out of context, and therefore such statements should be disregarded. Boston Hannah took the matter just as seriously as AAFP and worked with AAFP to immediately remedy the problem by setting aside the editorial content, starting the project over, and firing the staff member responsible for overseeing the

50

intern who wrote the articles at issue. (Ex. 1, 72:12-73:18; Ex. 5, 108:17-110:23, 114:6-20; Ex. 7, 56:17-57:21; Ex. 12, ¶ 12; Ex. 23, 11/5/09 Guzman/Ford Email). Furthermore, Mr. Springer acknowledged that the issue was corrected to the satisfaction of AAFP. (Ex. 7, 57:15-21).

AAFP Reply:  SOF 35 is uncontroverted.  Mr. Ford does refer to plagiarism, both in the specific lines cited and the surrounding testimony.  Ford Dep. at 104:18-109:2, attached hereto as AAFP Ex. A.  Mr. Ford, in fact, voluntary raised the plagiarism issue. Ford Dep. at 104:18-105:10 (AAFP Ex. A).  Moreover, AAFP also cited the sworn declaration of Susanna Guzman as evidence supporting this statement of fact and Boston Hannah does not mention or dispute any aspect of her declaration.  Boston Hannah's assertion that AAFP has misstated Mr. Harrington's testimony is incorrect.  When asked whether Boston Hannah had a plagiarism problem with the content Boston Hannah was trying to create for *Lowering Your Cholesterol*, Mr. Harrington stated, "We had a small problem…."  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 72:12-18.  For purposes of this motion, AAFP does not dispute that the issue was corrected to the satisfaction of AAFP.  As noted in SOF 35, it was corrected by AAFP taking back control of the editorial content for the entire publication.

**SOF 36.**   A month later, Mr. Ford confirmed that *Lowering Your Cholesterol* had been set aside for a complete re-write.  Ford. Dep. at 118:5-8.  Boston Hannah intended to rename the publication *Your Healthy Heart*, and planned to start sending editorial content sometime in 2010.  Ford. Dep. at 118:9-23; Guzman Dec. at ¶ 4.  Neither *Lowering Your Cholesterol* nor *Your Healthy Heart* was ever published.  Guzman Dec. at ¶ 4.

BH Response:  Admitted in part.  Boston Hannah does not dispute that Mr. Ford confirmed that *Lowering Your Cholesterol* had been set aside for a complete re-write. However, the phrase "a month later" implies that Boston Hannah was not doing anything to solve the issue, which was untrue and should be disregarded.  The parties had been working to resolve the matter immediately upon its discovery. (Ex. 1, 72:12-73:18; Ex. 5, 108:17-110:23; Ex. 7, 56:17-57:21, 114:6-20; Ex. 23).  Boston Hannah does not dispute that it intended to rename the publication *Your Healthy Heart*, and planned to start sending editorial content sometime in 2010, but clarifies that at that time, AAFP had already sent Boston Hannah some revised and approved material for the publication.  (Ex. 5, 118:5-23).  Boston Hannah states that AAFP misconstrues the facts regarding the publication of *Lowering Your Cholesterol/Your Healthy Heart*, rather than two publications, as implied by AAFP, it was one publication with the same content; only the title was changed in order to attract a wider demographic, and AAFP's statement implying otherwise should be disregarded. (Ex. 1, 68:25-70:25).

AAFP Reply:  SOF 36 is uncontroverted.  For purposes of this motion, AAFP does not dispute that, as soon as AAFP unearthed Boston Hannah's plagiarism, the parties immediately worked to correct the problem.  As noted in SOF 35, the correction was for AAFP re-write all the editorial content.  AAFP also does not dispute that *Lowering Your Cholesterol* and *Your Healthy Heart* were not two publications.  That is why SOF 36 refers to the "renam[ing]" of *Lowering Your Cholesterol* as *Your Healthy Heart*.  Furthermore, Boston Hannah's distinction between one or two magazines is irrelevant.  The magazine was never published under any title.  SOF 36.

**SOF 37.**   Boston Hannah's plagiarism and reliance on improper sources reinforced to AAFP the requirement for a rigorous editorial process. Guzman Dec. at ¶ 5.   AAFP concluded that it would not abbreviate or deviate from its full and complete editorial process when working on any publication with Boston Hannah. *Id*. ¶ 5.

BH Response:   Denied.   Boston Hannah is without knowledge to admit this fact and thus denies the same.   Boston Hannah complied with AAFP's entire editorial process. (Ex. 1, 316:5-317:17; Ex. 5, 39:1-40:20; Ex. 7, 15:11-16, 43:20-44:21; Ex. 9, 21:9-14, 34:14-19, 35:14-39:7; Ex. 21; Ex. 22; Ex. 24, 8/5/09 Ford/White Email thread).

AAFP Reply:   SOF 37 is uncontroverted for the reasons stated in AAFP's reply to SOF 1.  Boston Hannah has not established any foundation for BH Ex. 21, 22 and 24, which are therefore inadmissible.  For purposes of this motion, AAFP does not dispute that Boston Hannah complied with AAFP's entire editorial process, although as shown in SOF 34, Boston Hannah tried to change that process.  The point of SOF 34-37 is that AAFP tried a different process proposed by Boston Hannah, experienced a very negative result and concluded that it would not agree to any future requests by Boston Hannah to abbreviate or deviate from AAFP's process.

**SOF 38.**   AAFP's editorial process included (1) creation of editorial content (*i.e.* substantive writing like articles as opposed to advertising); (2) review by AAFP's editors and medical editors; (3) fact checking; (4) copy editing; (5) sending the edited copy to Boston Hannah for any comments or revision; (6) repeat steps (1)-(5) for any material revisions; and (7) AAFP's final review of Boston Hannah's designed proofs.   4/22/10 Email from White to Ford ("4/22/10 Email") (Ex. 43); White Dep. (Ex. 11) at 81:8-18, 82:23-83:6, 85:6-86:10; Guzman Dec. at ¶ 6.

BH Response:   Admitted in part.  Ashley White emailed Mr. Ford on 4/22/10 and set forth the process described therein.  Boston Hannah is without knowledge to admit that this is AAFP's standard procedure for all publications and therefore denies the same.

AAFP Reply:   SOF 38 is uncontroverted for the reasons stated in AAFP's reply to SOF 1.

**SOF 39.**   AAFP uses this process for reprints of articles or portions of articles as well.  Guzman Dec. at ¶ 6.  AAFP also requires that articles be updated through the regular editorial process before being reprinted. Ford Dep. at 65:14-20; 68:17-23.  Boston Hannah knew of this requirement and knew that AAFP never deviated from it. *Id*.  If Boston Hannah would have requested to republish any magazine, AAFP would have required it to follow the same editorial process.  White Dep. at 83:12-84:25.

BH Response:   Admitted in Part.  Boston Hannah is without knowledge to admit the process AAFP uses for reprints of articles and portions of articles, and whether AAFP would have required Boston Hannah to follow the same editorial process, and thus denies the same.  Boston Hannah does not dispute that it knew AAFP never substantially deviated from its editorial protocol, but even though the same editorial protocol would have been used, it

undeniably would have gone much faster because any re-used material would already have been written, edited, and approved for a previous publication. (Ex. 5, 68:24-69:22).

AAFP Reply:  SOF 39 is uncontroverted for the reasons stated in AAFP's reply to SOF 1.  Boston Hannah's assertion that AAFP's editorial process would gone much faster for any re-used material is inadmissible speculation and must therefore be disregarded. Further, as noted in SOF 39, under AAFP's editorial process, articles are not simply reprinted in multiple publications; AAFP requires articles to be updated.  In addition, a magazine would have to have new articles and new images as well as updated articles from the previously published magazine on the same topic.  White Dep. (AAFP Ex. 11) at 83:7-84:21.

SOF 40.   Boston Hannah published *Understanding Over the Counter Medicines* in late February/early March 2010, some five months after it began working on the magazine. Harrington 30(b)(6) Dep. at 158:23-159:15; Ford Dep. at 99:21-100:11, 133:15-18; 144:7-14.

BH Response:  Admitted in part.  Boston Hannah does not dispute that *Over the Counter Medicines* was published in late February/early March 2010.  *Over the Counter Medicines* was approved by AAFP in November 2009 and was intended to be part of the Fourth Edition of the *Family Doctor* Book; however, Mr. Harrington held back publication of *Over the Counter Medicines* until late February/early March 2010 because of late advertisement insertion, so in reality it took only one or two months to essentially produce *Over the Counter Medicines.* (Ex. 1, 68:7-24; Ex. 5, 99:12-100:11).  During that same time period, Boston Hannah was also working on another publication for AAFP, *Lowering Your Cholesterol.* (Ex. 5, 99:12-100:11).

AAFP Reply:  SOF 40 is uncontroverted.  Boston Hannah's assertion that *Understanding Over the Counter Medicines* was intended to be part of the Fourth Edition of the *Family Doctor* Book is unsupported by any evidence and must therefore be disregarded.  For purposes of this motion, AAFP does not dispute that it signed off on aspects of the magazine in November of 2009.  For example, Boston Hannah sent AAFP a proposed table of contents for the magazine in mid-October, Ford Dep. (AAFP Ex. 2) at 99:21-100:11, which AAFP approved in the following weeks.  Boston Hannah, however, appears to be asserting that AAFP approved the final, all-in draft of *Understanding Over the Counter Medicines* in November 2009.  That assertion is without any factual basis and is contrary to Boston Hannah's Response to SOF 69 (asserting that AAFP had signed off on a "significant part of the publication in November 2009").  In fact, Boston Hannah published *Understanding Over the Counter Medicines* without receiving the final "good to go" from AAFP.  3/9/10 Email from Guzman to Harrington (AAFP Ex. 31).

SOF 41.   On April 16, 2010, Mr. Ford wrote to Ashley White, stating that Boston Hannah was prepared to begin work again on *Your Healthy Heart*.  Ford Dep. at 133:19-22.  Mr. Ford suggested a print deadline of the end of May, approximately 6 weeks later.  Ford Dep. at 137:21-23.  Ms. White, AAFP's Associate Editor responsible for the publication, wrote Mr. Ford back, stating that a May deadline was not possible.  4/22/10 Email; White Dep. at 81:8-14.  Ms. White declined to abbreviate the editorial process, as Mr. Ford had proposed.  4/22/10 Email; White Dep. at 82:6-86:10.

BH Response:  Admitted in part.  Boston Hannah does not dispute that Mr. Ford wrote Ms. White on April 16, 2010, and in that email stated that Boston Hannah was prepared to begin work again on *Your Healthy Heart*.  Boston Hannah does not dispute that Mr. Ford suggested a print deadline for the end of May, but clarifies that this was because *Your Healthy Heart* was using a substantial amount of *Lowering Your Cholesterol* material, the majority of which had already been approved by AAFP.  (Ex. 5, 118:5-23, 137:21-138:18).  Boston Hannah does not dispute that it suggested abbreviating the editorial process.  However, Boston Hannah did nothing without AAFP's approval, and did not shorten the editorial process for *Your Healthy Heart.*  (Ex. 9, 81:8-18, 86:13-23; Ex. 25, 4/21/10 White/Ford Email thread; Ex. 26, 4/22/10 White/Ford/Guzman Email thread).

AAFP Reply:  SOF 41 is uncontroverted.  For purposes of this motion, AAFP does not dispute the allegations in Boston Hannah's response to SOF 41, none of which controvert anything in SOF 41.

SOF 42.    A month later, on May 19, 2010, Mr. Ford wrote Ms. White that he had been asked to put *Healthy Heart* on hold for a couple of weeks because of issues with ad sales.  5/19/10 Email from Ford to White (Ex. 42); Ford Dep. at 144:22-145:9.  Boston Hannah needed additional time to sell the advertising for the publication.  Ford Dep. at 145:5-13.

BH Response:  Admitted in part.  Boston Hannah does not dispute Mr. Ford wrote Ms. White stating that he had been asked to put *Your Healthy Heart* on hold for a couple of weeks.  The rest of this purported fact mischaracterizes the evidence, is speculative, and should be disregarded.  Mr. Ford actually stated in his 5/19/10 email that the schedule was being put on hold due to "some aspect" of the advertisement sales.  (Ex. 27, 5/19/10 Ford/White Email).  In reality, this "aspect" of the advertisement sales was that Mr. Harrington had asked the sales staff to refrain from selling advertisements for any AAFP publications until the problem with the unreasonable advertising restrictions being imposed by the AAFP was dealt with.  (Ex. 12, ¶¶ 13 and 14).

AAFP Reply:  SOF 42 is uncontroverted.  Contrary to Boston Hannah's accusation, AAFP did not mischaracterize the evidence.  On the contrary, as noted in the testimony cited by AAFP, Mr. Ford explained that, when he referred to "some aspect of the ad sales" in his email, he meant that Boston Hannah "required more time to sell the advertising pages."  Ford Dep. (AAFP Ex. 2) at 145:5-13.  In its response, Boston Hannah tries to divert attention away from Mr. Ford's testimony by citing to the affidavit of Mr. Harrington.  But, Mr. Harrington did not write Mr. Ford's email, has no personal knowledge of what Mr. Ford meant by "aspect."  Moreover, although Boston Hannah's assertions in response to SOF 42 tie Mr. Harrington's affidavit to the "aspect" of ad sales referred to by Mr. Ford, Mr. Harrington does not address that issue in his affidavit.

SOF 43.    Aside from one telephone conference or written communication in the first quarter of 2010 about a potential publication entitled *Your Healthy Child*, Boston Hannah had not done any work on any other publication by mid-May 2010.  Ford Dep. at 145:20-146:10; 147:3-10.

BH Response:  Admitted in part.  Boston Hannah does not dispute this purported fact, but it is incomplete.  Little work had been done because Boston Hannah had ceased work on the 2010 publications following AAFP's misrepresentations and confusing communications, which resulted in a dissolution of the parties' working relationship. (Ex. 1, 382:3-384:16, 388:11-390:11, 393:25-394:20; Ex. 12, ¶¶ 13 and 14).

AAFP Reply:  SOF 43 is uncontroverted.  After conceding that it does not dispute anything in SOF 43, Boston Hannah makes additional assertions that are not admissible.  Boston Hannah's assertions about AAFP's alleged misrepresentations and purportedly confusing communications is inadmissible argument.  Boston Hannah's assertion about "a dissolution of the parties' working relationship" is an inadmissible legal conclusion and/or lay witness opinion.

**SOF 44.**    Boston Hannah claims that it would nevertheless have published five more magazines by August of 2010, three months later.  Harrington 30(b)(6) Dep. at 315:24-316:1.

BH Response:  Admitted in part.  Boston Hannah agrees it would have published five publications total by the end of August 2010.  This is because the planning and branding process had already been completed for the mini-magazines and three of the mini-magazines to be published later in 2010 would have been reproductions.  (Ex. 1, 306:21-309:7, 315:24-316:14).  Boston Hannah and AAFP both testified that this publication schedule was completely reasonable. (Ex. 1, 308:2-309:7; Ex. 7, 60:10-61:23).

AAFP Reply:  SOF 44 is uncontroverted.  Boston Hannah's response does not controvert anything in SOF 44.  Rather, Boston Hannah attempts to justify its claim that it would have published five more magazines by August of 2010, a claim that AAFP obviously does not agree with, notwithstanding Boston Hannah asserting such an agreement as a statement of fact.  In the testimony cited by Boston Hannah, Mr. Harrington states his belief that Boston Hannah could have accomplished this production rate in part because it had taken over editorial and could produce articles quickly.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 316:5-14.  But, AAFP had taken back responsibility for the development of editorial, *i.e.* non-advertising, content.  SOF 34-37.  And, according to Mr. Harrington, AAFP was "far slower-moving" than Boston Hannah.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 316:5-14.  Nevertheless, Boston Hannah insists that it always would follow AAFP's editorial process.  SOF 41.  Boston Hannah's assertion that the planning process had been completed for the mini-magazines is not supported by Boston Hannah's citations and must therefore be disregarded.  Furthermore, the testimony cited by Boston Hannah does not support its contention that publishing five more magazines[22] by

---

[22] Boston Hannah's response to SOF 44 could be read as reducing the number of magazines Boston Hannah claims would be published in 2010 prior to the end of August.  Boston Hannah published *Understanding Over the Counter Medicines* at the end of February/early March of 2010.  SOF 40.  Boston Hannah's claim in this case is that it would have published five <u>additional</u> magazines by August of 2010.  SOF 44.  That is a total of six magazines.  Yet, in its response to SOF 44, Boston Hannah writes that it would have published "five publications total by the end of August 2010."  If "five publications total" includes *Understanding Over the Counter Medicines*, then Boston Hannah has changed its claim and is now asserting that it would have produced an additional four magazines by August 2010.  Since Boston Hannah has not overtly stated otherwise, AAFP assumes that Boston Hannah continues

August of 2010 was completely reasonable.  The testimony Boston Hannah cites is not tied to the period of time available, *i.e.* through the end of August of 2010.  It also does not mention that the first couple of months of 2010 were devoted to a publication, *Understanding Over the Counter Medicines*, that is not included in the five additional magazines that Boston Hannah claims would have been published.

> **SOF 45.**   Boston Hannah does not contend in this case that AAFP breached any agreement with respect to any of the magazines Boston Hannah published.  Harrington 30(b)(6) Dep. at 43:15-19, 43:22-44:1, 67:1-5, 67:8-11, 67:14-16, 67:19-23, 68:1-4, 68:7-24, 150:23-151:2.

> BH Response:  Admitted.

## V.      BOSTON HANNAH'S ALLEGED AMENDMENTS TO THE 2005 AGREEMENT.

> **SOF 46.**   As discussed further below, SOF 49, Boston Hannah asserts that the parties executed a written amendment that gave Boston Hannah the right to publish five more magazines in 2010.  Boston Hannah does not contend that any other document is a written amendment to 2005 Agreement.  Harrington 30(b)(6) Dep. at 76:13-19; 151:3-13.

> BH Response:  Admitted in part.  Boston Hannah admits that it has asserted that the parties executed a written amendment which gave Boston Hannah the right to publish mini-magazines in 2010 to replace the Fifth Edition.  Boston Hannah denies that no other document is a written amendment.  Boston Hannah further states that AAFP took Boston Hannah's deposition testimony out of context and that the contention that no other documents can be a written amendment to the 2005 Agreement is a legal conclusion, and therefore this statement should be disregarded.  While the email correspondence between Mr. Harrington and Mr. Springer in late February and early March 2009 was the main written amendment to the 2005 Agreement, there were many amendments and modifications that were made by the parties over the years. (Ex. 1, 75:17-76:12).  Furthermore, the AAFP signed off on every single change that Boston Hannah made, including the mini-magazines. (Ex. 1, 166:5-167:17; Ex. 12, ¶ 9).

> AAFP Reply:  SOF 46 is uncontroverted.  Because Boston Hannah admits the allegations in SOF 49, it admits the first sentence of SOF 46.  Boston Hannah's denial of the second sentence of SOF 46 is without basis.  While appearing as Boston Hannah's Rule 30(b)(6) designee, Mr. Harrington testified as follows:

> > Q.      Can you point me to any document that is a written amendment of Deposition Exhibit 8 [the 2005 Agreement]?
> > A.      Only my email to Michael at the end of February and his reply at the beginning of March.
> > Q.      Anything else?
> > A.      That's all.

---

to claim that, by the end of August 2010, it would have published five more magazines besides *Understanding Over the Counter Medicines*.

Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 76:13-19.  Boston Hannah is bound by this testimony. *New Jersey,* 2010 WL 610671, at *2.  For purposes of this motion, AAFP does not dispute that Mr. Harrington asserts that unspecified modifications to the magazines occurred over the years, but as demonstrated by the quotation from his testimony above, he confirmed that the only written amendment alleged by Boston Hannah is the February/March 2009 email exchange.  As a result, SOF 46 is uncontroverted.

> SOF 47.     As discussed further below, SOF 53, 57, Boston Hannah asserts that the parties orally agreed to amend the 2005 Agreement to require placement of a digital version of the *Family Doctor* publication on the FamilyDoctor.org website and to allow Boston Hannah to sell advertising on the FamilyDoctor.org. website.  Boston Hannah does not contend that any other oral statements amended the 2005 Agreement.  Harrington 30(b)(6) Dep. at 165:16-20.

> BH Response:  Denied.  The 2005 Agreement and the conduct of the parties, including the February/March 2009 email exchange between Mr. Harrington and Mr. Springer, also reinforced Boston Hannah's rights to place a digital version of the *Family Doctor* publication on AAFP's FamilyDoctor.org website ("FamilyDoctor.org") and to sell enhanced advertising packages, including Banner Ads* on Family Doctor.org. (Ex. 3, § 4.4; Ex. 8).  Boston Hannah also denies that no other oral or written statements amended the 2005 Agreement, as the 2005 Agreement was continuously modified throughout the parties' relationship, was approved by AAFP in writing and confirmed through the parties' subsequent conduct. (Ex. 1, 81:11-82:4, 166:5-20; Ex. 7, 121:4-19; Ex. 8; Ex. 9, 21:9-14, 34:14-19, 35:14-39:7; Exs. 22, 24; Ex. 28, 9/15/09 Guzman/Ford Email; Ex. 29, Charles Ford Affidavit, ¶ 3, Ex. A thereto, "OK to Publish" Faxes).

> *A "Banner Ad" is defined as an online form of advertising that entails embedding an advertisement into a web page.

> AAFP Reply:  SOF 47 is uncontroverted.  Boston Hannah begins its response with assertions about the February/March 2009 email exchange and the alleged conduct of the parties.  The February/March 2009 email exchange is not an "oral" communication or alleged oral amendment.  Consequently, such assertions do not controvert anything in SOF 47.  Moreover, Boston Hannah's assertions that it had legal rights to place a digital version of the publication on FamilyDoctor.org and to sell enhanced advertising packages at premium prices are inadmissible arguments about inadmissible legal conclusions.

> As for Boston Hannah's denial that there were no other oral or written statements that amended the parties' relationship, that asserted denial is barred by the testimony of Boston Hannah's Rule 30(b)(6) witness, Mr. Harrington.  Mr. Harrington's testimony about alleged written amendments is described in SOF 46.  SOF 47 addresses the purported oral amendments alleged by Boston Hannah.  As to that subject, Mr. Harrington contended on behalf of Boston Hannah that the parties orally agreed to amend the 2005 Agreement to require placement of a digital version of the *Family Doctor* publication on the FamilyDocotor.org website and to allow Boston Hannah to sell advertising on the FamilyDoctor.org website.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 162:24-163:6, 164:21-165:11.  Immediately following this testimony, Mr. Harrington closed the list of oral amendments alleged by Boston Hannah:

> Q.      Any other oral statement that you contend – Boston Hannah contends modified the 2005 Agreement?
> A.      No.  I think that would the – that would be the ones.

Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 165:16-20.  Boston Hannah is bound by this testimony.  *New Jersey,* 2010 WL 610671, at *2.  In its response to SOF 47, Boston Hannah tries to avoid this testimony by Mr. Harrington by submitted a long string cite.  None of the materials cited, however, states or purports to identify any other alleged oral amendment to the 2005 Agreement.  SOF 47 is thus uncontroverted.  As for Boston Hannah's assertion that the 2005 Agreement was continuously modified as confirmed by the parties' conduct, that assertion is not supported by the record and should be disregarded for the reasons stated in AAFP's reply to SOF 48.

**SOF 48.**   Boston Hannah does not contend that any other amendments were made to the 2005 Agreement.  Harrington 30(b)(6) Dep. at 166:5-20.

BH Response:  Denied.  Boston Hannah contends that numerous amendments and modifications were made to the 2005 Agreement and that Mr. Harrington's testimony to which AAFP cites is mischaracterized and therefore should be disregarded.  (Ex. 1, 54:8-22, 75:17-76:12, 144:24-146:20, 149:1-150:11; Ex. 7, 121:4-19; Ex. 8).

AAFP Reply:   SOF 48 is uncontroverted.   After identifying the written and oral amendments alleged by Boston Hannah, Mr. Harrington was asked about any other amendments that Boston Hannah asserted.  His testimony as follows.

> Q.      Are there any other amendments that Boston Hannah contends were made to the 2005 Agreement.
> A.      No, they are – they are the changes that reflect where we were with the magazines, but, again, as I said many times, everything we did was always with the agreement of the AAFP.  They had to sign it, yeah, and we could go through a thousand questions, but at the end of a day, the AAFP agreed with everything, signed everything, and were happy with everything.

Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 166:5-7, 13-20.  Mr. Harrington explained that his testimony about AAFP "sign[ing]" referred to AAFP going to an FTP website set up by Boston Hannah and approving and/or requesting changes to ads and articles for each magazine.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 166:21-167:8; *accord* Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 144:24-146:7, 149:1-150:22.  The process that was used to create a magazine was also described by Ms. White at her deposition.  White Dep. (AAFP Ex. 11) at 35:14-39:7.  Thus, Mr. Harrington testified that "No," Boston Hannah did not contend there were any other amendments, but he claims that AAFP agreed to the contents of each published magazine through the FTP approval process.

For purposes of this motion, AAFP does not dispute that AAFP used the FTP site to review, provide feedback and/or approve the content of ads and articles.  As Ms. White testified, AAFP at times requested changes to the claims made in advertisements, but it never rejected

advertisements for the magazines.  White Dep. (AAFP Ex. 11) at 38:16-20.  The 2005 Agreement repeatedly and expressly provides for such exchanges and approvals by AAFP.  *E.g.*, 2005 Agreement (AAFP Ex. 19) at §§ 2.2, 3.1, 3.4, 3.7, 4.3.  Boston Hannah's assertion that this process caused continuous or numerous modifications to the 2005 Agreement is without basis.  Boston Hannah does not attempt to identify a single term of 2005 Agreement that was allegedly changed through this process.  For all these reasons, SOF 48 is uncontroverted.

A.    **Additional Magazines**

**SOF 49.**    Under the written terms of the 2005 Agreement, Boston Hannah was to publish one consumer-oriented health magazine each year.  2005 Agreement at §§ 1.1, 2.1; Harrington 30(b)(6) Dep. at 89:8-12; Springer Dep. at 116:19-22.  Boston Hannah contends that Mr. Harrington's 2/24/09 Email and Mr. Springer's 3/1/2009 Email are a written amendment to the 2005 Agreement that changes these terms.  Harrington 30(b)(6) Dep. at 76:13-19; 95:3-7; 149:1-7.  Specifically, Boston Hannah seeks damages for five magazines that it claims it would have published in 2010 (in addition to the *Understanding Over the Counter Medicines* magazine that was published that year).  Harrington 30(b)(6) Dep. at 228:24-229:3, 315:24-316:1; Plaintiff's Third Amended Disclosures (Ex. 33).

BH Response:  Admitted in part.  AAFP has misstated the terminology in the 2005 Agreement.  Under the written terms of the 2005 Agreement, Boston Hannah was to publish an annual consumer-oriented health magazine.  (Ex. 3, §§ 1.1 and 2.1).  Boston Hannah does not dispute the rest of this purported fact.

AAFP Reply:  SOF 49 is uncontroverted.  Boston Hannah's accusation that AAFP misstated the terms of the 2005 Agreement is without merit.  AAFP agrees that, under the written terms of the 2005 Agreement, Boston Hannah was required to publish an annual magazine.  Hence the statement in SOF 49 that Boston Hannah was to publish one magazine each year.

**SOF 50.**    As noted previously, the "totally different" concept outlined by Mr. Harrington in his 2/24/09 Email including publishing magazines quarterly.  Harrington 30(b)(6) Dep. at 81:16-18.  Initially, Mr. Harrington proposed publishing four magazines a year.  *Id.* at 155:5-14.

BH Response:  Admitted in part.  Boston Hannah states that AAFP's use of the phrases "totally different" and "Initially, Mr. Harrington proposed publishing four magazines a year" mischaracterize Mr. Harrington's testimony and ignores the evidence on the record, and therefore should be disregarded.  Originally Mr. Springer had the idea for quarterly publications.  (Ex. 7, 11:1-12:10).  The mini-magazine concept was actually very similar to the annual Book, just a change in formatting.  (Ex. 1, 89:13-90:14; Ex. 9, 29:12-24).  Boston Hannah does not dispute that the 2/24/09 email did include the idea of publishing magazines quarterly, but clarifies that Mr. Harrington specifically wrote, "For the first year, I would look to publish two mini publications from each of the two areas…of course this is totally flexible." (Ex. 8).

AAFP Reply:  SOF 50 is uncontroverted.  AAFP has not mischaracterized any evidence.  AAFP's description of Mr. Harrington's concept as "totally different" is

completely faithful to the record.  Mr. Harrington wrote that exact phrase to describe his concept. 2/24/09 Email (AAFP Ex. 20).  At his deposition, he testified that, by using that phrase, he meant that his concept was "totally different from before."  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 78:16-19.  Likewise, in the testimony AAFP cited, Mr. Harrington stated that his proposal for quarterly publications meant four magazines.  For purposes of this motion, AAFP does not dispute that Mr. Springer testified that, back in 2002, he wanted to publish more than one magazine per year, although he did not specify how many.  Springer Dep. (BH Ex. 7) at 11:1-20. Nevertheless, both the 2002 Agreement, at § 1.1,  and 2005 Agreement, at § 1.1.,  provide for a single publication each year.  For purposes of this motion, AAFP does not dispute that Mr. Harrington's email refers only to the first year and does not propose any number of publications for 2010 or any later year.

**SOF 51.**    A few weeks later, Boston Hannah's ambitions had doubled.  Mr. Ford wrote AAFP that the plan was to publish eight magazines a year.  3/18/09 Email from Ford to Montemayor (Ex. 39); Ford Dep. at 83:12-19.  Indeed, Mr. Harrington's dream was to publish up to 16 magazines a year.   Harrington 30(b)(6) Dep. at 133:8-10.  Mr. Ford put it best when he candidly admitted that, as of mid-March of 2009:  "[I]t was still very much a situation in flux. We were trying to ascertain how many we could produce, how the AAFP would be able to cooperate and on what level.  It was basically trying to work it out, I think."  Ford Dep. at 86:2-9.

BH Response:   Admitted in part.   There was never a "plan" to publish eight magazines a year, rather, it was a proposal put forth by Boston Hannah's editor that was never finalized; thus AAFP's statement mischaracterizes the testimony and should be disregarded.   Mr. Harrington and Mr. Springer had worked out that five issues were to be published in 2010 in order to replace the Fifth Edition of the *Family Doctor* Book.   (Ex. 1, 308:2-316:1; Ex. 5, 149:19-24; Ex. 7, 60:10-61:23; Ex. 12, ¶ 10).   Boston Hannah does not dispute that several years into the project, it would have liked to eventually publish up to 16 magazines in one year. (Ex. 1, 90:5-15).

AAFP's Reply:   SOF 51 is uncontroverted.  For purposes of this motion, AAFP does not dispute that, on March 18, 2009, Mr. Ford wrote about a "proposal" rather than a "plan" to publish eight magazines, but this is distinction without a difference in this context.  As reflected in that email, the proposal grew out conversations between Mr. Harrington and Mr. Springer.  3/18/09 Email from Ford to Montemayor (AAFP Ex. 39).  Boston Hannah's assertion of the existence of an agreement to publish five issues in 2010 in lieu of the so-called Fifth Edition is not supported by the evidence and must therefore be disregarded.  Mr. Springer's testimony and Mr. Harrington's affidavit do not propose the same number of magazines for 2010. Furthermore, neither Mr. Springer nor Mr. Harrington attempt to link their testimony to any date. As a result, SOF 51, which states the circumstances as of mid-March of 2009, is uncontroverted.

**SOF 52.**    Those issues were never resolved.  Ford Dep. at 86:10-12.

BH Response:   Denied.  This purported fact ignores relevant evidence in the record and mischaracterizes Mr. Ford's testimony and should be disregarded.  The parties ultimately resolved the issues surrounding the "new approach" and produced three magazines in 2009 in lieu of the Fourth Edition of the *Family Doctor* Book.  (Ex. 1, 67:19-68:24; Ex. 12, ¶ 9).

The decision was resolved when the parties decided to publish between five and six magazines in 2010, and AAFP was comfortable with the production schedule. (Ex. 1, 305:1-23, 307:22-23; Ex. 5, 149:19-24; Ex. 7, 60:10-61:24; Ex. 12, ¶ 10).

    <u>AAFP's Reply:</u>  SOF 52 is uncontroverted.  AAFP has not mischaracterized anything.  In the deposition testimony cited, Mr. Ford confirms that the issues, *i.e.* the state of flux over how many magazines could or would be produced, was never resolved. Furthermore, the evidence is uncontroverted that Boston Hannah did not produce three magazines in 2009.  It published two magazines that year.  SOF 33, 40.  For purposes of this motion, AAFP does not dispute that Mr. Springer testified, that at some point in 2009, he and Mr. Harrington discussed a plan to publish five or six magazines in 2010.  That does not controvert anything in SOF 52, however.

## B.  Placement of a Digital Version on FamilyDoctor.org

    **SOF 53.**  The 2005 Agreement does not grant Boston Hannah the right to place a digital version of the magazine on FamilyDoctor.org.  Harrington 30(b)(6) Dep. at 190:5-191:6; *see generally* 2005 Agreement.  Boston Hannah alleges, however, that the parties amended the 2005 Agreement through their conduct by placing digital copies on FamilyDoctor.org.  Harrington 30(b)(6) Dep. at 160:15-161:7; 190:8-191:18.  Boston Hannah also contends that the parties orally amended the 2005 Agreement to permit Boston Hannah to place a digital version on FamilyDoctor.org.  *Id.* at 428:19-23, 429:8-23.

    <u>BH Response:</u> Admitted in part.  Boston Hannah specifically denies that the 2005 Agreement fails to grant it the right to place a digital version of the magazine on FamilyDoctor.org.  Pursuant to § 4.4 of the 2005 Agreement, the parties agreed to discuss the online application of the *Family Doctor* Books as enhanced advertiser packages, which was done. (Ex. 1, 51:8-11, 104:1-105:16; Ex. 3, § 4.4).  Boston Hannah does not dispute the remaining portion of this purported fact, and adds that because of AAFP's representations, the parties worked together to place a digital version of each publication on FamilyDoctor.org every year, beginning in 2005 or 2006.  (Ex. 1, 107:25-108:6, 162:24-163:20, 164:21-165:2). Consequently, Boston Hannah has receipts dating back to 2006 for the costs associated with converting the Book into a digital version. (Ex. 14).

    <u>AAFP Reply:</u> SOF 53 is uncontroverted.  When asked at his deposition about how the consumer alliance agreement allegedly violated the 2005 Agreement, Mr. Harrington claimed it violated Boston Hannah's right to place a digital version of the magazine on FamilyDoctor.org.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 190:1-14.  When asked to point out that allegedly violated provision in the 2005 Agreement, Mr. Harrington said, "It's not in there."  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 190:15-191:1.  Boston Hannah is bound by the testimony of its Rule 30(b)(6) witness.  *New Jersey,* 2010 WL 610671, at *2.  For purposes of this motion, AAFP does not dispute that § 4.4 of the 2005 Agreement obligates the parties "to discuss possible online applications for the content and as enhanced advertiser packages (at a premium price)."  That language, however, does not controvert SOF 53 or Mr. Harrington's testimony because it does not grant Boston Hannah the right to place a digital copy on any website and does not obligate AAFP to do so either.  Only a valid amendment to the 2005 Agreement or a separate, enforceable agreement could create those obligations.  Finally, the

documents in BH Ex. 14 are not admissible.  There is no foundation for those documents, which also appear to contain inadmissible hearsay, and perhaps multiple levels of hearsay.

**SOF 54.**    A digital version of each magazine was linked to FamilyDoctor.org each year.  Harrington 30(b)(6) Dep. at 105:6-16, 107:25-108:6; White Dep. at 51:21-52:1, 68:1-4, 74:7-17; Townsend Dec. (Ex. 16) at ¶ 2; Montemayor Dec. at ¶¶ 2-3.  AAFP provided these links as a courtesy to Boston Hannah.  Townsend Dec. at ¶ 2; Montemayor Dec. at ¶ 2.

BH Response:   Admitted in part.  Boston Hannah does not dispute that a digital version of each publication was linked directly to FamilyDoctor.org each year.  Boston Hannah denies that AAFP provided these links solely as a courtesy to Boston Hannah.  AAFP agreed that the digital version would be placed on FamilyDoctor.org, as such placement enhanced traffic on FamilyDoctor.org and was included in the Media Packs approved by AAFP. (Ex. 1, 106:7-25; Ex. 5, 39:1-40:20; Ex. 12, Ex. B attached thereto; Ex. 30, Media Packs).

AAFP Reply:   SOF 54 is uncontroverted.  Boston Hannah cites nothing that controverts AAFP's evidence that it provided links as a courtesy to Boston Hannah. Furthermore, the documents in BH Ex. 30 are not admissible.  There is no foundation for those documents, including without limitation no evidence of authenticity, of how the documents were used, if at all, of the status of the documents as a draft or final version, etc.  BH Ex. 30 also seems to contain hearsay for unidentified sources.  In addition, Boston Hannah's assertions and any testimony about the contents of any media pack are  inadmissible hearsay.  Finally, the other materials cited by Boston Hannah do not even address digital versions of the magazine, so they cannot and do not controvert anything in SOF 54.

**SOF 55.**   During  the  years  the  2005  Agreement  was  in  effect,  the FamilyDoctor.org website has evolved.  Townsend Dec. at ¶ 3.  As that has occurred, AAFP has from time to time added, removed and/or moved the location(s) of one or more of the links on the website to the magazines.  *Id.*

BH Response:   Admitted in part.  The parties worked together regarding the specific placement of the digital version on FamilyDoctor.org.  (Ex. 1, 406:19-407:23; Exs. 8 and 15; Ex. 31, 10/21/09 J. Harrington Email).

AAFP Reply:   SOF 55 is uncontroverted.  Boston Hannah has provided no foundation for BH Ex. 15 and 31, which are therefore not admissible.  Nevertheless, for purposes of this motion, AAFP does not dispute that, as a courtesy, it worked with Boston Hannah to place a digital version of the magazine on FamilyDoctor.org.  It is not clear what Boston Hannah means by "specific placement," but the evidence in SOF 55 that AAFP from time to time added, removed and/or moved the location(s) of one or more of the links on the website is uncontroverted.

**SOF 56.**   Currently, FamilyDoctor.org contains links to digital copies of the 2009 publications, *Living with Diabetes* and *Healthy Living*, as well as the 2010 edition: *Understanding Over the Counter Medicines*.  Townsend Dec. at ¶ 3; Montemayor Dec. at ¶ 3.

DB04/001520.0138/5231935.4DD02

At least one link to each of these magazines has remained on FamilyDoctor.org at all times since it was first placed on the website.  Townsend Dec. at ¶ 3; Montemayor Dec. at ¶ 3.

        BH Response:  Admitted in part.  Boston Hannah does not dispute that currently, FamilyDoctor.org contains links to digital copies of the publications *Living With Diabetes, Healthy Living,* and *Understanding Over the Counter Medicines*, but clarifies that these links are not embedded in certain parts of the FamilyDoctor.org website as detailed in the Media Packs because of the ████████████████████████ (Ex. 1, 412:20-25; Ex. 9, 69:6-20, 72:17-20; Ex. 32, ███████████████████████████████ Ex. 34, 1/13/10 White/Townsend Email thread; Ex. 35, 4/6/10 White Email).  Boston Hannah denies that at least one link to each of these magazines has remained on FamilyDoctor.org at all times since it was first placed on the website.  (Ex. 1, 412:20-25; Ex. 9, 69:6-20, 72:17-20; Ex. 34; Ex. 35).

        AAFP Reply:  SOF 56 is uncontroverted.  None of the evidence cited by Boston Hannah controverts AAFP's statement that at least one link to each magazine has remained on FamilyDoctor.org at all times since it was first placed on the website.  Rather, the evidence Boston Hannah cites supports the statement in SOF 55 that AAFP has from time to time added, removed and/or moved the location(s) of one or more of the links.  Finally, Boston Hannah's assertion about details in the Media Packs should be disregarded because Boston Hannah has not submitted any admissible evidence of any Media Pack for any magazine and Boston Hannah's assertions are inadmissible hearsay.  *See* AAFP's Reply to SOF 54.

### C.    Advertisements on FamilyDoctor.org.

        **SOF 57.**    The 2005 Agreement does not grant Boston Hannah the right to sell advertising on FamilyDoctor.org.  Harrington 30(b)(6) Dep. at 99:11-20; 103:18-21; 108:7-17.  Boston Hannah asserts, however, that the 2005 Agreement was amended by an oral agreement to grant Boston Hannah the right to sell advertising on FamilyDoctor.org.  *Id*. at 165:3-11, 431:13-18.  A "banner" advertisement is an advertisement placed on a website, which runs across the top or bottom of the site, or along the side as a "skyscraper."  Oakley 30(b)(6) Dep. (Ex. 4) at 11:12-23.

        BH Response:  Admitted in part.  Boston Hannah denies that the 2005 Agreement does not grant it the right to sell advertising on FamilyDoctor.org, and § 4.4 of the 2005 Agreement contemplates the opposite conclusion.  (Ex. 3, § 4.4).  Such enhanced advertising packages were approved by AAFP through its written approval of the 2009 Media Packs, which specifically stated that each advertiser could receive Banner Ads on AAFP's official website.  (Ex. 1, 106:7-25; Ex. 5, 39:1-40:20; Ex. 30). Moreover, after Boston Hannah began selling Banner Ads it communicated such to AAFP, who approved.  (Ex. 12, Ex. B attached thereto).  Boston Hannah does not dispute the rest of this purported fact.

        AAFP Reply:  SOF 57 is uncontroverted.  In the testimony cited for the first sentence of SOF 57, Mr. Harrington, who was testifying as Boston Hannah's Rule 30(b)(6) witness repeatedly confirmed that the 2005 Agreement does not mention advertising on FamilyDoctor.org.  Boston Hannah is bound by that testimony.  *New Jersey,* 2010 WL 610671, at *2.  Moreover, even if Mr. Harrington had not settled this question, Boston Hannah's

assertions about § 4.4 of the 2005 Agreement are an inadmissible argument about an inadmissible legal conclusion.  Further, by its terms, § 4.4 refers only to discussions.  The plain language of the provision does not create any right to advertise or obligation to allow advertising on FamilyDoctor.org.  For the reasons stated in AAFP's reply to SOF 54, BH Ex. 30 and Boston Hannah's assertions about the content of the media packs and any testimony about the content of the media pack are not admissible.  Accordingly, the assertions about Media Packs have no evidentiary basis and must therefore be disregarded.  Finally, for purposes of this motion, AAFP does not dispute that Boston Hannah sold some advertising for FamilyDoctor.org.  As explained in SOF 58, however, those sales were through Boston Hannah's separate arrangement with AnswersMedia, not pursuant to anything in the 2005 Agreement.

SOF 58.   The only way for Boston Hannah to sell advertising on FamilyDoctor.org was through a third party, AnswersMedia.  Harrington 30(b)(6) Dep. at 102:12-24; 210:11-15;  Springer Dep. at 113:24-114:23.  In February/March of 2009, Mr. Springer introduced Mr. Harrington to AnswersMedia.  Harrington 30(b)(6) Dep. at 432:15-433:6.  According to Mr. Harrington, it was orally agreed at that time that Boston Hannah would sell advertising on FamilyDoctor.org through AnswersMedia.  *Id*. at 432:15-433:23.

BH Response:  Admitted in part.  The only way for Boston Hannah to sell Banner Ads on FamilyDoctor.org was through its arrangement with AnswersMedia.  Boston Hannah does not dispute that Mr. Springer introduced Mr. Harrington to AnswersMedia, and adds that Mr. Springer did so because AAFP wanted to integrate the *Family Doctor* Books with the whole AAFP business plan, maximize the Books' appeal to consumer advertisers, and bring traffic to FamilyDoctor.org.  (Ex. 7, 29:14-30:7; Ex. 8; Ex. 30; Ex. 36, 9/12/09 Springer/Dicus Email).  The parties accomplished this by allowing Boston Hannah to offer both print and online enhanced advertising packages.  (Ex. 1, 103:4-105:25; Ex. 3, § 4.4; Ex. 7, 29:14-30:7).  Boston Hannah does not dispute that it was orally agreed that Boston Hannah could sell Banner Ads on FamilyDoctor.org through AnswersMedia, in accordance with the 2005 Agreement, but clarifies that this agreement was placed in writing as reflected by AAFP's approval of the Media Packs with Banner Ad offerings in them.  (Ex. 1, 106:7-25; Ex. 5, 39:1-40:20; Ex. 30).  Furthermore, AAFP's Director of Online Development and Partnerships encouraged (sic) approved the arrangement between Boston Hannah and AnswersMedia. (Ex. 12, Ex. B attached thereto; Ex. 37, Bradley Houseton Depo. 104:19-23, 106:3-11, 114:16-20; Ex. 38, 6/1/09 Emails Townsend/Foley).  AAFP continued to be supportive of Boston Hannah's practice until it entered into the Consumer Alliance Agreement with ███████████████. (Ex. 7, 95:20-96:20).

AAFP Reply:  SOF 58 is uncontroverted.  Boston Hannah's response is devoted to its additional assertions, not an attempt to controvert anything in SOF 58.  For purposes of this motion, AAFP does not dispute that AAFP wanted to integrate the *Family Doctor* magazines with the overall AAFP business plan and maximize the appeal of the magazines to advertisers.  Boston Hannah's assertion that Mr. Springer introduced Mr. Harrington to AnswersMedia in order to bring traffic to FamilyDoctor.org is not supported by the evidence Boston Hannah cites and must therefore be disregarded.  For purposes of this motion, AAFP also does not dispute that Boston Hannah sold advertising for the print magazines and sold advertising directly on FamilyDoctor.org.  Boston Hannah's contention that the sale of advertising on FamilyDoctor.org was "in accordance with the 2005 Agreement" is without

64

evidentiary basis, is inadmissible argument and must therefore be disregarded.  In fact, Boston Hannah admits that it could only sell advertising on FamilyDoctor.org through its arrangement with AnswersMedia, an arrangement that AAFP was not a party to.  *See* BH Response to SOF 58 and 59.  For the reasons stated in AAFP's Reply to SOF 54, BH Ex. 30 is not admissible, and neither are Boston Hannah's assertions about the content of the media packs and any testimony about the content of the media pack.  For purposes of this motion, AAFP does not dispute that it knew about and had no general objection to Boston Hannah selling advertisements for FamilyDoctor.org through Boston Hannah's agreement with AnswersMedia.  Boston Hannah's assertion that, after entering the consumer alliance agreements, AAFP stopped being supportive of AAFP selling ads for FamilyDoctor.org through its arrangement with AnswersMedia overstates the evidence cited and to that extent is inadmissible.  After entering the consumer alliance agreements, AAFP eventually limited on line advertising of beverages and supplements, but continued to have no objection to Boston Hannah selling banner advertisements for other products, or for permitted beverages and supplements.

      **SOF 59.**    Boston Hannah eventually purchased banner advertising space on FamilyDoctor.org from AnswersMedia on a CPM basis—cost per thousand impressions. Harrington 30(b)(6) at 98:18-99:10.  That was a commercial transaction between AnswersMedia and Boston Hannah to which AAFP was not a party.  Springer Dep. at 113:24-114:23.

      BH Response:  Admitted in part.  Boston Hannah does not dispute that it purchased Banner Ad space on FamilyDoctor.org from AnswersMedia on a CPM basis.  Boston Hannah states that while AAFP was not a party to the agreement between AnswersMedia and Boston Hannah, AAFP was still responsible for overseeing FamilyDoctor.org and AAFP brought Boston Hannah and AnswersMedia together to allow Boston Hannah to offer Banner Ads.  (Ex. 1, 209:18-25; Ex. 7, 29:14-30:7; 114:6-10; Ex. 36; Ex. 38; Ex. 39, Craig Doane Depo. 21:3-15; Ex. 40, Dicus Rule 30(b)(6) Depo. 35:10-36:8; Ex. 41, Handwritten Note from Springer to Dicus).

      AAFP Reply:  SOF 59 is uncontroverted.  For purposes of this motion, AAFP does not dispute the assertions in Boston Hannah's response to SOF 59, which do not controvert anything in SOF 59.

      **SOF 60.**    Boston Hannah did not resell the advertising space it had purchased on FamilyDoctor.org.  Rather, ███████████████████████████████████████████████████████████████████████████████████████████.  Oakley 30(b)(6) Dep. at 12:17-14:7. ██████████████████████████████████.  *Id*. at 14:8-11.

      BH Response:   Denied.  This purported fact mischaracterizes Mr. Oakley's testimony and should be disregarded.  Boston Hannah provided online Banner Ads to advertisers as part of an enhanced advertising package to persuade advertisers who were unsure about Boston Hannah's advertisement proposal.  (Ex. 42, Oakley Rule 30(b)(6) Depo. 13:17-14:7; Ex. 30).

      AAFP Reply:  SOF 60 is uncontroverted.  AAFP did not mischaracterize anything.  While appearing as Boston Hannah's Rule 30(b)(6) witness, Mr. Oakley testified

without objection as AAFP has described.  Boston Hannah is bound by this testimony.  *New Jersey*, 2010 WL 610671, at *2.  For the reasons stated in AAFP's Reply to SOF 54, BH Ex. 30 is not admissible.  Furthermore, BH Ex. 30 does not purport to address what advertising Boston Hannah offered to any advertiser, or at what price.

## VI.    THE CONSUMER ALLIANCE PROGRAM

SOF 61.    In early 2008, AAFP created the Consumer Alliance Program, through which AAFP partners with private sector companies to create and enhance AAFP programs and projects, including the patient education content on FamilyDoctor.org.  Doane 30(b)(6) Dep. (Ex. 8) at 17:14-24; Doane Dep. (Ex. 7) at 28:15-29:12; Houseton Dep. (Ex. 10) at 63:10-64:22, 65:2-7; Doane Dec. (Ex. 48) at ¶ 2.

BH Response:  Admitted in part.  Boston Hannah does not dispute this purported fact, but it is incomplete.  AAFP also entered into the



AAFP Reply:  SOF 61 is uncontroverted.  Boston Hannah has provided no foundation for BH Ex. 44, which is therefore not admissible.  Nevertheless, for purposes of this motion, AAFP does not dispute Boston Hannah's assertions to this paragraph, which do not controvert anything in SOF 61.

SOF 62.    Effective ████████████, AAFP and ████████ entered into a ████████████████ Dicus Dep. at 58:23-59:2, 59:23-60:15.   A copy of the ████████████ is attached as Ex. 36.   The ████████████ has a ████████.



BH Response:  Admitted in part.  While the ████████████ purported to have a ████████████, AAFP represented to Boston Hanna that

AAFP Reply:  SOF 62 is uncontroverted.  Boston Hannah's assertion that AAFP represented to Boston Hannah that ████████████████████████ is without any evidentiary basis and must therefore be disregarded.  Boston Hannah has provided no foundation for BH Ex. 47, which is therefore inadmissible.  For purposes of this motion, AAFP does not dispute that it informed Boston

66

Hannah that ███████████████████████████████████ That fact does not dispute anything in SOF 62.



███████████ Subject to various caveats, ████████████████
█████████████████████████████████████████████
████████████████████████████████ The limits apply to
████████████████████████████████

BH Response:  Denied.  This purported fact mischaracterizes the severity of ███████████████████████ and therefore should be disregarded.  The ████████████ actually contains an exclusivity clause which specifically states,

AAFP Reply:  SOF 63 is uncontroverted.  For purposes of this motion, AAFP does not dispute that Boston Hannah has quoted part of the consumer alliance agreement.  That agreement is the best evidence of what it says and it speaks for itself.  The final sentence of Boston Hannah's response is based only on testimony that was properly objected to as calling for a legal conclusion.  That sentence must therefore be disregarded.

**SOF 64.**   On February 3, 2010, AAFP notified Boston Hannah of § IV. of the ████████████ 2/3/10 Email from Springer to Harrington ("2/3/10 Email") (Ex. 28); Springer Dep. at 88:12-89:11; Harrington 30(b)(6) Dep. at 171:23-172:5.  Mr. Springer wrote:



█████████████████████████████████ 2/3/10 Email.  Mr. Springer attached a memorandum that quotes from the relevant language in ████████████████████████████████████████████████████████████████ The memorandum also explained that the restrictions were to be in effect until ████████████████████

BH Response:  Admitted in part.  Boston Hannah does not dispute that the quoted language in this purported fact is as quoted; however, this purported fact is incomplete.  Importantly, in his 2/3/10 email, Mr. Springer also stated, "We realize this is too restrictive…" (Ex. 48).  Furthermore, the statement █████████████████████████████ mischaracterizes the evidence and should be

67

disregarded.  The attached memorandum actually stated 

AAFP Reply:  SOF 64 is uncontroverted.  For purposes of this motion, AAFP does not dispute that Boston Hannah has quoted part of the 2/3/10 email and attachment.  Those documents are the best evidence of what they say and those documents speak for themselves.  Boston Hannah's accusation that AAFP mischaracterized the evidence is not true as examination of attachment to the email shows.  Moreover, Mr. Harrington confirmed that Boston Hannah knew that the consumer alliance agreement with █████████████████  ████████████  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 177:17-178:12.

SOF 65.  When he received the 2/3/10 Email, Mr. Harrington opened and reviewed the attached memorandum, which contained the exclusivity provision for ████████  ████████  Harrington 30(b)(6) Dep. at 173:13-15.  Mr. Harrington then replied that the limitation from ██████████████  was okay:  "I have told the team ████████████  ████████  companies are not allowed.  It's a bit of a pain but if its only till later in the year it should be OK."  2/4/10 Email from Harrington to Springer ("2/4/2010 Email") (Ex. 29); Harrington 30(b)(6) Dep. at 173:13-15; 174:2-5; 177:5-178:12.  Mr. Harrington was truthful and accurate in the 2/4/10 email.  Harrington 30(b)(6) Dep. at 187:1-4.

BH Response:  Admitted in part.  Boston Hannah does not dispute that Mr. Harrington opened the memorandum attached to the 2/3/10 Email, which contained the exclusivity provision for the █████████████████████.  Boston Hannah does not dispute that the quoted language is stated as quoted, and that Mr. Harrington thought he was being truthful and accurate in the 2/4/2010 email, but denies that Mr. Harrington replied that the limitation was "okay", and adds that this entire purported fact mischaracterizes Mr. Harrington's testimony and takes his statement out of context and should therefore be disregarded.  Mr. Harrington briefly reviewed Mr. Springer's correspondence and quickly responded stating it shouldn't be too much of a pain because Mr. Harrington honestly understood at that time that the advertising ban was a ban on ████████ products, which by their very nature were not allowed in the publications, and also on competing water companies, but nothing else.  (Ex. 1, 174:2-175:2; 178:5-179:18; Ex. 49, 2/4/10 Harrington Email).  Mr. Harrington understood that, Boston Hannah would have lost only one small area that it would not get any advertising from anyway.  (Ex. 1, 174:2-175:2; 178:5-179:18; Ex. 49).  In his reply to Mr. Springer's email, Mr. Harrington never imagined that the advertising restriction was going to be interpreted to stop other healthy products from advertising.  (Ex. 1, 175:3-23).  This is also evidenced by Mr. Springer's testimony that, he also knew at the time Mr. Harrington wrote the 2/4/10 email, Mr. Harrington did not understand the implications that the advertising ban wasn't just a matter of ██████████; that in reality the advertising restriction effectively took any liquid product out of the realm of possible advertisers.  (Ex. 7, 92:7-18).  It was never Boston Hannah's position that the limitations were "okay."  (Ex. 1, 176:9-177:4).  At the time, if Boston Hannah had known how far-reaching the advertising ban

68

was, Mr. Harrington certainly would not have responded to the 2/3/10 Email in that way.  (Ex. 1, 176:9-177:4).

                             **AAFP Reply:**  SOF 65 is uncontroverted.  Boston Hannah's assertion that Mr. Harrington responded to the 2/3/10 Email by "stating it shouldn't be too much of a pain because Mr. Harrington honesty understood at that time that the advertising ban was a ban on ████████████████ . . . but nothing else" is not supported by the evidence and must therefore be disregarded.  Mr. Harrington's truthful and accurate 2/4/2010 email, which is quoted in SOF 65, indisputably was not what Boston Hannah asserts in its response to this paragraph.  In his truthful and accurate 2/4/2010 email, Mr. Harrington stated that advertising by ████████████ ██████████████████████  He did not refer to any particular product or category of products.  And, he confirmed that such a limitation should be "OK."  Boston Hannah's attempt to rewrite Mr. Harrington's truthful and accurate response is improper and inadmissible.  Boston Hannah's citation to testimony from Mr. Springer is also improper and inadmissible.  AAFP properly objected to Mr. Springer's speculation about Mr. Harrington's understanding, and in the portion of Mr. Springer's testimony that was not the subject of the objection, Mr. Springer confirmed that Mr. Harrington's response was that the limitation was a bit of pain, but something Boston Hannah could deal with.  Springer Dep. (BH Ex. 7) at 92:7-24.



                             Effective ██████████, AAFP and ████████ entered into a ████ Dicus Dep. at 113:1-14.  A copy of the ██████████████████████████ is attached as Ex. 37.   The ██████████ ████████ has a

                             **BH Response:**  Admitted in part.  Boston Hannah does not dispute that, effective ██████████████, AAFP and ██████████ entered into a ██████ and states that the ████████████████████████ speaks for itself.  However, this purported fact is incomplete.

                             **AAFP Reply:**  SOF 66 is uncontroverted.  For purposes of this motion, AAFP does not dispute that Boston Hannah has paraphrased and quoted parts of the ██████████ ██████████  That agreement is the best evidence of what it says and it speaks for itself.  The paraphrased and quoted language does not controvert anything in SOF 66.

        **SOF 67.**  Subject to various caveats, ██████████████████████ states limits on advertising AAFP can accept for dietary supplements other than ████████ ████████████████████████████████████████ █  ████████████████████████████████████████████  Among other things, the limits in the ██████ ████████████████████████████████████████

 Harrington 30(b)(6) Dep. at 181:15-18; Dicus Dep. at 114:6-115:4; Doane Dec. at ¶ 4.

<u>BH Response:</u>  Admitted in part.  This purported fact mischaracterizes the severity of ████████████████████████ and therefore should be disregarded.  The ██████████ actually contains an exclusivity clause which specifically states,

████████████ Boston Hannah does not dispute that the exclusions are applicable to FamilyDoctor.org, and denies that they are inapplicable to the *Family Doctor* publications and AAFP's other print media, because the digital versions of the *Family Doctor* books were placed on FamilyDoctor.org.  (Ex. 1, 181:15-182:1, 102:25-104:13).  If the advertisements were put in the print publications but removed from the digital versions, Boston Hannah would have reneged on its agreement with its advertisers. (Ex. 1, 188:1-189:6)

<u>AAFP Reply:</u>  SOF 67 is uncontroverted.  For purposes of this motion, AAFP does not dispute that Boston Hannah has quoted part of the ████████████████.  That agreement is the best evidence of what it says and it speaks for itself.  Boston Hannah has misinterpreted AAFP's statement in SOF 67 that the ██████████████ does not apply to the *Family Doctor* publications and AAFP's other print media.  AAFP meant that statement literally.  The ████████████ does not apply to print media, *i.e.* printed, paper magazines.  AAFP does not dispute that the ████████████ applies to FamilyDoctor.org.  However, as Boston Hannah admits in its response to SOF 54, AAFP always placed on FamilyDoctor.org links to copies of the digital version or each magazine.  Finally, Boston Hannah's assertion that removal of advertisements from the digital version would have caused Boston Hannah to renege on its advertising agreements is an inadmissible argument about an inadmissible legal conclusion.  Moreover, the testimony cited by Boston Hannah is about the removal of a banner ads, not the effect of removing advertisements from digital copies of the magazines.

**SOF 68.**  AAFP notified Boston Hannah of the ██████████████ on March 5, 2010.  3/5/2010 Letter to Kevin Harrington ("3/5/10 Letter) (Ex. 30) at 1; Houseton Dep. at 136:25-137:21.  In the letter, AAFP informed Boston Hannah that:

- An advertisement for Elations juice drinks needed to be removed from *Understanding Over the Counter Medicines* and could not be placed on FamilyDoctor.org.

- *Understanding Over the Counter Medicines* and any digital version could include advertisements for dietary supplements because Boston Hannah sold those advertisements prior to February 1.

- Boston Hannah was not authorized to sell advertising that features dietary supplements in future AAFP print or online publications.

3/5/10 Letter.

        BH Response:  Admitted in part.  Boston Hannah does not dispute that AAFP notified Boston Hannah of the ▮▮▮▮▮▮▮▮▮▮▮▮ on March 5, 2010.  Boston Hannah clarifies that the 3/5/10 Letter specifically states, "The upcoming print and virtual editions of 'Understanding Over the Counter Medicines' includes an advertisement for Elations® juice drinks.  Because this is [sic] advertisement features a beverage, it must be removed from the print/virtual publication and furthermore, cannot be placed on FamilyDoctor.org."  Boston Hannah denies that AAFP told Boston Hannah that *Over the Counter Medicines* and any digital version could include advertisements for dietary supplements because Boston Hannah sold those advertisements prior to ▮▮▮▮▮▮▮  Rather, the language of the 3/5/10 Letter states that Boston Hannah was authorized to run dietary supplement advertisements in the edition of *Over the Counter Medicines* currently being printed, but not on FamilyDoctor.org, which was where the virtual edition would have been placed.  (Ex. 50, 3/5/10 Letter; Ex. 51, 3/11/10 Doane/Townsend Email).  Boston Hannah does not dispute that AAFP told Boston Hannah that it was not authorized to sell advertising that featured dietary supplements in any future AAFP print, virtual, or online publications. (Ex. 50).

        AAFP Reply:  SOF 68 is controverted in part.  In AAFP's view, the statement in the 3/5/10 Letter that ads for dietary supplements and dietary supplement companies could not be placed on FamilyDoctor.org refers to banner advertisements, not the digital version of any magazine.  That said, for purposes of this motion, AAFP does not dispute that the language of the 3/5/10 letter could be read as applying to the digital version as well as banner ads.  Regardless, as Boston Hannah admits, AAFP placed a link on FamilyDoctor.org to a complete copy of the digital version of each magazine, including a digital version of *Understanding Over the Counter Medicines*.  SOF 54-56; BH Response to SOF 54.  Boston Hannah has provided no foundation for BH Ex. 51, which is therefore inadmissible.  Furthermore, BH Ex. 51 does not address the placement of digital copies of the magazines online.

        **SOF 69.**   As of March 5, AAFP was not aware that *Understanding Over the Counter Medicines* had just been published.  3/9/10 Email; Harrington 30(b)(6) Dep. at 191:21-193:1.  When AAFP learned this, it abandoned its request for Boston Hannah to remove the advertisement for Elations juice drinks.  Harrington 30(b)(6) Dep. at 191:21-193:1.  Ms. Guzman emailed Mr. Harrington and stated that AAFP would explain the situation to its corporate partner and take responsibility for it.  3/9/10 Letter.

        BH Response:  Admitted in part.  Boston Hannah does not dispute that Ms. Guzman emailed Mr. Harrington and stated that AAFP would explain the situation to its corporate partner and take responsibility for it.  Boston Hannah denies the rest of this purported fact, and states that the term "abandoned" is argumentative and should be disregarded.  AAFP knew at the time of publication of *Over the Counter Medicines* that it was being published, because AAFP had already agreed and had signed off on a significant part of the publication in

November 2009. (Ex. 1, 59:22-60:22; 145:4-146:20, 166:5-167:17; Ex. 5. 31:10-32:3; Ex. 12, ¶ 9).

AAFP Reply:  SOF 69 is uncontroverted.  Boston Hannah's assertion that AAFP knew at the time of publishing that Boston Hannah was publishing *Understanding Over the Counter Medicines* is without any evidentiary basis and is therefore not admissible.  Rather, as Ms. Guzman stated in her email, Boston Hannah published *Understanding Over the Counter Medicines* without obtaining the final "good to go" from AAFP.  3/9/10 Email (AAFP Ex. 31).

**SOF 70.**  As a result, AAFP approved the selection of advertisers and advertising content that appeared in all *Family Doctor* publications from 2006-2010, including advertising for beverages and dietary supplements.  Guzman Dec. at ¶ 8.

BH Response:  Denied.  This purported fact misstates the facts in evidence and should be disregarded.  AAFP did approve all the advertisements appearing in the *Family Doctor* written publications from 2006-2010, however, beginning in 2010 AAFP did not approve certain Banner Ads to run on the FamilyDoctor.org website, and links to the digital versions were taken down from certain areas of the FamilyDoctor.org website.  (Ex. 9, 69:6-20, 72:17-20; Ex. 34; Ex. 35; Ex. 37, 122:2-17; Ex. 52, 4/6/10 Doane/Houseton Email thread; Ex. 79, 3/4/10-3/12/10 Advertisement Rejection Emails).

AAFP Reply:  SOF 70 is uncontroverted.  Contrary to Boston Hannah's accusation, AAFP did not misstate the evidence.  Indeed, Boston Hannah admits as much after making its false accusation.  For purposes of this motion, AAFP does not dispute that some—but not all—of the links to the digital versions of various magazines were moved and/or removed from certain areas of the FamilyDoctor.org website.  *See* SOF 54-56.  Boston Hannah's assertion that AAFP did not approve certain banner ads is not supported by citations to admissible evidence and must be disregarded.  BH Ex. 79 is inadmissible.  It lacks any foundation and is hearsay.

**SOF 71.**  The AAFP also promptly addressed an error in the 3/5/10 Letter.  The 3/5/10 Letter erroneously stated the scope of the limitation in the ███████████████████ Houseton Dep. at 138:13-18.  According to its terms, ███████████████████████████ ██████████████████  Harrington 30(b)(6) Dep. at 181:15-18.  On March 24, 2010, Boston Hannah and AAFP had a conference call.  *Id.* at 203:20-25.  During this phone call, AAFP clarified that the restriction on dietary supplement advertisements applied only to FamilyDoctor.org.  *Id.* at 207:21-24.

BH Response:  Admitted in part.  Boston Hannah does not dispute that the 3/5/10 Letter erroneously stated the scope of the limitation in the ███████████████████. Boston Hannah states that ███████████████████  speaks for itself, and clarifies that, it was not until the ███████████████  was produced through discovery in this litigation that Boston Hannah had full access to such information.  (Ex. 1, 382:3-384:16; 388:11-390:11; 393:25-394:20).  Boston Hannah does not dispute that on March 24, 2010, AAFP and Boston Hannah had a conference call, but denies the remainder of this fact.  (Ex. 1, 203:20-204:1).  The fact that AAFP later corrected its inaccurate representation does not change the effect the

limitations had the advertisers, because the digital versions, which is an identical copy of the *Family Doctor* Books, would not be able to be placed on FamilyDoctor.org.  (Ex. 1, 181:19-182:1; Ex. 52).

       AAFP Reply:  SOF 71 is uncontroverted.  For purposes of this motion, AAFP does not dispute that it produced ███████████ during discovery, which gave Boston Hannah "full access" to the terms of the entire document.  Boston Hannah's implication, however, that it did not have full access to the relevant terms of ███████████ in March of 2010 is contrary to the record and must therefore be disregarded.  The advertising provisions in the agreement were discussed at length by the parties during March of 2010.  *See* SOF 68-71.  In its response to SOF 71, Boston Hannah admits that a March 24, 2010 conference call occurred but "denies the remainder of this fact."  It is not clear what Boston Hannah means by this.  In support of its denial, Boston Hannah cites only the testimony of Mr. Harrington where he state he does not recall exactly what was stated during the call.  While that may be so, Mr. Harrington did recall that, during the call, AAFP clarified that the restrictions on dietary supplement advertisements applied only to FamilyDoctor.org.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 207:21-24.  Furthermore, Boston Hannah's statement that digital versions of the magazines would not be able to be placed on FamilyDoctor.org is inadmissible speculation.  The record shows that AAFP placed links on FamilyDoctor.org to the complete digital version of each magazine, and did so both before and after the March 5, 2010 communication.  SOF 53-56.  Finally, after receiving the 3/5/10 Letter and the 2/3/10 Email before it, Boston Hannah did not change any of its advertising practices.  SOF 79.

## VII.    TERMINATION OF THE 2005 AGREEMENT

       **SOF 72.**   On April 8, 2010, Boston Hannah wrote AAFP a letter stating as accurately as possible Boston Hannah's view of the issues between the parties.  Harrington 30(b)(6) Dep. at 207:10-24, 208:10-14; 4/8/10 Letter from Ayers to Valponi ("4/8/10 Letter") (Ex. 32).  According to Boston Hannah, the ████████████████████████████ ███████████ in the magazines or on FamilyDoctor.org.  4/8/10 Letter; Harrington 30(b)(6) Dep. at 209:3-8.  The ████████████████████████████████████████ but only on the website FamilyDoctor.org.  4/8/10 Letter; Harrington 30(b)(6) Dep. at 209:3-8.  AAFP did not take the position that the limitations in the ███████████ should be applied or interpreted more broadly.  Harrington 30(b)(6) Dep. at 390:12-16.

       BH Response:  Admitted in part.  Boston Hannah does not dispute that it wrote AAFP a letter stating Boston Hannah's view of the issues between the parties as accurately as it knew them to be at that time, but clarifies that Mr. Harrington actually stated this in his deposition on pp. 208:25-209:2. Boston Hannah states that the contents of the 4/8/10 letter speak for themselves.  Mr. Harrington cannot testify for AAFP, thus Boston Hannah denies the remainder of this purported fact.

       AAFP Reply:  SOF 72 is uncontroverted.  Boston Hannah's attempt to deny the final sentence of SOF 72 is without effect.  Testifying as Boston Hannah's Rule 30(b)(6) witness, Mr. Harrington admitted that AAFP did not take the position that the limitations in the ███████████ should be applied or interpreted broadly.  Harrington

73

30(b)(6) Dep. (AAFP Ex. 1) at 390:12-16.  Boston Hannah is bound by this admission.  *New Jersey,* 2010 WL 610671, at *2.

        **SOF 73.**   Boston Hannah intended for the 4/8/10 Letter to terminate the 2005 Agreement immediately.   Harrington 30(b)(6) Dep. at 214:16, 217:3-12.   Boston Hannah announced that there was "no purpose in producing the agreed schedule of publications during the year," and that Boston Hannah therefore would only produce two additional publications "where advertising is already sold on and work is at an advanced stage."  4/8/10 Letter.  Boston Hannah stated that it would "cease all work" after completing those two titles.  *Id.*

        BH Response:  Admitted in part.  Boston Hannah denies that it intended for the 4/8/10 Letter to terminate the 2005 Agreement, the term "termination" is a legal conclusion and should be disregarded.   Furthermore, this statement mischaracterizes Mr. Harrington's testimony and fails to take into consideration relevant testimony on the record and should be disregarded for this reason as well.  Mr. Harrington believed that the termination had already occurred by AAFP's actions.  (Ex. 1, 168:10-23; 208:10-14, 213:9-21).  Boston Hannah does not dispute that the 4/8/10 Letter speaks for itself, and also states the reason why there was no purpose in producing the agreed schedule of publications and why it was only producing the publication where work was at an advanced stage, was because AAFP had destroyed "all the potential of profitable publications" (Ex. 53, 4/8/10 Letter).   The reason that Boston Hannah wrote the 4/8/10 Letter was to explain to AAFP that Boston Hannah had tried to compromise with AAFP and mitigate its losses, but the restrictions were too harsh, too much of Boston Hannah's advertising market had been taken away, and the advertisers were not getting what they had been promised.  (Ex. 1, 215:8-216:12).  Boston Hannah saw the 4/8/10 Letter as "one last shot at trying to get [AAFP] to see sense for the damage they had caused" and try and come to a resolution.  (Ex. 1, 215:8-216:12).

        AAFP Reply:  SOF 73 is uncontroverted.  AAFP has not mischaracterized anything.  As Boston Hannah's Rule 30(b)(6) witness, Mr. Harrington testified that Boston Hannah intended for the 4/8/10 Letter to terminate the 2005 Agreement immediately.  This was Boston Hannah's admission and Boston Hannah never made any objection to the questions or answers that produced this testimony.  Boston Hannah is bound by this testimony.  *New Jersey,* 2010 WL 610671, at *2.  By contrast, the testimony Boston Hannah cites for the last two sentences of its response is not admissible because AAFP properly made valid objections to the testimony at the time it was made.  See Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 215:13-14, (objecting to 215:8-216:14 as nonresponsive and moving to strike).

        **SOF 74.**   As noted previously, see SOF 41-43, *supra,* there were no magazines at an advanced stage.  And, shortly thereafter, Boston Hannah decided not to do any additional work on any publication.   Harrington 30(b)(6) Dep. at 227:21-228:20.   Boston Hannah's salespeople halted their efforts to sell advertising for the AAFP publications in March or April 2010.  Oakley Dep. (Ex. 3) at 70:11-16; 73:18-23; 75:14-76:8.

        BH Response:  Admitted in part.  Boston Hannah does not dispute that it ultimately decided it could not do any additional work on any publication, but clarifies that this was because, after the 4/8/10 Letter was written, it was decided that the risk of AAFP coming up

with another banned advertising area, and the massive limitation by the two advertising areas that had already been banned, would make it impossible for Boston Hannah to continue to perform.  (Ex. 1, 215:8-216:12; 218:5-219:2, 227:21-228:11, 323:12-324:18).  Thus, Boston Hannah's salespeople halted their efforts to sell advertising for the AAFP publications, but clarifies that this was in March-April 2010, after its attempts to salvage the relationship of the parties failed immensely.  (Ex. 12, ¶¶ 12 and 13).

        **AAFP Reply:**  SOF 74 is uncontroverted.  Nothing in Boston Hannah's response attempts to dispute anything stated in SOF 74.  For purposes of this motion, AAFP does not dispute that Boston Hannah alleges in this case that it decided to stop work on all publications because of the possibility that AAFP might sign another consumer alliance agreement and the risk that the combined impact of that potential future agreement with the limits on ads for beverages and supplements in differing mediums could make it unprofitable to publish the *Family Doctor* books.  However, Boston Hannah's allegations are not evidence that it would in fact be "impossible for Boston Hannah to continue to perform."  Such an assertion is inadmissible argument.  At that time, *i.e.* in February-April of 2010, Boston Hannah interpreted the existing consumer alliance agreements as imposing various limitations on ads for beverages and ads for supplements.  SOF 72.  Except for Boston Hannah confirming that it halted efforts to sell advertising for AAFP publications in March or April 2010, the assertions in the final sentence of Boston Hannah's response to SOF 74 are not supported by the cited record and must therefore be disregarded.

        **SOF 75.**   On April 15, 2010, AAFP responded to Boston Hannah's 4/8/10 Letter.  4/15/10 Letter from Dicus to Ayers ("4/15/10 Letter") (Ex. 27); Harrington 30(b)(6) Dep. at 170:16-20; Dicus Dep. at 131:17-132:25.  In the letter, Mr. Dicus explained, among other things, that:

- AAFP had satisfied its contractual obligations;

- Any agreement for advertising on FamilyDoctor.org was between Boston Hannah and AnswersMedia, and AAFP was not a privy to any such agreement or relationship;

- AAFP had worked with Boston Hannah on advertising from the beverage and vitamin/supplements categories, both in print and on the web, including authorizing Boston Hannah to proceed with the beverage advertisements sold for the two publications Boston Hannah claimed it was going to complete;

- Section 4.3 of the 2005 Agreement expressly makes the selection of advertisers subject to the approval of AAFP; and

- AAFP agreed that the parties needed to part ways and was providing formal notice that it would not renew the 2005 Agreement.

4/15/10 Letter.  Mr. Dicus's approval of Boston Hannah's beverage advertisements was never withdrawn; the 4/15/10 Letter was AAFP's final word on the matter.  Harrington 30(b)(6) Dep. at 222:3-223:7.

BH Response:  Admitted in part.  Boston Hannah does not dispute that on April 15, 2010, AAFP responded to Boston Hannah's 4/8/10 Letter.  Boston Hannah does not dispute that the letter speaks for itself, but denies that the contentions suggested by AAFP that Mr. Dicus makes in the 4/15/10 Letter are all true, and therefore any implication that they are fact should be disregarded.  AAFP had not satisfied its contractual obligations to Boston Hannah.  AAFP did not approve of beverage ads running on FamilyDoctor.org.  (Exs. 51 and 79).  Boston Hannah does not dispute this letter was the last communication it received from the AAFP on this matter, but cannot speak for the AAFP as to whether it was the AAFP's "final word" on this matter, and thus denies the same.

AAFP Reply:  SOF 75 is uncontroverted.  Boston Hannah's statement that AAFP had not satisfied its contractual obligations is inadmissible argument that is unsupported by any citation to the record.  Boston Hannah has provided no foundation for BH Ex. 51 and 79, which are therefore inadmissible.  BH Ex. 79 is not admissible because it is inadmissible hearsay.  Furthermore, when Mr. Doane was asked at his deposition whether the banner ads mentioned in BH Ex. 51 ran on FamilyDoctor.org, he testified that he did not know.  Doane Dep. at 51:22-24, attached hereto as Exhibit B.  There is no admissible evidence that those ads were not placed on the website.  The assertion that AAFP did not approve beverage ads running on FamilyDoctor.org is therefore unsupported by admissible evidence and must be disregarded.  Finally, as cited in SOF 75, Mr. Harrington testified that Mr. Dicus's letter was AAFP's last word on the approval of the advertisements.  Boston Hannah is bound by this testimony.  *New Jersey,* 2010 WL 610671, at *2.

SOF 76.  If Boston Hannah's 4/8/10 Letter did not terminate the 2005 Agreement, AAFP's 4/15/10 Letter did, effective August 25, 2010.  Harrington 30(b)(6) Dep. at 170:16-171:20.

BH Response:  Denied.  This purported fact states a legal conclusion and mischaracterizes Mr. Harrington's testimony, and therefore should be disregarded.  Mr. Harrington believed that the 2005 Agreement was terminated by AAFP's actions in entering into the Consumer Alliance Agreements with ████████████████ and subsequently refusing to cooperate with Boston Hannah in order to mitigate the effects of the resulting advertising ban.  (Ex. 1. 168:10-23; 208:10-14, 213:9-21).

AAFP Reply:  SOF 76 is uncontroverted.  AAFP did not mischaracterize anything.  As noted in SOF 73, Mr. Harrington testified that Boston Hannah's 4/8/10 Letter was intended by Boston Hannah to be an immediate termination of the 2005 Agreement.  In the testimony cited in SOF 76, he also testified that AAFP's 4/15/10 Letter contained language that would have terminated the 2005 Agreement effective August 25, 2010.  Boston Hannah's reliance on Harrington 30(b)(6) Dep. at 213:9-21 is misplaced.  That testimony is inadmissible because it is the subject of a valid objection by AAFP.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 213:22-23, objecting to 213:9-21.  For purposes of this motion, AAFP does not dispute that Boston Hannah contends that the 2005 Agreement was terminated by the actions of AAFP.  But, Boston Hannah's statements about the consumer alliance agreements and AAFP's alleged refusal to cooperate are not supported by the evidence cited and therefore are inadmissible.

76

## VIII.   BOSTON HANNAH AND ITS ADVERTISERS

      **SOF 77.**   Boston Hannah uses a standard form "insertion order" as its contract with anyone who wants to buy advertising from Boston Hannah.   Harrington 30(b)(6) Dep. at 420:22-421:17.   Each contract with an advertiser contains the same "Terms and Conditions."   *Id.* at 427:1-10.   The Terms and Conditions include the following provisions:



Insertion Order (Ex. 44); Harrington 30(b)(6) Dep. at 420:22-421:17; 427:1-428:12.

      BH Response:  Admitted.

      **SOF 78.**   Boston Hannah asserts that AAFP's actions tortiously interfered with Boston Hannah's existing and prospective contractual relations with the following seven advertisers: [redacted]   Plaintiff's Second Amended Responses and Objections to AAFP's Second Interrogatories (Ex. 45) at 13-19.

      * During discovery, AAFP asked Boston Hannah to identify the advertising contracts that were the subject of its two tortious interference claims.  In its original interrogatory responses, Boston Hannah identified nine companies whose contracts AAFP allegedly interfered with.  At his Rule 30(b)(6) deposition, Mr. Harrington testified that Boston Hannah's claim for tortious interference with prospective business relation related to the same companies  specified in the interrogatory responses.  Harrington 30(b)(6) Dep. at 332:22-333:9.  A few days after the deposition, Boston Hannah served an amended answer to this interrogatory, listing the seven companies identified in the text.  Then on August 10, Boston Hannah served the cited and attached second amended response, which reiterates the seven companies identified in the text.

      BH Response:  Admitted.

      **SOF 79.**   After receiving the 2/3/10 Email and the 3/5/10 Letter, Boston Hannah did not inform any advertisers that Boston Hannah could not accept their ads.   Harrington 30(b)(6) Dep. at 182:8-15.   Glenn Oakley, Boston Hannah's President of USA Operations, leads Boston Hannah's advertising sales effort in the United States.   Oakley 30(b)(6) Dep. at 9:21-

10:18.  Mr. Oakley did not adjust his sales efforts or change his targets for advertising sales after March 5, 2010.  Oakley Dep. at 70:7-10.  Indeed, with respect to the seven advertisers that Boston Hannah targets, there is no evidence that Boston Hannah has communicated with any of these companies about their advertisements since the alleged breach.  Harrington 30(b)(6) Dep. at 281:16-282:16, 289:5-290:11, 295:8-296:17, 298:15-299:10, 299:21-300:9, 303:1-17.

BH Response:  Admitted in part.  Boston Hannah does not dispute that Glenn Oakley is Boston Hannah's President of USA Operations and leads Boston Hannah's advertising sales effort in the United States.  Boston Hannah denies that it did not inform any advertisers after receiving the 2/3/10 Email and 3/5/10 Letter that Boston Hannah could not accept their advertisements.  Harrington 30(b)(6) Depo. 287:24-288:15; Ex. 54, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮).  Boston Hannah denies that it did not communicate with any of the seven advertisers; rather, Boston Hannah did communicate with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.  (Ex. 1, 287:6-17, 287:24-15, 292:22-293:22; Ex. 54).

AAFP Reply:  SOF 79 is controverted in part.  For purposes of this motion, AAFP does not dispute that Boston Hannah states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ has asked about an advertisement a few times, although it never paid for any advertisement.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 287:18-288:15.  Boston Hannah did not want to tell ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ an exact reason.  *Id.*  Thus, while there is evidence that Boston Hannah had communications with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, those communications had no real substance.  Boston Hannah's assertions about ▮▮▮▮▮ are not admissible.  ▮▮▮▮▮ is not one of the advertisers at issue in this case.  In its supplemental and second supplemental interrogatory responses, Boston Hannah dropped ▮▮▮▮▮ from its list of advertisers who are the subject of its tortious interference claims.  *See* SOF 78, including the footnote in SOF 78.  Furthermore, BH Ex. 54 is not admissible.  No foundation exists for that exhibit, which contains hearsay.  Likewise, the testimony at Harrington 30(b)(6) Dep. at 293:13-22 is inadmissible hearsay.

**SOF 80.**  Boston Hannah did not refund any of the money it received from advertisers.  Harrington 30(b)(6) Dep. at 289:25-290:4, 293:11-12, 295:17-22, 298:23-24, 300:1-2, 303:7-9.  And there is no evidence that Boston Hannah has attempted to sell advertising to any of the seven advertisers since AAFP's alleged breach.  *Id.* at 281:22-282:3, 288:16-20, 295:23-296:17, 299:3-10, 300:3-9, 303:10-17.

BH Response:  Denied.  Boston Hannah did offer ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 54).  Further, the reason that Boston Hannah has not attempted to sell any advertisements to the seven advertisers identified therein is because it has not published a suitable magazine in which to portray advertisements from those advertisers.  (Ex. 1, 281:22-282:3, 285:25-286:11, 288:16-20, 296:2-14, 298:15-17, 299:3-6).

AAFP Reply:  SOF 80 is uncontroverted.  Boston Hannah's assertions about ▮▮▮▮▮ are not admissible.  ▮▮▮▮▮ is not one of the advertisers at issue in this case.  In its supplemental and second supplemental interrogatory responses, Boston Hannah dropped ▮▮▮▮▮ from its list of advertisers that are the subject of its tortious interference claims.  *See* SOF 78,

DB04/001520.0138/5231935.4DD02

including the footnote in SOF 78.  Furthermore, BH Ex. 54 is not admissible.  No foundation exists for that exhibit, which contains hearsay.  For purposes of this motion, AAFP does not dispute Boston Hannah's proffered excuse for why it has not attempted to sell any advertising to any of the seven advertisers at issue.  Nothing about that explanation, however, controverts anything in SOF 80.

      **SOF 81.**   Boston Hannah never provided AAFP with the insertion orders for the advertising contracts.  Harrington 30(b)(6) Dep. at 282:4-10; 286:16-18; 288:21-24; 290:9-11; 294:11-13; 296:18-20; 299:11-14; 300:10-23; 303:25-304:3.   According to Boston Hannah, AAFP knew that Boston Hannah sold advertising, but did not know the individual names of advertisers.  *Id.* at 288:25-289:4.

      <u>BH Response:</u>  Admitted in part.  Boston Hannah does not dispute that it did not provide AAFP with the specific insertion orders for the advertising contracts until the discovery stage of this litigation.  However, AAFP was specifically aware of the general terms of each of the different advertisement contracts, and of the identity of each advertiser, because before each advertisement went in a publication or on the FamilyDoctor.org website, Boston Hannah was required to get AAFP's approval for each advertisement on Boston Hannah's standard FTP approval website, the standard practice for eight years.  (Ex. 1, 290:12-291:10, 291:17-292:17, 294:14-295:2, 295:8-13, 296:21-297:18; 298:15-17, 299:15-18, 300:10-17, 300:24-301:7; 302:10-23; 303:18-22; Ex. 7, 15:11-16, 16:23-18:10; Ex. 16, 66:11-67:6).  At AAFP's request, Boston Hannah had also provided AAFP with the financial statements for every advertiser it had ever sold advertising to in the *Family Doctor* publications.  (Ex. 1, 263:7-17; 265:17-24; Ex. 16, 84:1-5; Ex. 55, 2/25/10 and 2/26/10 Spaced Book by Project Emails).

      <u>AAFP Reply:</u>  SOF 81 is uncontroverted.  For purposes of this motion, AAFP does not dispute that it reviewed the picture and content of proposed ads on the FTP website.  The assertion that Boston Hannah's postings on the FTP website included the general terms of each different advertising contract is not supported by the evidence cited and must be disregarded.  For purposes of this motion, AAFP does not dispute that in late February of 2010, Boston Hannah forwarded to AAFP the Space Booked by Project spreadsheets.  That post-dates the consumer alliance agreements and alleged tortious interference asserted by Boston Hannah.  Thus, while AAFP eventually learned the individual names of advertisers, it was not during the relevant time.

      **SOF 82.**   AAFP's actions in entering into the Consumer Alliance Agreements were in the economic self-interest of AAFP.  Doane 30(b)(6) Dep. at 43:13-16, 72:10-12, 98:25-99:9.

      <u>BH Response:</u>  Denied.  This purported fact states an improper legal conclusion and should be disregarded.  Boston Hannah cannot speak for AAFP as to whether its actions in entering into the Consumer Alliance Agreements were solely in its economic self-interest, and thus denies the same.

      <u>AAFP Reply:</u>  SOF 82 is uncontroverted.  SOF 82 does not attempt to assert a legal conclusion.  Moreover, AAFP does not cite any testimony by Boston Hannah or its

<div align="center">79</div>

employees, so Boston Hannah's denial on the grounds that it cannot speak for AAFP is without basis or effect.

## IX.   BOSTON HANNAH'S ADVERTISING REVENUES

**SOF 83.**   Boston Hannah contends that the beverage category and supplement category each constitute approximately ███ of Boston Hannah's advertising revenues. Harrington 30(b)(6) Dep. at 326:1-6.  Boston Hannah also maintains that, if Boston Hannah lost ███ of its advertising sales, the magazines would not be profitable.  *Id.* at 326:7-11.

**BH Reply:**  Admitted in part.  Boston Hannah does not dispute that, if the advertising restrictions imposed by AAFP only related to beverage and dietary supplement advertisements and it only lost ███ of its advertising sales, the magazines might not be profitable.  In the testimony upon which AAFP relies, AAFP's counsel focuses only on beverage and dietary supplement advertisements, not advertisements relating to beverage and dietary supplement companies, which were integral part of the advertising ban, and therefore this entire statement should be disregarded.  (Ex. 1, 195:10-13; 195:21-196:5; 199:25-200:7; 270:20-271:4; 271:11-272:14; 273:19-274:8; 319:23-320:9; 321:6-10; Ex. 56, Doug Miller Expert Report with Ad Sales Spreadsheets).   Furthermore, Boston Hannah states that beverage and vitamin supplement companies make up a much more considerable amount of Boston Hannah's historical advertisers.  (Ex. 56).

**AAFP Reply:**  SOF 83 is uncontroverted.  Boston Hannah's assertion that the advertisements relating to beverage and dietary supplement companies were an integral part of the advertising ban is inadmissible argument.  Furthermore, as explained in SOF 72, which is uncontroverted, Boston Hannah's position during the relevant time was that the advertising provisions in the consumer alliance agreements related to ads for beverages and dietary supplements, and AAFP did not take the position that the limitations in the ███████████ should be applied or interpreted more broadly.  For the reasons stated in AAFP's Motion to Strike (Doc. 119, 120, 126, 132) and AAFP's Motion to Exclude Any Report and Testimony by Douglas Miller (Doc. 136, 137, 152), which are incorporated herein, BH Ex. 56 is not admissible.  Accordingly, the final sentence of Boston Hannah's reply to SOF 83 is not supported by any admissible evidence and therefore must be excluded.

**SOF 84.**   Boston Hannah did not always sell advertising for beverages and/or supplements.  For example, *Living with Diabetes* does not contain any advertisements for beverages or dietary supplements.  Harrington 30(b)(6) Dep. at 319:6-320:12.  Boston Hannah nonetheless made a profit on *Living with Diabetes*.  *Id.* at 323:5-16.  Moreover, *Healthy Living* contained no advertisements for beverages.  Guzman Dec. ¶ 9.  The *Family Doctor 2008* publication and the 2010 *Understanding Over the Counter Medicines* each had one advertisement for a beverage.  Guzman Dec. ¶ 9.

**BH Response:**  Admitted in part.  Boston Hannah does not dispute that the 2009 edition of *Living With Diabetes* did not contain any advertisements for beverages or dietary supplements, and that Boston Hannah made a profit on *Living With Diabetes*.  However, this statement is incomplete and ignores relevant testimony.  While Boston Hannah was able to make a profit on *Living With Diabetes* with no ads for beverages or dietary supplements in 2009, this

does not mean Boston Hannah would have been able to do so in subsequent years.  (Ex. 1, 323:12-324:18).   Additionally, the AAFP's advertising restrictions were not just on advertisements featuring beverages or dietary supplements; AAFP banned advertisements **from any beverage or dietary supplement companies as well**, whose reach was much broader and would have included many more advertisements.  (Ex. 1, 199:25-200:7; 270:20-271:4; 271:11-272:14; 273:19-274:8; 319:23-320:9; 321:6-10; Ex. 56).  For example, although *Living With Diabetes* contained no advertisements for beverages or dietary supplements, 22.33% of its advertisement sales came from companies that had beverages or dietary supplements as part of their product line.  (Ex. 56).  *Over the Counter Medicines* had at least five advertisements for dietary supplements and one advertisement for a beverage, and 85.07% of its advertisement sales came from companies that had beverages or dietary supplements as part of their product line. (Ex. 42, 41:15-43:4; Ex. 56).  *Healthy Living* had two advertisements for dietary supplements and two advertisements for beverages, and 38.04% of its advertisement sales came from companies that had beverages or dietary supplements as part of their product line.  (Ex. 1, 320:13-321:10; Ex. 42, 43:5-12; Ex. 56).  In total, the 2009 mini-magazines which replaced the Fourth Edition collectively received 52.36% of their advertisement sales from companies with beverages or dietary supplements as part of their product line.  (Ex. 56).  The 2008 edition of *Family Doctor* had at least eight advertisements for dietary supplements and one advertisement for beverages, and 48.52% of its advertisement sales came from companies that had beverages or dietary supplements as part of their product line.  (Ex. 42, 43:13-46:24; Ex. 56).  The 2007 edition of *Family Doctor* contained at least 13 advertisements for dietary supplements and six advertisements for beverages, and 34.66% of its advertisement sales came from companies that had beverages or dietary supplements as part of their product line. (Ex. 42, 46:25-50:10; Ex. 56). The 2006 edition of *Family Doctor* contained at least eight beverage advertisements and six dietary supplement ads, and 34.22% of its advertisement sales came from companies that had beverages or dietary supplements as part of their product line.  (Ex. 42, 50:11-51:25; Ex. 56).

AAFP Reply:   SOF 84 is uncontroverted.   In the first sentence of its response, Boston Hannah admits the first three sentences of SOF 84.  Later, in its response, Boston Hannah admits that the *Family Doctor 2008* publication and the 2010 *Understanding Over the Counter Medicines* each had one advertisement for a beverage.  Boston Hannah attempts to controvert AAFP's statement that the *Healthy Living* magazine had no advertisements for beverages by citing testimony in which Mr. Harrington declares advertisements for fresh pineapple spears and for Subway restaurants to be beverage ads.  No reasonable juror would look at those advertisements and reach that conclusion.   Accordingly, AAFP's statement is uncontroverted.

Boston Hannah devotes most of its response to making assertions about advertising of products other than supplements and beverages by companies that Boston Hannah claims are beverage and supplement companies.  As explained in SOF 72, which is uncontroverted, Boston Hannah's position during the relevant time was that the advertising provisions in the consumer alliance agreements related to ads for beverages and dietary supplements, and AAFP did not take the position that the limitations in the ███████████ should be applied or interpreted more broadly.  For the reasons stated in AAFP's Motion to Strike (Doc. 119, 120, 126, 132) and AAFP's Motion to Exclude Any Report and Testimony by Douglas Miller (Doc. 136, 137, 152), which are incorporated herein, BH Ex. 56 is not admissible.  All of Boston Hannah's assertions about advertisement sales came from companies that had beverages or dietary supplements as

81

part of their product line are based solely on Boston Hannah's inadmissible Ex. 56.  Being based solely on an inadmissible document, these assertions must be excluded.

**SOF 85.**   Furthermore, even if Boston Hannah lost ▮▮▮ of its advertising sales, the magazines would still be very profitable according to Boston Hannah's allegations.  Harrington 30(b)(6) Dep. at 228:24-229:7, 326:20-330:2; Plaintiffs' Third Disclosures.  To illustrate, Boston Hannah alleges that its advertising sales for *Healthy Living* were ▮▮▮.  Plaintiffs' Third Disclosures at Attachment A.   Thus, if Boston Hannah lost ▮▮▮ of its advertising sales, that would leave ▮▮▮ in gross revenue from advertising sales.  Boston Hannah alleges that the costs associated with that magazine were ▮▮▮.  *Id.*  Subtracting those costs from ▮▮▮ yields a profit of ▮▮▮ on that magazine.  Thus, according to Boston Hannah's own allegations, Boston Hannah would have made more than ▮▮▮ on a single magazine, even after losing ▮▮▮ of its ad revenues.

**BH Response:**   Denied.   This purported fact is an improper legal conclusion, is speculative, ignores additional obligations paid by Boston Hannah, such as royalties and fees payable to AAFP, is not supported by any evidence on the record, and furthermore, uses incorrect numbers with no explanation of how they were computed; therefore, this purported fact should be disregarded.*

*Ironically, in this improper argument AAFP relies on Boston Hannah's expert Doug Miller's Third Supplemental Expert Report, which AAFP sought to exclude.

**AAFP Reply:**   SOF 85 is uncontroverted.   SOF 85 is not a legal conclusion.  It is the application of basic math to the assertions of Boston Hannah.  Furthermore, the footnote to Boston Hannah's response reveals that Boston Hannah did not examine the record AAFP cited.   AAFP did not cite to or rely on any report by Doug Miller.  His work is inadmissible.  Rather, AAFP cited to Boston Hannah's Third Amended and Supplemental Rule 26(a)(1) Initial Disclosures, which are Boston Hannah's current disclosures in the case.

## X.   BOSTON HANNAH'S FAILURE TO PAY ROYALTIES AND COSTS

**SOF 86.**   Boston Hannah was obligated to make a base royalty payment to AAFP of $150,000 under § 7.1 of the 2005 Agreement.  Harrington 30(b)(6) Dep. at 335:12-15; 2005 Agreement at § 7.1.*  This payment was to be made in two installments of $75,000.  2005 Agreement at § 7.1(b)-(e); Harrington 30(b)(6) Dep. at 335:16-22.  The subparagraphs of § 7.1 of the 2005 Agreement include a payment schedule for each installment.  For the 2009 guaranteed royalty, Boston Hannah was obligated to pay the first installment by July 1, 2008, and the second installment by February 1, 2009.  2005 Agreement at § 7.1(d).

*Under the terms of the 2005 Agreement, the base guarantee amount is the greater of $150,000 or 5% of Net Advertising Revenue received by Boston Hannah.  2005 Agreement at § 7.1(a).  For purposes of this motion, AAFP uses $150,000, the minimal base royalty guaranteed by Boston Hannah.

**BH Response:**  Admitted in part when read in conjunction with footnote [*].  Boston Hannah states that the 2005 Agreement speaks for itself and adds that it also provides, "For the Fifth Edition of the Book and all Updates, if any, published up to and

including April 2010 (collectively, the '2010 Publications')" a royalty in the amount of $150,000 shall be paid by Boston Hannah to AAFP. (Ex. 3, § 7.1(e)).  However, the Fifth Edition of the Book was never published. (Ex. 12, ¶ 14). The only publication published in 2010 was *Over the Counter Medicines*, which was part of the 2009 Fourth Edition of the *Family Doctor* Book. (Ex. 1, 68:7-24; Ex. 12, ¶ 10).

        **AAFP Reply:**   SOF 86 is uncontroverted.   SOF 86 is drawn from the language of the 2005 Agreement, the meaning of which was conceded by Boston Hannah's Rule 30(b)(6) witness, Mr. Harrington.  Boston Hannah's additional assertion that the Fifth Edition of the Book was never published and its characterization of *Understanding Over the Counter Medicines* as part of the 2009 Fourth Edition is inadmissible argument.  AAFP also incorporates its reply to SOF 19 and 88.  Finally, *Understanding Over the Counter Medicines* was a consumer-oriented health magazine published in 2010.  SOF 40.  To use the language of the 2005 Agreement, it was published during the period of time "up to and including April 2010." SOF 40.  In short, it meets the definition of the 2010 annual publication in the 2005 Agreement.

        **SOF 87.**   Boston Hannah paid one of the $75,000 royalty payments for 2009, but did not pay the second.  Harrington 30(b)(6) Dep. at 336:2-7.  The second payment was due on February 1, 2009.  *Id.* at 336:9-12.  This deadline predates the actions that Boston Hannah alleges breached the 2005 Agreement.  Harrington 30(b)(6) Dep. at 337:6-12.

        **BH Response:**   Admitted in part.  Boston Hannah does not dispute that it paid $75,000 in royalties for 2009, and states that, while the 2005 Agreement speaks for itself regarding payment due dates, the reason that the second invoice was not paid was because AAFP did not provide an invoice for the second royalty payment to AAFP until May 6, 2010, after AAFP had breached the 2005 Agreement and the parties' relationship had completely dissolved. (Ex. 1, 336:9-337:14; Ex. 57, 6/9/10 Letter w/ Invoices).

        **AAFP Reply:**   SOF 87 is uncontroverted.  Nothing in Boston Hannah's response purports to controvert anything in SOF 87.  For purposes of this motion, AAFP does not dispute that Boston Hannah has stated its contention for why it failed to pay the second royalty payment for 2009 by the date established by the 2005 Agreement.  AAFP also notes that Boston Hannah has not asserted that this deadline was amended.  See Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 168:1-9.  Boston Hannah also does not dispute that the deadline predates the actions that Boston Hannah alleges breached the 2005 Agreement.  Boston Hannah has not provided any foundation for BH Ex. 57, which is therefore inadmissible.

        **SOF 88.**   The 2005 Agreement also required Boston Hannah to make a 2010 royalty payment to AAFP.  2005 Agreement at § 7.1(e); Harrington 30(b)(6) Dep. at 337:15-23. Boston Hannah concedes that it has not paid any of that amount.  Harrington 30(b)(6) Dep. at 337:15-23.  Under the 2005 Agreement, the installments for the 2010 guaranteed royalty were due on July 1, 2009, and February 1, 2010.  2005 Agreement at § 7.1(e).

        **BH Response:**   Denied.  Boston Hannah denies that any royalties were due and owing for 2010 because no publications for the Fifth Edition of the Book were published in 2010. (Ex. 3, § 7.1(e); Ex. 12, ¶ 14).

AAFP Reply:  SOF 88 is uncontroverted.  As the Rule 30(b)(6) witness for Boston Hannah, Mr. Harrington stated that the reason Boston Hannah did not make the 2010 royalty payments to AAFP because (1) AAFP did not send an invoice, and (2) according to Boston Hannah, AAFP had not complied with its part of the agreement.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 336:9-338:3; SOF 92.  Boston Hannah is bound by this testimony, *New Jersey,* 2010 WL 610671, at *2, which bars the new argument asserted in response to SOF 88 that Boston Hannah did not make the 2010 royalty payment because the Fifth Edition of the Book was not published in 2010. AAFP also incorporates its reply to SOF 19, which addresses Boston Hannah's definition of Edition.

SOF 89.  The 2005 Agreement required Boston Hannah to make an inflationary adjustment each year to the base royalty payment.  2005 Agreement at §§ 7.1(b)-(e), 7.5; Harrington 30(b)(6) Dep. at 338:4-9.  Boston Hannah never paid the inflationary adjustments to the base royalty amount.  Harrington 30(b)(6) Dep. at 338:10-13.

BH Response:  Admitted in part.  Boston Hannah does not dispute that the 2005 Agreement required Boston Hannah to make an inflationary adjustment each year to the base royalty payment.  The reason the inflationary adjustments were never paid is because Boston Hannah was never invoiced for the inflationary payments until March 24, 2010. (Ex. 1, 338:10-339:3; Ex. 58, 2006-2010 Invoices; Ex. 59, 2/1/10 Letter).  Boston Hannah relied on AAFP's historical practice of invoicing Boston Hannah upon completion of publishing projects. (Ex. 1, 333:20-334:5, 334:24-335:5; Ex. 59).  This was never an intentional oversight by either party, and was only found once AAFP's Internal Audit Manager, Amie Barnes, conducted an audit in February 2010.  (Ex. 1, 336:13-337:5l; 340:1-5; Ex. 60, Barnes Rule 30(b)(6) Depo. 21:25-22:19, 51:11-53:18).

AAFP Reply:  SOF 89 is uncontroverted.  Boston Hannah's assertion that its failure to make the inflationary adjustment payment was not due to an intentional oversight by either party is not supported by the evidence cited and must therefore be disregarded.  Boston Hannah has not provided any foundation for BH Ex. 58 and 59, which are therefore inadmissible. Boston Hannah's assertion that AAFP had a historical practice of invoicing Boston Hannah upon completion of publishing projects is not supported by the admissible evidence cited and must therefore be disregarded.  For purposes of this motion, AAFP does not dispute that Boston Hannah was never invoiced for the inflationary payments until March 24, 2010.  Under the terms of the 2005 Agreement, Boston Hannah was required to make those payments without receipt of any invoice.

SOF 90.  The unpaid inflationary adjustments total $13,500.  Harrington 30(b)(6) Dep. at 339:22-25.  The following chart specifies the inflationary adjustment payments and deadlines that Boston Hannah missed:

| Description of Payment | Amount of Payment | Deadline for Payment |
|---|---|---|
| First half of 2007 inflationary adjustment | $1,575 | July 1, 2006 |
| Second half of 2007 inflationary adjustment | $1,575 | February 1, 2007 |

84

| First half of 2008 inflationary adjustment | $3,225 | July 1, 2007 |
| Second half of 2008 inflationary adjustment | $3,225 | February 1, 2008 |
| First half of 2009 inflationary adjustment | $0 | July 1, 2008 |
| Second half of 2009 inflationary adjustment | $0 | February 1, 2009 |
| First half of 2010 inflationary adjustment | $1,950 | July 1, 2009 |
| Second half of 2010 inflationary adjustment | $1,950 | February 1, 2010 |

2005 Agreement at §§ 7.1(b)-(e), 7.5; Harrington 30(b)(6) Dep. at 338:4-339:25; 2/16/10 Email from Harrington to Guzman (Ex. 25); 3/1/10 Email from Guzman to Harrington (Ex. 34); Guzman Dec. at ¶ 11.

BH Response:  Admitted in part.  Boston Hannah does not dispute that the unpaid inflationary adjustments for the four editions of the Book published from 2005 through 2009 amounted to $13,500.  The rest of this purported fact mischaracterizes the evidence and should be disregarded.   Boston Hannah was never invoiced for the inflationary payment until March 24, 2010. (Ex. 1, 338:10-339:3; Exs. 57-59; Ex. 60, 53:9-18).

AAFP Reply:  SOF 90 is uncontroverted.  AAFP has not mischaracterized any evidence.  The contents of the chart, *i.e.* the description of payment, the amount due and the deadline for payment, are drawn from the language of the 2005 Agreement and the other evidence cited.  Boston Hannah has provided no foundation for BH Ex. 57, 58 and 59, which are therefore inadmissible.  Nevertheless, for purposes of this motion, AAFP does not dispute that did not send Boston Hannah an invoice for the inflationary payments until on or about March 24, 2010.  Under the terms of the 2005 Agreement, Boston Hannah was required to make those payments without receipt of any invoice.

**SOF 91.**   The 2005 Agreement also required Boston Hannah to pay AAFP for various costs AAFP incurred in producing the Books.  2005 Agreement at §§ 3.6(a), 7.3.  The 2005 Agreement required AAFP to issue a statement of the amount Boston Hannah owed for these expenses.  2005 Agreement at §§ 3.6(a), 7.3.  AAFP complied with this requirement and sent Boston Hannah an invoice in the amount of $23,822.46 for AAFP's recoverable expenses associated with producing Understanding Over the Counter Medicines.  Invoice #8537301-18 (Ex. 35); Harrington 30(b)(6) Dep. at 340:23-341:2.  Boston Hannah does not dispute that the amount of the invoice is correct.  Harrington 30(b)(6) Dep. at 341:3-8.  Payment was due on or about May 24, 2010, *i.e.* within 15 days of when Boston Hannah received the invoice (assuming three days for mailing).  2005 Agreement at §§ 3.6(a), 7.3.  Boston Hannah has not made this required payment.  Harrington 30(b)(6) Dep. at 344:9-14.

BH Response:  Admitted in part.  Boston Hannah does not dispute that the 2005 Agreement speaks for itself, that AAFP sent Boston Hannah an invoice for $23,822.46 for AAFP's expenses associated with producing *Over the Counter Medicines,* and that payment was due on or about May 24, 2010.  Boston Hannah denies the rest of this purported fact as mischaracterizing Mr. Harrington's testimony, and adds that the reason this invoice was not paid was because by the time AAFP invoiced Boston Hannah on May 6, 2010, AAFP had breached

85

the 2005 Agreement and the relationship between the parties had completely dissolved. (Ex. 1, 341:9-14; Ex. 57).

AAFP Reply:  SOF 92 is uncontroverted.  AAFP did not mischaracterize Mr. Harrington's testimony.  The final citation, however, does contain a typo.  Mr. Harrington testified at 341:9-14 (not at 344:9-14) that Boston Hannah has not made the required payment.  Boston Hannah's assertions about why the invoice was not paid are not supported by the record cited and must therefore be disregarded.

SOF 92.   Boston Hannah offers two excuses for its disregard of its contractual obligations:  (1) AAFP did not issue a timely invoice; and (2) AAFP allegedly breached the agreement.  Harrington 30(b)(6) Dep. at 336:16-19; 337:24-338:2; 340:1-8; 341:15-18.  Boston Hannah has conceded, however, that the royalty payment deadline is established by the 2005 Agreement, *id.* at 333:22-335:11, 336:9-12, and the 2005 Agreement does not make Boston Hannah's royalty payment obligation continent upon receipt of an invoice from AAFP.  *Id.*

BH Response:  Admitted in part.  Boston Hannah denies that it has relied on "excuses," and furthermore such statement is an improper opinion, argumentative, and therefore should be disregarded.  Boston Hannah does contend that AAFP did not issue a timely invoice and that AAFP breached the 2005 Agreement.  Boston Hannah denies that it ever paid a royalty payment or reimbursed a cost to AAFP without AAFP first providing Boston Hannah with an invoice.  (Ex. 1, 333:20-334:5, 334:24-335:5).  The remainder of this purported fact is argumentative and states a legal conclusion and therefore should be disregarded.

AAFP Reply:  SOF 92 is uncontroverted.  For purposes of this motion, AAFP does not dispute that "Boston Hannah denies that it ever paid a royalty payment or reimbursed a cost to AAFP without AAFP first providing Boston Hannah with an invoice."  Boston Hannah's assertion that the final sentence of SOF 92 is argumentative and states a legal conclusion is without merit.  AAFP has accurately described Mr. Harrington's testimony, which he gave while appearing as Boston Hannah's Rule 30(b)(6) witness.  Boston Hannah is bound by his admissions.  *New Jersey,* 2010 WL 610671, at *2.

SOF 93.   Under § 8.1 of the 2005 Agreement: "If either party obtains a judgment against the other party by reason of a breach of this Agreement, a reasonable attorneys' fee, as fixed by the court, shall be included in the judgment."

BH Response:  Admitted.

**BOSTON HANNAH'S ADDITIONAL STATEMENTS OF FACT**

BH-SOF 94.  Before the *Family Doctor* Books, AAFP had no consumer presence. (Ex. 38). The *Family Doctor* Books helped build AAFP's consumer presence, with no investment on AAFP's part, and produced about ▇▇▇▇▇ in royalties for AAFP. (Ex. 38).

AAFP Reply: Boston Hannah's assertions in BH-SOF 94 are not supported by the cited evidence and must therefore be disregarded.  Neither of the documents in BH Ex. 38

86

have any relation to the assertions in BH-SOF 94.  Moreover, Boston Hannah has not cited any foundation for BH Ex. 38, which is therefore inadmissible.

**BH-SOF 95.**  Because of the relationship with Boston Hannah the *Family Doctor* Books were a very successful and profitable venture for AAFP from the start. (Ex. 7, 32:3-18; Ex. 61, 2/23/10 Springer Email).

AAFP Reply: Boston Hannah has not cited any foundation for BH Ex. 61, which is therefore inadmissible.  Nevertheless, for purposes of this motion, AAFP does not dispute BH-SOF 95.

**BH-SOF 96.**  In 2005 when drafting the 2005 Agreement, there were no negotiations in to 2005 Agreement because it was, for the most part, identical to the 2002 Agreement. (Ex. 1, 53:1-22; Ex. 7, 23:8-24:1).

AAFP Reply: As stated in AAFP's reply to SOF 12, AAFP does not dispute Mr. Harrington received a draft of the 2005 Agreement and did not seek to change any terms, including § 9.1.  Mr. Harrington also testified that there were differences between the 2002 and 2005 Agreements, particularly in that (1) the 2005 Agreement deleted a section concerning potential expansion into multiple smaller update publications; (2) the 2005 Agreement deleted a section concerning a Spanish edition; and (3) the 2005 Agreement contained a different provision concerning royalty payments.  Harrington 30(b)(6) Dep. (BH Ex. 1) at 54:15-57:7.  Moreover, BH-SOF 96 is not supported by BH Ex. 7.  To the contrary, Mr. Springer testified he was responsible for "working with Boston Hannah to arrive at the [2005] agreement."  Springer Dep. (BH Ex. 7) at 23:19-22.

**BH-SOF 97.**  Pursuant to the 2002 and 2005 Agreements Mr. Springer understood the parties had the right to change the production schedule of the Books, if the parties mutually agreed. (Ex. 7, 84:19-85:17).

AAFP Reply: Boston Hannah's assertions about the 2002 Agreement are not supported by the cited evidence and must therefore be disregarded.  For purposes of this motion, AAFP does not dispute the remainder of BH-SOF 97.

**BH-SOF 98.**  During the parties' relationship, AAFP never gave Boston Hannah notice that it was not complying with the 2005 Agreement in any way. (Ex. 7, 37:23-38:4).

AAFP Reply: BH-SOF 98 is not supported by the record cited and should be disregarded.  In this portion of the record, Mr. Springer testified only with respect to the 2006-2007 time frame, not the entirety of the parties' relationship.  See Springer Dep. (BH Ex. 7) at 37:15-38:4.  Indeed, since Mr. Springer resigned in February 2010, he lacked personal knowledge to testify to any notice that might have been provided by AAFP after that time.  SOF 28; Springer Dep. (AAFP Ex. 5) at 135:8-21.

**BH-SOF 99.**  In 2005, AAFP and Boston Hannah published a Spanish edition of the *Family Doctor* Book, entitled "Médico Familiar." (Ex, 1, 55:20-56:20). However, the Spanish market in the United States was not big enough, so the parties subsequently scrapped the

87

idea. (Ex. 7, 55:20-56:20). No amendment or addendum was ever signed by the parties, but AAFP signed off on the Spanish publication. (Ex. 12, ¶ 5).

    <u>AAFP Reply:</u> For purposes of this motion, AAFP does not dispute that Boston Hannah published *Medico Familiar* in 2005, or that no amendment or addendum to the 2002 Agreement or 2005 Agreement was signed by the parties for this magazine. However, Boston Hannah makes no assertion and cites no evidence that this magazine was published pursuant to the 2002 Agreement, and Mr. Harrington's testimony indicates that *Medico Familiar* was published prior to the execution of the 2005 Agreement. Harrington 30(b)(6) Dep. (BH Ex. 1) at 55:20-57:1. Under the terms of § 3.3 of the 2002 Agreement, Boston Hannah and AAFP agreed that, "[p]rior to publication of the first edition of the Book," *i.e.* prior to publishing the 2002 magazine, the parties would discuss the possibility of including Spanish language content within the Book. AAFP Ex. 17. No provision in the 2002 Agreement provides for the publication of a Spanish language magazine in 2005. Furthermore, the 2005 Agreement removes entirely the language that had been in § 3.3 of the 2002 Agreement. Harrington 30(b)(6) Dep. (BH Ex. 1) at 55:20-56:3. As a result, even if Boston Hannah had asserted that *Medico Familiar* was published pursuant to § 3.3 of the 2002 Agreement, the 2005 Agreement is a written, executed removal of that term.

    **BH-SOF 100.** Each of the publications published by AAFP and Boston Hannah, including the mini-magazines, were well received by the members of the AAFP. (Ex. 7, 35:3-8; Ex. 62, Springer Email Membership Praise). The publications published by AAFP and Boston Hannah won publishing awards, such that the 2004 Medical Marketing and Media Health Care Publication of the Year Award and the best website award in 2005. (Ex. 7, 35:10-36:3).

    <u>AAFP Reply:</u> For purposes of this motion, AAFP does not dispute that FamilyDoctor.org won an award for best health care website in 2005, but Boston Hannah has drafted BH-100 to imply that Boston Hannah is responsible in whole or in part for AAFP receiving that award. There is no evidence supporting that implication, which AAFP denies. AAFP does not dispute the remainder of BH-SOF 100 for purposes of this motion.

    **BH-SOF 101.** At the request of Boston Hannah, in June 2006, Mr. Henley prepared a statement reflecting the exception working relationship of the parties, emphasizing that the *Family Doctor* publications were "award-winning and innovative," and have "set a new standard of excellence for patient information." (Ex. 13).

    <u>AAFP Reply:</u> Boston Hannah has not cited any foundation for BH Ex. 13 or its assertion that Dr. Henley wrote the attachment to BH Ex. 13. Therefore, BH Ex. 13 is inadmissible and BH-SOF 101 must be disregarded.

    **BH-SOF 102.** While the parties had discussed the concept of mini-magazines as far back as 2003, in 2009, the conversation about publishing multiple mini-magazines got very serious, because of the very sharp downturn in advertising. (Ex. 7, 12:4-10; 38:15-39:13). Both Boston Hannah's and AAFP's liaisons recognized that publishers were going to have to come up with a new model if they were going to be able to sustain a business. (Ex. 7, 38:12-39:13, 75:10-76:3; Ex. 8).

<div align="center">88</div>

AAFP Reply: AAFP does not dispute BH-SOF 102 for purposes of this motion, but it is incomplete.  As early as 2002, Boston Hannah and AAFP had discussed the possibility of multiple publications each year.  Springer Dep. (BH Ex. 7) at 11:1-20.  In fact, the 2002 Agreement, at § 2.3, provided that the parties would discuss the possibility of smaller publications that would cover specific areas, such as Healthy Living.  Notwithstanding those discussions, in both the 2002 and 2005 Agreements, AAFP and Boston Hannah agreed to a single publication each year.  SOF 5, 11.  The 2005 Agreement also removed entirely the language requiring the parties to discuss the possibility of smaller, targeted magazines.  Harrington 30(b)(6) Dep. (BH Ex. 7) at 55:1-11.

**BH-SOF 103.**  Mr. Harrington put together a plan regarding small, more targeted mini-magazines and laid it out for Mr. Springer. (Ex. 7, 39:22-40:21). In addition to single-topic mini-magazines, Boston Hannah would be able to offer advertising both in print and through FamilyDoctor.org in digital and then on FamilyDoctor.org with Banner Ads. (Ex. 7, 39:22-40:21). People were moving to this type of model, and it "very much appealed" to Mr. Springer. (Ex. 7, 39:22-40:21). Thus, the parties agreed to move forward according to Mr. Harrington's proposal. (Ex. 1, 81:1-82:4; Ex. 7, 41:2-5; 121:4-19).

AAFP Reply: AAFP does not dispute the assertion in BH-SOF 103 that Mr. Harrington put together a concept for more targeted mini-magazines and presented the concept to Mr. Springer.  AAFP also does not dispute that others moved to this "type of model," or that it appealed to Mr. Springer.  However, the description of Mr. Harrington's proposal to Mr. Springer is inaccurate and not fully supported by the cited record.  Mr. Harrington's proposal did not address online advertising sales by Boston Hannah on FamilyDoctor.org.  2/24/09 Email (AAFP Ex. 20); SOF 17.  In addition, the assertion that the parties agreed to Mr. Harrington's proposal is a legal conclusion which should be disregarded.  It is also erroneous for several reasons, which are explained fully in AAFP's Motion for Summary Judgment and are incorporated by this reference.  For example, § 9.1 of the 2005 Agreement provides: "This Agreement may not be modified or amended except in writing signed by both parties hereto." SOF 12.  Boston Hannah does not allege in BH-SOF 103 that the parties executed a formal written amendment concerning the matters contained in Mr. Harrington's proposal, because they never did.

**BH-SOF 104.**  In 2009, the first three months of work on the Fourth Edition of the *Family Doctor* Book were taken up with AAFP and Boston Hannah working very closely, planning and branding the mini-magazines because AAFP wanted to ensure that the mini-magazines were branded as closely as possible to FamilyDoctor.org. (Ex. 1, 81:19-82:12; Ex. 8; Ex. 12, Ex. B attached thereto; Ex. 63, 1/13/09 Springer Email).

AAFP Reply: For the reasons stated in AAFP's reply to SOF 19, Boston Hannah's definition of "Fourth Edition" is not admissible.  Boston Hannah has not cited any foundation for BH Ex. 63, which is therefore inadmissible.  Nevertheless, for purposes of this motion, AAFP does not dispute the assertions in BH-SOF 104, other than as stated above.

**BH-SOF 105.** When Michael Springer, Vice President of Publishing and Communications at AAFP, discussed the production of multiple mini-magazines with Dr. Henley and Mr. Dicus, they did not object to the parties beginning production of the mini-magazines and also did not have a sense of urgency about entering into a formal addendum in order to amend the 2005 Agreement. (Ex. 7, 6:18-7:6, 84:19-85:17).

AAFP Reply: For purposes of this motion, AAFP does not dispute that Mr. Springer discussed Mr. Harrington's totally different concept with Dr. Henley and Mr. Dicus, but the description of the conversation in BH-SOF 105 is not supported by the evidence. According to Mr. Springer, while he overviewed the concept, no specifics were discussed; the conversation was "couched in the terms of we will probably need to update the [2005] agreement or do an addendum or something like that." SOF 21. BH-SOF 105 is also inaccurate and misleading insofar as it indicates Dr. Henley and Mr. Dicus felt no sense of urgency to enter into a formal amendment to the 2005 Agreement. The record cited does not support such an assertion. Rather, Mr. Springer testified simply that "there didn't seem to be a lot of urgency in updating the contract" because the agreement was "up for renewal in the following year," not that Dr. Henley and Mr. Dicus personally felt no sense of urgency in amending the 2005 Agreement. Springer Dep. (AAFP Ex. 5) at 85:10-17.

**BH-SOF 106.** In October 2009, Mr. Springer sent correspondence to the members of AAFP, stating that *Family Doctor* had been "restyled in an innovative way that now gives patient information in a shorter but more in-depth format." (Ex. 29, at ¶¶ 3-4; Ex. 64, *Living With Diabetes* and *Healthy Living*; Ex. 65, 10/09 Letter to the AAFP's Membership). The 10/09 Letter continued, "Rather than publishing *Family Doctor* as before, as a single, general health and wellbeing magazine, we have identified a series of individual health topics that are especially relevant to the great majority of today's patients. This concept now presents *Family Doctor* as a highly focused series of magazines, each covering one vital health and wellness topic….Whereas *Family Doctor* was published just once a year, this new series of patient education programs continues throughout the year, thus benefiting patients with a constant flow of expert health and wellness information….[T]he editorial content has been specifically developed and approved by AAFP writers and physicians editors." (Ex. 65).

AAFP Reply: For purposes of this motion, AAFP does not dispute BH-SOF 106.

**BH-SOF 107.** In the end, AAFP was satisfied with the mini-magazines. (Ex. 7, 49:7-10; Ex. 9, 43:25-44:12). AAFP received positive feedback from its members, who expressed great enthusiasm for the mini-magazines, and who liked the targeted format, and who wanted more copies sent to their offices. (Ex. 7, 49:17-50:4; Ex. 9, 44:9-14; Ex. 62).

AAFP Reply: Boston Hannah has provided no foundation for BH Ex. 62, which is also hearsay. That exhibit, therefore, is not admissible evidence. Likewise, the second sentence of BH-SOF 107 and the deposition testimony cited for that sentence are hearsay and therefore inadmissible. For purposes of this motion, AAFP does not dispute the first sentence in BH-SOF 107.

**BH-SOF 108.** AAFP received many benefits to the mini-magazine approach, including expanding the reach of the publication to interested readers, benefiting AAFP's members' patients with constant flow of information, appealing to advertisers, and keeping pace with the changing market in order to retain advertisers and consumers. (Ex. 1, 309:14-24; Ex. 7, 38:12-39:13; 41:11-42:3; Ex. 8; Ex. 9, 31:23-32:5; Ex. 65).

AAFP Reply: The assertions in BH-SOF 108 about benefits to AAFP are not supported by the evidence cited and must therefore be disregarded. Boston Hannah cites BH Ex. 8, the email exchange between Mr. Harrington and Mr. Springer about Boston Hannah's totally different concept. In that exchange, Mr. Harrington and Mr. Springer both write their opinion that the concept would be more attractive to advertisers. Boston Hannah also cites to excerpts from Mr. Springer's deposition during which he similarly stated that the concept of multiple publications should overcome one objection that pharmaceutical companies had to the magazines and make it more attractive to advertisers. Springer Dep. (BH Ex. 7) at 38:12-39:13; 41:11-42:3. Boston Hannah also cites the testimony of Ms. White, who stated that the patient education content that AAFP puts on its website, including the *Family Doctor* magazines is good content for patients. White Dep. (BH Ex. 9) at 31:23-32:5. Patients were also mentioned in BH Ex. 65. Specifically, Mr. Springer wrote that a constant flow of health and wellness information would benefit patients. Boston Hannah's final citation is to a passage from the deposition of Mr. Harrington in which he asserts that the multiple publications would have a larger reach than the annual publication. Harrington 30(b)(6) Dep. (BH Ex. 1) at 309:14-24. In the testimony that followed, which Boston Hannah did not cite, Mr. Harrington went on to explain that he meant that he thought more patients would read the single-topic magazines. *Id.* at 310:4-21.

The hopes of Mr. Harrington and Mr. Springer about how advertisers would react to multiple magazines is not admissible evidence. It is speculation. There is no evidence of how any advertiser reacted to or viewed this concept. The same is true for patients. There is no evidence that any patient was in fact benefited by multiple magazines and no evidence that more patients read them. It is more inadmissible speculation. Furthermore, even if there were admissible evidence that more advertisers purchased advertising and/or patients actually benefited, that would not support Boston Hannah's assertion in BH-SOF 108 that "AAFP received many benefits." If, as Boston Hannah claims, the multiple magazines were published under the amended terms of the 2005 Agreement, Boston Hannah would retain the proceeds from increased advertising sales that Boston Hannah expected to occur. SOF 11. AAFP received no benefit. Likewise, while AAFP certainly hopes that patients find the information AAFP provides to be helpful, benefits given to patients are not benefits received by AAFP. Thus, the record cited by Boston Hannah would not support its assertions, even if that record were admissible. Boston Hannah's assertion that AAFP received benefits must therefore be disregarded.

**BH-SOF 109.** The 2005 Agreement contained a clause that specifically stated, "Boston Hannah and AAFP agree to discuss possible online application for the content and as enhanced advertiser packages (at a premium price)." (Ex. 3, § 4.4). That was important because the FamilyDoctor.org website had 3.7 million unique visitors a month. (Ex. 30; Ex. 43, 86:14-20; Ex. 66, 11/19/09 Consumer Alliance Partnership Meeting Summary, p. 2).

AAFP Reply: For purposes of this motion, AAFP does not dispute the first sentence of BH-SOF 109, aside from the typographical error contained in the quotation of § 4.4. For the reasons stated in AAFP's reply to SOF 54, BH Ex. 30 is inadmissible. Nevertheless, for purposes of this motion, AAFP also does not dispute the second sentence of BH-SOF 109.

**BH-SOF 110.** Boston Hannah and AAFP worked together each year to place the digital version on the website, with AAFP actually placing the digital versions of the publications on the FamilyDoctor.org website. (Ex. 1, 107:25-108:6, 162:24-163:20, 164:21-165:2; Ex. 7, 151:13-18; Ex. 9, 60:2-9, 64:12-18, 66:8-69:1; Exs. 14 and 15).

AAFP Reply: Boston Hannah has provided no foundation for BH Ex. 14 and 15, which also contain multiple levels of hearsay. Accordingly, these exhibits are not admissible. Nevertheless, for purposes of this motion, AAFP does not dispute BH-SOF 110, but adds that in the few years that links were placed on FamilyDoctor.org, AAFP provided those links as a courtesy to Boston Hannah. SOF 54.

**BH-SOF 111.** Additionally, based on AAFP's representations and parties' agreement, Boston Hannah began offering Banner Ads to advertisers, because AAFP wanted to ensure that Boston Hannah was selling a complete package. (Ex. 1, 165:3-11; Ex. 7, 29:14-30:12).

AAFP Reply: Boston Hannah's assertion in BH-SOF 111 that it began offering banner advertisements "based on AAFP's representations and parties' agreement" is not supported by the cited record and must be disregarded. Boston Hannah has not cited to any specific representations made by AAFP concerning any right of Boston Hannah to sell banner advertising, because there were none. Boston Hannah's assertion of an "agreement" concerning online advertising is a legal conclusion and should be disregarded. However, if by "parties" Boston Hannah is referred to it and AnswersMedia, AAFP does not dispute that Boston Hannah sold advertising pursuant to its agreement with AnswersMedia. Springer Dep. (AAFP Ex. 5) at 113:24-114:23; Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 102:12-24; 210:11-15. Boston Hannah even concedes that it could sell banner advertisements on FamilyDoctor.org only through its arrangement with AnswersMedia. SOF 58. For purposes of this motion, AAFP does not dispute the remainder of BH-SOF 111.

**BH-SOF 112.** Over the years, AAFP was completely aware that Boston Hannah, as part of its advertising marketing, would be marketing to its advertising customers for placement on FamilyDoctor.org. (Ex. 7, 31:21-32:2: Ex. 12, Ex. B attached thereto; Ex. 36).

AAFP Reply: BH-SOF 112 is not supported by the evidence cited, insofar as it suggests that individuals at AAFP had awareness that Boston Hannah sold online advertising before 2009. AAFP does not otherwise dispute BOH-SOF 12 for purposes of this motion.

**BH-SOF 113.** In fact, AAFP helped place Boston Hannah's brokership with AnswersMedia to ensure the relationship actually developed, because AAFP wanted to integrate the *Family Doctor* Books with the whole AAFP business plan and maximize the Books' appeal to consumer advertisers and draw increased traffic to FamilyDoctor.org, and AAFP believed this

92

could be done by offering both print and online enhanced advertising packages. (Ex. 1, 165:3-11; Ex. 3, § 4.4; Ex. 7, 29:14-30:7).

        <u>AAFP Reply:</u> For purposes of this motion, AAFP does not dispute that AAFP wanted to integrate the *Family Doctor* magazines with the overall AAFP business plan and maximize the appeal of the magazines to advertisers.  Boston Hannah's assertion that AAFP introduced Mr. Harrington to AnswersMedia in order to bring traffic to FamilyDoctor.org is not supported by the evidence Boston Hannah cites and must be disregarded.  For purposes of this motion, AAFP does not dispute the remainder of BH-SOF 113.

        **BH-SOF 114.**  In January and February 2009, Mr. Springer emailed Mr. Harrington explaining his enthusiasm for the further integration of the *Family Doctor* publications with the newly re-launched version of FamilyDoctor.org. In this correspondence, Mr. Springer acknowledged Boston Hannah's advertisers' ability to be placed on the homepage and agreed that the plan needs to be further expanded to make the print and website work even more efficiently together, through coordination with AnswersMedia, following up a specific meeting schedule. (Ex. 63).

        <u>AAFP Reply:</u> BH-SOF 114 must be disregarded because it is not supported by admissible evidence.  Boston Hannah cites only BH Ex. 63 as support for its assertions, but has not cited any foundation for this exhibit.  Moreover, even if BH Ex. 63 were admissible, it does not support Boston Hannah's assertion that Mr. Springer "acknowledged Boston Hannah's advertisers' ability to be placed on the homepage," which assertion must also be disregarded for this reason.

        **BH-SOF 115.**  Furthermore, once the arrangement to sell Banner Ads had been made between Boston Hannah and AAFP, Heather Townsend, AAFP's Director of Online Development and Partnerships, also approved the arrangement. (Ex. 38). AAFP continued to be supportive of this practice until it entered into the Consumer Alliance Agreement with ███████ ███. (Ex. 7, 95:20-96:20).

        <u>AAFP Reply:</u> Boston Hannah's assertion that there was an arrangement between AAFP and Boston Hannah to sell banner ads is not supported by the evidence cited and must therefore be disregarded.   In the evidence cited, Heather Townsend referred to an arrangement between Boston Hannah and AnswersMedia.  For purposes of this motion, AAFP does not dispute that Ms. Townsend wrote of her approval of the arrangement between Boston Hannah and AnswersMedia.  Boston Hannah's assertion that, after entering the consumer alliance agreements, AAFP stopped being supportive of AAFP selling ads for FamilyDoctor.org through its arrangement with AnswersMedia overstates the evidence cited and to that extent is inadmissible.  After entering the consumer alliance agreements, AAFP eventually limited online advertising of beverages and supplements, but continued to have no objection to Boston Hannah selling banner advertisements for other products, or for permitted beverages and supplements.

        **BH-SOF 116.**  AAFP's Deputy Executive Vice President, Todd Dicus, who oversaw the operations knew that Boston Hannah was bundling the *Family Doctor* Book advertisements and FamilyDoctor.org advertisements in order to sell ads to potential advertisers, and Mr. Dicus did not object. (Ex. 45, 11:1-12:9; Ex. 36).

AAFP Reply: For purposes of this motion, AAFP does not dispute BH-SOF 116, although it is incomplete.  On August 28, 2009, Mr. Dicus emailed Mr. Springer, requesting a copy of any agreements between AAFP and Boston Hannah. SOF 22.  Mr. Springer provided Mr. Dicus with a copy of the 2005 Agreement, along with a note suggesting a possible amendment of the definition of "Book" from an annual.  SOF 23.  After reviewing the 2005 Agreement, Mr. Dicus emailed Mr. Springer again, explaining that the 2005 Agreement related only to the *Family Doctor* "Books" and that Boston Hannah needed AAFP's "consent or agreement" to bundle advertising for the magazines and FamilyDoctor.org.  9/8/09 Email (AAFP Ex. 21).

**BH-SOF 117.**   AAFP was comfortable with the plan to produce five publications in 2010 and never objected to Mr. Harrington's proposals in 2010 in terms of the number of publications Boston Hannah was targeting. (Ex. 7, 60:10-61:23).

AAFP Reply: AAFP does not dispute that Mr. Springer testified he was comfortable with Boston Hannah's proposed 2010 publications and that he was unaware of any objection at AAFP to the proposed number of publications, but Mr. Springer remained in AAFP's employ only until early February 2010; therefore, he lacks personal knowledge about any subsequent objections to Boston Hannah's proposed publication schedule.  SOF 28; Springer Dep. (AAFP Ex. 5) at 135:8-15.  In this respect, BH-SOF 117 is not supported by the record cited and should be disregarded.  Indeed, AAFP did object to Boston Hannah's proposed publication schedule for *Your Healthy Heart*.  SOF 41.

**BH-SOF 118.**   The publications that Boston Hannah and AAFP agreed to produce in 2010—*Your Healthy Heart, Men's Health,* and the reprints of *Living With Diabetes, Healthy Living,* and *Over the Counter Medicines*—would have made up the Fifth Edition of the *Family Doctor* Book, had they ever been published. (Ex. 12, ¶ 10).

AAFP Reply: For purposes of this motion, AAFP does not dispute that Boston Hannah intended to publish the five listed magazines at some time in 2010.  However, Boston Hannah's assertion that its proposed 2010 publications would have "made up the Fifth Edition of the *Family Doctor* Book" is erroneous, and must be disregarded.  As explained in SOF 19, the 2005 Agreement does not define edition in the manner asserted by Boston Hannah.  Moreover, Boston Hannah has not cited to any evidence suggesting the parties properly amended the 2005 Agreement to redefine "edition" so that a certain number of magazines would replace the 2010 annual magazine called for under the 2005 Agreement.  Boston Hannah's attempt to define it in a different manner than under the 2005 Agreement is not a statement of fact, is confusing and misleading, and is argumentative.

**BH-SOF 119.**   It was feasible for Boston Hannah to publish the mini-magazines in as little as two months. Mr. Ford testified that it had only taken five months to publish *Living With Diabetes* and *Healthy Living*, which took longer than normal to publish since they were the very first publications in Fourth Edition, they were the first mini-magazines done as part of the new approach, and were the first publications in which new staff members at the AAFP had been involved. (Ex. 5, 141:3-143:4; 143:18-25).

94

AAFP Reply: Boston Hannah's assertion that "[i]t was feasible for Boston Hannah to publish the magazines in as little as two months" is inadmissible argument and should be disregarded.  AAFP does not dispute that Mr. Ford testified that it took Boston Hannah from May to September (or a period of approximately five months) to publish *Living with Diabetes* and *Healthy Living*.  However, Mr. Ford also testified that Boston Hannah began work on the first mini-magazine, *Living with Diabetes*, in March 2009.  SOF 33.  Moreover, it is undisputed that *Living with Diabetes* and *Healthy Living* were actually published in October 2009.  SOF 33.  Therefore, it took Boston Hannah a period of seven months (not five) to publish *Living with Diabetes* and *Healthy Living*.  AAFP does not dispute the remainder of BH-SOF 120 for purposes of this motion.

**BH-SOF 120.**  Ordinarily, when publications are part of a new series, the first few months are dedicated to the planning and branding phase, as well as training sales staff, which takes much longer with a new series than with an established series. (Ex. 1, 157:21-158:22).

AAFP Reply: BH-SOF 120 is not supported by the record cited.  As evidenced in the record, Mr. Harrington did not purport to testify about the typical process for creating a new publication series.  Moreover, Boston Hannah provided no evidentiary support for the assertion that it takes "much longer" to plan and brand with a new series.

**BH-SOF 121.**  The total time it took to actually publish the three mini-magazines, *Living With Diabetes, Healthy Living,* and *Over the Counter Medicines* was approximately six months. (Ex. 1, 157:21-158:22).

AAFP Reply: BH-SOF 121 is inaccurate.  AAFP does not dispute Mr. Harrington testified at one point that it took only six months to publish the three mini-magazines.  However, Mr. Harrington's estimate is flatly contradicted by the documentary evidence, which showed that it took approximately 11 months to create and publish *Living with Diabetes*, *Healthy Living*, and *Understanding Over the Counter Medicines*.  SOF 33, 40.

**BH-SOF 122.**  Regardless of the number of magazines Boston Hannah intended to publish in a given year, the total page number published would not have changed; the number of pages produced in the mini-magazines would have been very similar in a year as to what was produced in the one annual publication. (Ex. 1, 90:5-14). Boston Hannah never planned to produce and publish multiple large annual *Family Doctor* Books in one year; rather it was dividing up the small parts that made up the whole annual publication. (Ex. 1, 90:5-14). Boston Hannah was using a similar number of pages, just in a different way. (Ex. 1, 90:5-14).

AAFP Reply: AAFP does not dispute that Boston Hannah never intended to publish several large annual publications in a given year.  However, the remainder of BH-SOF 122 is not supported by admissible evidence, because Mr. Harrington's underlying testimony is inadmissible speculation.

**BH-SOF 123.**  Michael Springer, senior management at AAFP, wrote and reviewed the proposed 2010 agreement. (Ex. 7, 131:7-10; 132:13-16).

95

AAFP Reply: For purposes of this motion, AAFP does not dispute BH-SOF 123.  However, it is incomplete.  Mr. Springer further testified that he never had AAFP's legal counsel or his superiors review the draft 2010 agreement.  Springer Dep. (AAFP Ex. 5) at 132:10-24.

BH-SOF 124.   As early as February 24, 2010, AAFP's Deputy Executive Vice President, Todd Dicus, understood that Kevin Harrington believed the proposed 2010 agreement was finalized and ready for signatures. (Ex. 45, 142:20-25; Ex. 67, Dicus Handwritten Meeting Notes).

AAFP Reply: For purposes of this motion, AAFP does not dispute BH-SOF 124.  However, Boston Hannah admits that the parties never actually executed the draft 2010 agreement, so the statement is irrelevant.  SOF 31.

BH-SOF 125.   AAFP approved the development and production processes for each magazine at each stage. (Ex. 5, 39:1-40:20).

AAFP Reply: BH-SOF 125 is not supported by the record cited and should therefore be disregarded.  Mr. Ford never testified that AAFP approved the development and production processes for each magazine at each stage.

BH-SOF 126.   Initially, it was a joint effort for the parties to determine the topics for publication. (Ex. 5, 46:9-19). After the topics were determined, once Boston Hannah got the go-ahead from AAFP, Boston Hannah would start developing Media Packs and send those to AAFP for approval. (Ex. 1, 106:7-25; Ex. 5, 39:1-40:20; Ex. 68, 11/19/09 and 2/15/10 Email Strings).

AAFP Reply: Boston Hannah failed to provide any evidence supporting the first sentence of BH-SOF 126 because the relevant section of the record is not contained within the cited exhibit.  Further, Boston Hannah has not established any foundation for BH Ex. 68, which is therefore inadmissible.  AAFP does not otherwise dispute BH-SOF 126 for purposes of this motion.

BH-SOF 127.   AAFP was required to approve each of the Media Packs, which explained to AAFP and potential advertisers Boston Hannah's advertising campaign and detailed exactly what Boston Hannah was going to present the advertisers, including the enhanced advertising packages Boston Hannah was offering the advertisers. (Ex. 1, 106:7-25, 191:7-18; Ex. 30; Ex. 68).

AAFP Reply: As noted in response to SOF 126, Boston Hannah has not cited any foundation for BH Ex. 68, which is therefore inadmissible.  Further, as explained in SOF 54, BH Ex. 30 and any testimony about its contents are inadmissible.  Therefore, Boston Hannah has failed to present any admissible evidence in support of this paragraph.

BH-SOF 128.  Michael   Springer,   Vice   President   of   Publishing   and Communication at AAFP, reviewed and approved each Media Pack. (Ex. 7, 6:18-7:6; Ex. 45, 55:5-19; Ex. 68).

96

AAFP Reply: Boston Hannah's assertion that Michael Springer reviewed and approved Boston Hannah's media packs is not supported by the evidence cited and should be disregarded. The cited section of Mr. Springer's testimony in BH Ex. 7 does not refer to media packs. Mr. Dicus testified in his individual deposition that *if* anyone had reviewed the media packs, it would have been Mr. Springer or one of his staff members. Dicus Dep. (AAFP Ex. 6) at 54:8-55:11. He testified that he had no personal familiarity with the media packs. Dicus Dep. at 50:21-24; 52:25-53:5; 54:8-13, attached hereto as AAFP Ex. C. He never testified that Mr. Springer actually reviewed any media packs. Moreover, as previously noted, BH Ex. 68 is inadmissible. And, nothing in BH Ex. 68 actually supports Boston Hannah's assertion that Mr. Springer reviewed and approved every media pack. Indeed, nowhere in the exchange does anyone purport to "approve" any media pack.

**BH-SOF 129.** From at least as early as 2006, the Media Packs included placement of a digital version of each publication on the FamilyDoctor.org website, and AAFP signed off on the Media Packs each year. (Ex. 1, 106:7-25, 191:7-18; Ex. 30).

AAFP Reply: Boston Hannah has not presented any admissible evidence in support of its assertion that the media packs "included placement of a digital version." BH Ex. 30 is inadmissible and Boston Hannah has not provided any admissible evidence of any media pack for any magazine. Further, Mr. Harrington's testimony about the contents of the media packs is inadmissible hearsay and cannot support the assertion in BH-SOF 129. AAFP does not dispute that Kevin Harrington testified AAFP agreed to Boston Hannah's media packs. However, Boston Hannah's assertion that AAFP "signed off on the Media Packs each year" is erroneous and misleading. As explained in AAFP's Response to SOF 128, Boston Hannah has not provided any admissible evidence that Mr. Springer reviewed and approved the media packs. Further, it would be irrelevant if Boston Hannah sent AAFP media packs (even if they did contain representations that digital versions would be provided) because Boston Hannah could not grant itself contractual rights it otherwise lacked under the 2005 Agreement (here, the right to place digital versions on FamilyDoctor.org) by representing to third parties that it could.

**BH-SOF 130.** Even after the annual Book became mini-magazines and included website Banner Ads, AAFP signed off on the Media Packs. (Ex. 1, 106:7-25; Ex. 30).

AAFP Reply: Boston Hannah's assertion in BH-SOF 130 that AAFP "signed off on the Media Packs" even after Boston Hannah began publishing "mini-magazines" is erroneous and misleading, for the reasons discussed in response to BH-SOF 129. Moreover, for the reasons stated in AAFP's reply to SOF 54, BH Ex. 30 is inadmissible. Boston Hannah has not presented any admissible evidence of any media pack for any magazine.

**BH-SOF 131.** AAFP even used one of Boston Hannah's 2009 Media Packs in its ███████ Consumer Alliance presentation to ███████. (Ex. 43, 19:22-20:3; Ex. 69, ████████████████████, slide 27; Ex. 36).

AAFP Reply: AAFP does not dispute BH-SOF 131 for purposes of this motion.

DB04/001520.0138/5231935.4DD02

**BH-SOF 132.** Once the Media Pack was approved by AAFP, Boston Hannah's sales team could start selling advertisements for the publication and Boston Hannah would create a provisional table of contents for the proposed publication, which Boston Hannah would send to AAFP for approval. (Ex. 5, 39:1-40:20; Ex. 25).

AAFP Reply: The allegation in BH-SOF 132 that AAFP approved the media packs is not supported by the evidence cited. Further, Boston Hannah has not cited any foundation for BH Ex. 25, which is therefore inadmissible. For purposes of this motion, AAFP does not dispute the remainder of BH-SOF 132.

**BH-SOF 133.** Once the table of contents was approved by AAFP, the editorial content would be written and advertisements would be created, both of which would then be reviewed, edited, and approved in writing by AAFP. (Ex. 1, 316:5-317:17; Ex. 5, 39:1-40:20; Ex. 7, 15:11-16, 43:20-44:21; Ex. 9, 21:9-14, 34:14-19, 35:14-39:7; Ex. 16, 37:14-22; Ex. 21; Ex. 24; Ex. 28).

AAFP Reply: The allegation in BH-SOF 133 that AAFP "approved in writing" Boston Hannah's proposed advertising is erroneous and not supported by the evidence cited. As Mr. Ford testified, Boston Hannah uploaded the proposed editorial and advertising content onto a secure FTP site. Ford Dep. (BH Ex. 5) at 40:7-20. AAFP would then review the material and "check" a box to show approval of the content. *Id*. Boston Hannah contends that the AAFP editor's act of checking a box on the FTP website constitutes a "written" amendment to the 2005 Agreement. Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 166:5-167:25. For the various reasons discussed in the Motion for Summary Judgment, as well as this supporting reply brief, the act of checking a box (or "ticking"), on Boston Hannah's website could not have amended the 2005 Agreement under § 9.1 of the 2005 Agreement. Indeed, it is not even a "written" approval. Further, BH Ex. 24, cited in support, is inadmissible because Boston Hannah did not provide any foundation for it. AAFP does not dispute the remainder of BH-SOF 133 for purposes of this motion.

**BH-SOF 134.** Once all the editorial and advertising content was approved by AAFP, the content would be uploaded onto a secure site, where AAFP would give it another final review and approval, and then sign off on the entire publication before it went to press. (Ex. 1, 166:5-167:17; Ex. 5, 39:1-40:20; Ex. 7, 16:11-18:10; Ex. 16, 49:8-50:19, 52:16-20; Ex. 28; Ex. 29, ¶ 2, and Ex. A attached thereto).

AAFP Reply: Boston Hannah's description of the review and approval process in BH-SOF 134 is inaccurate and is not supported by the evidence cited. As Mr. Ford (and numerous others) testified, AAFP's approval of proposed advertising occurred on the secure FTP website. Ford Dep. (BH Ex. 5) at 40:7-20; Springer Dep. (BH Ex. 7) at 16:23-18:4; White Dep. (AAFP Ex. 11) at 35:14-38:15; Guzman 30(b)(6) Dep. (BH Ex. 16) at 50:20-25. AAFP did not first approve the proposed advertising content, and then approve it all over again on the FTP website, as Boston Hannah implies. *Id*. Boston Hannah has misconstrued Mr. Ford's testimony concerning the development and production process. Mr. Ford testified that AAFP's approval occurred on the secure website, where an AAFP editor "checked" a box for approval. Ford Dep. (BH Ex. 5) at 40:7-20. Then, *after everything had been approved*, there would be a "production process" on Boston Hannah's end, where Boston Hannah uploaded the files onto the printer

website, and Boston Hannah's Production Director did a final review and sign-off on the printer's website.  Ford Dep. (BH Ex. 5) at 40:14-23.  Mr. Ford did not testify that this process involved any review or approval by AAFP.   Further, Boston Hannah's claim that AAFP "signed off on the entire publication before it went to press" is misleading and misconstrues the evidence cited. After completing their review, AAFP's editors merely granted Boston Hannah approval to send the magazine to the printer.  See Ford Aff. (BH Ex. 29) at ¶ 3, Exhibit A.  As Ms. Guzman explained, this may have included an "ok to publish" form.  Guzman 30(b)(6) Dep. (BH Ex. 16) at 49:8-24; Ford Aff. (BH Ex. 29) at ¶ 3, Exhibit A.  Boston Hannah has not presented any evidence that anyone at AAFP executed a document approving Boston Hannah's deviations from the terms of the 2005 Agreement.

   **BH-SOF 135.**  This systematic process occurred for every single *Family Doctor* publication. (Ex. 1, 59:22-60:22; Ex. 5, 31:17-32:3; Ex. 9, 35:4-13).

   <u>AAFP Reply:</u> The objections to BH-SOF 133 and 134 are incorporated herein.  Subject to these objections, AAFP does not dispute BH-SOF 135 for purposes of this motion.

   **BH-SOF 136.**  Each publication usually had amendments of some kind or another before AAFP would sign off. (Ex. 5, 56:14-57:8). It was an ongoing process to always adjust, particularly at the end of the publications process, in order to make the publication have greater benefit to AAFP. (Ex.1, 106:7-15, 145:4-4; 160:18-162:23; Ex. 5, 98:20-99:11; Ex. 7, 19:9-21; Ex. 24; Ex. 28).

   <u>AAFP Reply:</u> Boston Hannah failed to provide any evidence supporting the first sentence of BH-SOF 136 because the relevant section of the record is not contained within the cited exhibit.  Moreover, BH-SOF 136 is ambiguous and misleading in that it appears to refer simply to minor changes made to publications, yet in support, Boston Hannah cites to Mr. Harrington's numerous unfounded claims in his deposition that the parties "amended" the 2005 Agreement through their actions.  To the extent Boston Hannah contends in BH-SOF 136 that the parties amended the 2005 Agreement through various deviations from the 2005 Agreement reflected in the publications, the contention is a legal conclusion and should be disregarded.  Moreover, Boston Hannah's assertion that adjustments were made "to make the publication have greater benefit to AAFP" is incomplete and misconstrues the evidence cited. AAFP does not dispute that Mr. Ford testified that amendments were made to the publication process in 2009 to benefit AAFP.  However, Mr. Ford was testifying about his response to an email he received from AAFP employee Susanna Guzman, in which Ms. Guzman expressed dissatisfaction with Boston Hannah's attempt to shorten the standard editorial process.  BH Ex. 28. The communication did not address any of the alleged amendments at issue in this litigation. Further, BH Ex. 24 is inadmissible because Boston Hannah did not provide any foundation for it.

   **BH-SOF 137.**  This same process was followed with the mini-magazines, and AAFP's fundamental responsibilities regarding review and approval did not change. (Ex. 1, 145:4-146:20, 166:5-167:17; Ex. 7, 43:3-19; Ex. 9, 34:14-35:13; Ex. 45, 46:3-7). AAFP signed off on the mini-magazines before they were published. (Ex. 29, ¶ 2, and Ex. A attached thereto).

AAFP Reply: The objections to BH-SOF 133 and 134 are incorporated herein with respect to Boston Hannah's claim that the "same process was followed with the mini-magazines."  AAFP does not dispute that it's review and approval rights did not change after Boston Hannah published more than one magazine in 2009.  However, as explained in the Motion for Summary Judgment, AAFP's review and approval of the editorial and advertising content of the publications did not constitute a written amendment to the 2005 Agreement, and these arguments are incorporated herein.  Further, Boston Hannah's claim in the second sentence of BH-SOF 137 that AAFP "signed off on the mini-magazines before they were published" is misleading and misconstrues the evidence cited.  As stated in AAFP Response to SOF 134, AAFP's editors merely granted Boston Hannah approval to send the magazines to the printer. No one at AAFP "signed" anything explicitly approving of Boston Hannah's deviations from the terms of the 2005 Agreement.

**BH-SOF 138.**  Boston Hannah reasonably understood that when the AAFP signed off on the publications, it agreed to everything in them, including changes in formatting that had been made from one annual Book to multiple mini-magazines. (Ex. 1, 166:4-167:17). Boston Hannah could not have published the three mini-magazines as part of the 2009 Fourth Edition of the *Family Doctor* Book without AAFP's full approval. (Ex. 1, 146:8-20; Ex. 7, 43:3-44:21).

AAFP Reply: The first sentence of BH-SOF 138 is a legal conclusion, which should be disregarded.  Moreover, the implicit assertion in BH-SOF 138 that the AAFP actually agreed to Boston Hannah's mini-magazine approach is erroneous and is not supported by the evidence cited.  For the reasons discussed at length in AAFP's Motion for Summary Judgment, which is incorporated herein, the parties never amended the 2005 Agreement to permit Boston Hannah to publish multiple magazines in a year.  With regard to the second sentence of BH-SOF 138, AAFP does not generally dispute that Boston Hannah needed AAFP's approval of the proposed editorial and advertising content to publish a magazine.  However, AAFP's approval to send the magazine to the printer did not constitute any written amendment to the 2005 Agreement.

**BH-SOF 139.**   Throughout the parties' working relationship, the parties worked together to produce the *Family Doctor* publications, and AAFP's input was essential to Boston Hannah and greatly valued, as was evidenced by the email correspondence between the parties. (Ex. 5, 60:5-14; Ex. 9, 41:13-42:10, 64:12-65:20; Ex. 16, 41:5-44:19, 63:23-25; Ex. 22; Ex. 24; Ex. 31; Ex. 70, 10/7/09 Ford Email thread; Ex. 71, 9/16/09 White Email).

AAFP Reply: BH Ex. 22, 24 and 31 are inadmissible because Boston Hannah has not cited any foundation for them.  AAFP does not otherwise dispute BH-SOF 139 for purposes of this motion.



**BH-SOF 140.**   On ▮▮▮▮▮▮▮▮, Mr. Doane wrote a letter to the Vice President of ▮▮▮▮▮▮▮▮▮▮▮, stating that AAFP was eager to explore a long-term partnership with the ▮▮▮▮▮▮▮▮ and enclosed a ▮▮▮▮▮▮▮▮▮▮ representing the ground work for a partnership allowing for ample room to grow and evolve as the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ continued to define strategic objectives over time. (Ex. 43, 24:8-15; Ex. 72, 5/12/09 Doane Letter).

100

AAFP Reply: AAFP does not dispute BH-SOF 140 for purposes of this motion.

**BH-SOF 141.** Later, on [redacted], Craig Doane, Vice President of Development at AAFP, circulated a document to the AAFP Board of Directors Executive Committee that stated that [redacted] (Ex. 43, Doane Depo. 44:7-10; Ex. 73, 9/9/09 Doane Letter).

AAFP Reply: AAFP does not dispute BH-SOF 141 for purposes of this motion.

**BH-SOF 142.** [redacted]

AAFP Reply: Boston Hannah has misquoted the language contained in BH Ex. 73 by adding the word "brand" before "exclusivity," in the second sentence of BH-SOF 142. AAFP does not otherwise dispute BH-SOF 142 for purposes of this motion.

**BH-SOF 143.** AAFP received [redacted]

AAFP Reply: Boston Hannah's assertion that AAFP received [redacted]

**BH-SOF 144.** The brand exclusivity [redacted]

<u>AAFP Reply:</u> Boston Hannah's assertion that ████████████ ████████████ misconstrues the evidence cited.  BH Ex. 74. does not purport to describe ████████████ ████████████ <i>See</i> BH Ex. 72; Doane 30(b)(6) Dep. (BH Ex. 43) at 41:6-42:14; 43:13-44:6. AAFP does not dispute the remainder of BH-SOF 144 for purposes of this motion.

**BH-SOF 145.**   Later, on March 29, 2010, Mr. Doane circulated an email stating that AAFP had contacted several companies ████████████████ about new Consumer Alliances, and that he hoped they would progress quickly past the introductory phase. (Ex. 47).

<u>AAFP Reply:</u> Boston Hannah failed to provide any admissible evidence in support of BH-SOF 145 and it should therefore be disregarded.  Boston Hannah did not provide a foundation for the document cited in support of BH-SOF 145 (BH Ex. 47); consequently, the document is inadmissible.

**BH-SOF 146.**   Ultimately, AAFP hoped to have as many as eight Consumer Alliances Agreements a year. (Ex. 43, 30:1-31:25; Ex. 72).

<u>AAFP Reply:</u> AAFP does not dispute BH-SOF 146 for purposes of this motion.

████████████ AAFP and ██████████ did in fact renew the ████████████ (Ex. 43, 74:6-14).

<u>AAFP Reply:</u> AAFP does not dispute BH-SOF 147 for purposes of this motion.

**BH-SOF 148.**   When Boston Hannah and AAFP executed the 2002 Agreement, Mr. Springer outlined for Mr. Harrington how the advertising restrictions would work, and that is how it did work for the first eight years. (Ex. 1, 224:2-20).

<u>AAFP Reply:</u> AAFP does not dispute that Mr. Harrington testified that Mr. Springer outlined for him how the advertising restrictions would work, and that it did so work for eight years.  However, Boston Hannah has failed to present admissible evidence in support of its claim that Mr. Springer outlined how the restrictions would work, because the testimony cited in support is improper parol evidence concerning the parties negotiations and their intent in drafting § 2.2. Even in the 2005 Agreement itself, the parties agreed that it was the "entire agreement between the parties" and all "prior agreements" were superseded.  2005 Agreement (AAFP Ex. 19), § 12.3.

**BH-SOF 149.**   As long as Boston Hannah and AAFP had been working together, there were two main reasons why an advertisement's approval was withheld by AAFP, and they had to do with substantive content of advertisements. (Ex. 1, 224:21-5; Ex. 7, 19:22-20:2).

AAFP Reply: The testimony cited in support of BH-SOF 149 is inadmissible to the extent that it constitutes parol evidence of the parties' intent in drafting § 2.2 of the 2005 Agreement. Moreover, Boston Hannah's claim that the "two main reasons" for withholding advertising approval were related to the "substantive content of the advertisements" is not supported by the evidence cited. Mr. Harrington specifically testified that the first "category" of reasons for withholding approval was that the "product was unsuitable." Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 224:24-225:5. His examples included ████████ ████████ tobacco, and alcohol. *Id.* at 225:3-16. Like "beverages" and particularly "dietary supplements," these are product-based restrictions, not content-based restrictions. AAFP does not otherwise dispute BH-SOF 149.

**BH-SOF 150.** The first reason an advertisements' approval was withheld was because the advertisement contained an unsuitable product, namely unhealthy food and beverages, tobacco, and alcohol. (Ex. 1, 224:21-226:6).

AAFP Reply: The testimony cited in support of BH-SOF 150 is inadmissible because it is parol evidence of the parties' intent in drafting § 2.2 of the 2005 Agreement. Mr. Harrington never testified that the AAFP actually withheld approval of an advertisement under this first "unsuitable product" basis. Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 224:2-225:16. Rather, Mr. Harrington was testifying to the parties intent in placing § 2.2 in the 2002/2005 Agreements. *See id.* Thus, BH-SOF 150 is not supported by the evidence cited, which is inadmissible anyway. BH-SOF 150 should be disregarded.

**BH-SOF 151.** The second reason an advertisements' approval was withheld dealt with unsubstantiated claims, which meant an advertiser would try to put in a statement that was not provable, so Boston Hannah would either make the advertiser prove the statement or Boston Hannah would take the statement out, and then AAFP would agree to it. (Ex. 1, 224:21-226:6; Ex. 9, 38:16-39:17).

AAFP Reply: AAFP does not dispute that it withheld approval for advertisements because they contained unsubstantiated claims. Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 225:17-23. However, BH-SOF 151 should be disregarded to the extent it suggests that AAFP could disapprove an advertisement for only one of two reasons under § 2.2 of the 2005 Agreement, as it is an improper legal conclusion and inadmissible argument. AAFP does not otherwise dispute BH-SOF 151 for purposes of this motion.

**BH-SOF 152.** Boston Hannah was always very cooperative with respect to modifying or revising the language content of the advertising in the Books and mini-magazines to conform to the requests of AAFP, as this was reasonable content restriction. (Ex. 1 243:15-244:16; Ex. 7, 20:3-8).

AAFP Reply: The assertion in BH-SOF 152 that language content was a "reasonable content restriction" is an inadmissible legal conclusion and improper opinion, and is not supported by the evidence cited. For purposes of this motion, AAFP does not dispute the remainder of BH-SOF 152.

**BH-SOF 153.**  Before AAFP entered into the Consumer Alliance Agreement with ▮▮▮▮▮▮ there was never a situation where AAFP and Boston Hannah were not able to resolve an advertising content issue. (Ex. 7, 20:9-14; Ex. 9, 38:16-20).

AAFP Reply:  AAFP does not dispute BH-SOF 153 for purposes of this motion.

**BH-SOF 154.**  Mr. Springer expressed to Mr. Doane and to other executives of AAFP that the exclusivity clause in the ▮▮▮▮▮▮▮▮▮▮ was very likely going to be a problem. (Ex. 7, 71:12-18).

AAFP Reply:  AAFP does not dispute BH-SOF 154 for purposes of this motion.

**BH-SOF 155.**  Once Mr. Springer realized that the ▮▮▮▮▮▮▮▮▮▮ called for exclusivity across all related activities of AAFP, he knew that the ▮▮▮▮▮▮▮▮▮ would wipe out large categories of advertising for Boston Hannah. (Ex. 7, 71:19-72:6). The AAFP did not change the breadth of the exclusivity clause after Mr. Springer expressed his concerns. (Ex. 7, 74:7-10).

AAFP Reply:  AAFP does not dispute that Mr. Springer testified he knew the ▮▮▮▮▮▮▮ would wipe out large categories of advertising for Boston Hannah. However, the testimony is inadmissible speculation; therefore, Boston Hannah has not presented any admissible evidence in support of the first sentence of BH-SOF 155.  Also, to the extent BH-SOF 155 suggests the ▮▮▮▮▮▮▮▮▮▮ did in fact "wipe out large categories of advertising" for Boston Hannah, it is improper opinion testimony that is not supported by the evidence cited.  AAFP does not dispute the second sentence of BH-SOF 155.

**BH-SOF 156.**  Regardless, AAFP never made any effort to assess what the economic impact would be on Boston Hannah as a result of the exclusivity clause in the Consumer Alliance Agreements with ▮▮▮▮▮▮▮▮. (Ex. 7, 68:11-17; Ex. 37, 80:18-22; Ex. 43, 93:11-14, 94:17-95:7, 103:3-20; Ex. 45, 69:19-70:3).

AAFP Reply:  AAFP does not dispute that Mr. Springer testified that he had no personal knowledge of an effort to assess the economic impact upon Boston Hannah as a result of the ▮▮▮▮▮▮▮.  However, Mr. Springer did not testify on behalf of AAFP and therefore could not speak for the entire organization.  Moreover, the assertion in BH-SOF 156 is not supported by any of the other evidence cited.  BH Exs. 37 and 45 do not support the claim at all, and Boston Hannah has not provided the relevant excerpts from BH Ex. 43.  Therefore, Boston Hannah has failed to present admissible evidence in support of BH-SOF 156, and it should be disregarded.

**BH-SOF 157.**  Prior to AAFP's entrance into the Consumer Alliance Agreement with ▮▮▮▮▮▮, nobody at Boston Hannah had an opportunity to address the subject matter of the exclusivity clause in the ▮▮▮▮▮▮▮▮. (Ex. 7, 68:18-24).

104

AAFP Reply: AAFP does not dispute BH-SOF 157 for purposes of this motion.

**BH-SOF 158.**   In January 2010, AAFP instructed Mr. Springer to notify Boston Hannah that it was not allowed to accept any advertising in the "beverage" category. (Ex. 7, 87:24-88:11). Mr. Springer told Boston Hannah that AAFP knew that the ███████ was too restrictive. (Ex. 7, 88:19-90:19; Ex. 48).

AAFP Reply: BH-SOF 158 misconstrues the testimony cited.   In January 2010, Mr. Doane sent out a memorandum to certain AAFP employees (including Mr. Springer), requesting that they notify businesses they worked with that AAFP could no longer accept beverage advertising.  Springer Dep. (AAFP Ex. 5) at 88:5-11.  AAFP does not dispute that Mr. Springer stated "[w]e realize this is too restrictive" in the 2/3/10 email to Mr. Harrington, but he clarified this statement by saying: ████████████████████████████████████████ ██████████████████████████████████████████████████████ AAFP Ex. 28.   The document speaks for itself.

**BH-SOF 159.**   By "too restrictive," Mr. Springer meant that AAFP's management and the publishing group realized the restrictions were going to be a problem in terms of the advertising that could be accepted, or that would be required to be rejected. (Ex. 7, 89:12-19).

AAFP Reply: AAFP does not dispute that Mr. Springer testified that was his intended meaning of "too restrictive," but the document speaks for itself.  Mr. Springer clarified his statement of "too restrictive" by subsequently stating: ██████████████████ ████████████████████████████████████████████████████████ ████████████████████   AAFP Ex. 28.

██████████████████████   On January 5, 2010, Bradley Houseton sent an email to Heather Townsend, stating, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████



AAFP Reply: AAFP does not dispute BH-SOF 160 for purposes of this motion, except to note the error in the quotation.

**BH-SOF 161.**   It was at least two months after AAFP had entered into the ████████ ████████████ that AAFP attempted to "get something in writing" from Boston Hannah stating that it would honor the exclusivity clause of the ████████████████. (Ex. 37, 144:3-145:2; Ex. 76, 2/3/10 Houston Email thread).

AAFP Reply: AAFP does not dispute BH-SOF 161 for purposes of this motion.

105

**BH-SOF 162.** AAFP wanted a written approval from Boston Hannah to document its due diligence with respect to its contractual obligation to ███████. (Ex. 76).

<u>AAFP Reply:</u> BH-SOF 162 misconstrues the evidence cited, because Ms. Houseton stated in the relevant email (BH Ex. 76) that *she* wanted the approval. AAFP does not otherwise dispute BH-SOF 162 for purposes of this motion.

**BH-SOF 163.** Boston Hannah never submitted any consent to the ████████ ██████ being entered into. (Ex. 7, 69:1-5; Ex. 45, 72:10-18).

<u>AAFP Reply:</u> BH-SOF 163 is a legal conclusion and should be disregarded. It is also erroneous and is not supported by the evidence cited. Mr. Springer testified that, to his knowledge, no one at Boston Hannah submitted a consent to the ████████ agreement "prior to its being executed." Springer Dep. (BH Ex. 7) at 68:1-5. Boston Hannah has misconstrued this testimony by using it to claim that no one at Boston Hannah *ever* consented to the restriction in the ████████████. This is erroneous because Boston Hannah did consent to the exclusivity restriction from the ████████████, in Mr. Harrington's February 4, 2010 email to Mr. Springer saying that the restriction was "ok." SOF 65. Further, the citation to Mr. Dicus's testimony does not support Boston Hannah's assertion in BH-SOF 163. Mr. Dicus testified that he was personally unaware of any agreement signed by Boston Hannah, in which Boston Hannah agreed to amend the 2005 Agreement based on the ████████ ██████████. Boston Hannah was certainly capable of consenting to the restriction in the ████████ (and waiving a breach of contract, if any) without executing a formal amendment to the 2005 Agreement.

**BH-SOF 164.** The reason that Boston Hannah was not notified about the █████████ until February 2010 was because ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████ (Ex. 7, 69:16-70:12; Ex. 48).

<u>AAFP Reply:</u> AAFP does not dispute BH-SOF 164 for purposes of this motion.

**BH-SOF 165.** Susanna Guzman testified that when AAFP entered into a Consumer Alliance Agreement ████████████, telling Boston Hannah at that point in time that there were going to be advertising restrictions would have been the more appropriate and fairer thing to do, given that such advertising restrictions would affect Boston Hannah's rights. (Ex. 77, Guzman Depo., 86:1-87:4).

<u>AAFP Reply:</u> BH-SOF 165 is not supported by admissible testimony. AAFP's counsel properly objected during this testimony because Boston Hannah's counsel improperly asked Ms. Guzman to speculate and hypothesize. Moreover, the testimony is irrelevant to any matter at issue in this litigation.

**BH-SOF 166.**   On November 12, 2009, it came to Ms. White's attention that a certain ad in the digital edition of *Healthy Living* conflicted with ███████████████. (Ex. 9, 90:5-22; Ex. 78, 11/12/09 White Email).

AAFP Reply: AAFP does not dispute BH-SOF 166 for purposes of this motion.

**BH-SOF 167.**   In response to Ms. White's email, Heather Townsend, AAFP's director of Online Development and Partnerships, research what digital editions of the *Family Doctor* publications needed to be removed from which sections of FamilyDoctor.org so as to avoid conflict with the ███████████████. (Ex. 9, 90:5-22; Ex. 78). Ms. White never informed Boston Hannah that any of its ads conflicted with the ███████████████. (Ex. 9, 92:1-10).

AAFP Reply: The first sentence of BH-SOF 167 is not fully supported by the evidence cited, and misstates the evidence.  Ms. Townsend sent an email stating that she was investigating whether she could remove digital editions off the consumer alliance pages "without issues."  BH Ex. 78.  Further, there is no indication in BH Ex. 78 that she did so "[i]n response to Ms. White's email," as Boston Hannah asserts.  AAFP does not dispute the second sentence of BH-SOF 167.

**BH-SOF 168.**   ███████████████████████████████ regarding █████████████ was implemented ██████████████, when AAFP took off all links to the *Healthy Living* mini-magazine on FamilyDoctor.org's "Healthy Living" section. (Ex. 9, 69:6-20, 72:17-20; Ex. 34). At this time, AAFP knew that placement of links to the digital edition was part of the 2005 Agreement with Boston Hannah. (Ex. 34).

AAFP Reply: The first sentence of BH-SOF 168 is not supported by the evidence cited.  Ms. White's emails in BH Ex. 34 indicate simply that Healthy Living links were removed from the Healthy Living section of FamilyDoctor.org for some unknown period of time.  Nothing in BH Ex. 34 supports Boston Hannah's claim that this occurred to implement the ███████████████ provision.   The links to the digital version were provided by AAFP as a courtesy to Boston Hannah.  SOF 54.  Over the years, AAFP has occasionally added, removed and/or moved the location(s) of one or more links on the website to the magazines.  SOF 55. FamilyDoctor.org currently has links to the digital copy of Healthy Living, as well as the copies of Living with Diabetes and Understanding Over the Counter Medicines.  SOF 56.  At least one link to each of these magazines has remained on FamilyDoctor.org at all times since it was first placed on the website.  SOF 56.

The second sentence of BH-SOF 168 is not supported by the evidence cited, which is inadmissible anyway.  In BH Ex. 34, Ms. White expressed her personal opinion about whether there was an agreement concerning placement of links to the digital editions. Boston Hannah cannot claim that Ms. White's personal opinion expressed in BH Ex. 34 expressed the knowledge of AAFP as an entity.  Moreover, Ms. White lacks personal knowledge concerning any amendment to the 2005 Agreement, including any amendment regarding the digital edition of the magazine.  As Ms. White explained during her deposition, she had never

reviewed the 2005 Agreement, White Dep. (AAFP Ex. 11) at 40:9-14, so she could not have had personal knowledge of its terms.  Therefore, the evidence is inadmissible.

**BH-SOF 169.**   Between March 5, 2010, and March 12, 2010, AAFP rejected three Banner Ads for , that Boston Hannah was contractually obligated to place on FamilyDoctor.org, because such advertising conflicted with the ████████████ Agreements. (Ex. 79).

AAFP Reply: BH-SOF 169 is not supported by any admissible evidence. Boston Hannah has not cited any foundation for BH Ex. 79, which is therefore inadmissible. The Court should therefore disregard BH-SOF 169.  Further, the assertion that "Boston Hannah" was contractually obligated to place the advertisements on FamilyDoctor.org is erroneous, because it is uncontested that the contracts between Boston Hannah and its advertisers stated that they were ████████████████████████████████████ ████████████████ SOF 77.

**BH-SOF 170.**   On March 24, 2010, Boston Hannah's production manager emailed Ashley White with the link for the digital version of *Over the Counter Medicines* to be put on FamilyDoctor.org. (Ex. 9, 74:1-6, Ex. 80, 3/24/10 J. Harrington Email).

AAFP Reply: AAFP does not dispute BH-SOF 170 for purposes of this motion.

**BH-SOF 171.**   Over a week later, on April 6, 2010, Bradley Houseton, Senior Manager of Strategic Partnerships, emailed Mr. Doane to see if AAFP could put a digital version of *Over the Counter Medicines* on FamilyDoctor.org, because it contained beverage and dietary supplement advertisements. (Ex. 52).

AAFP Reply: BH-SOF 171 is not supported by any admissible evidence. Boston Hannah failed to provide any foundation for BH Ex. 52, and it is therefore inadmissible. As BH-SOF 171 relies exclusively upon inadmissible BH Ex. 52, it should be disregarded.

**BH-SOF 172.**   Mr. Doane replied, "I think we are pushing the envelop [sic] with this as family doctor is what we want ████ and other [Consumer Alliance Partners] to have exclusivity over. So, putting [*Over the Counter Medicines*] on familydoctor does not give exclusivity at all. On the surface I would say no." (Ex. 52).

AAFP Reply: As previously noted, BH Ex. 52 is inadmissible; therefore, Boston Hannah has not provided any admissible evidence in support of BH-SOF 172.

**BH-SOF 173.**   As a result, AAFP stalled putting up a digital version of *Understanding Over the Counter Medicines* on the FamilyDoctor.org website, and once it did, only embedded it in certain areas. (Ex. 9, 74:20-75:6, 78:1-4, Ex. 35; Ex. 80, 4/6/10 J. Harrington Email).

AAFP Reply: BH-SOF 173 is not supported by the evidence cited.  AAFP does not dispute that Ms. Houseton *requested* that the digital edition not be placed on FamilyDoctor.org temporarily, until she could speak with Mr. Doane.  *See* BH Ex. 35.  However, BH Ex. 35 does not indicate that AAFP actually stalled in placing the digital version on FamilyDoctor.org.  Moreover, none of Boston Hannah's other citations support that proposition.  In addition,  the evidence cited does not support Boston Hannah's claim that AAFP "only embedded it in certain areas."  It should therefore be disregarded.

**BH-SOF 174.**  Many of Boston Hannah's advertisers complained that the digital version was not up and Boston Hannah was concerned that it was too late to fix the problem.  (Ex. 35).

AAFP Reply: BH-SOF 174 is not supported by admissible evidence and must be disregarded.  Boston Hannah has not cited any foundation for the email it cites from BH Ex. 35.  Further, the evidence is inadmissible hearsay.

**BH-SOF 175.**  On March 8, 2010, Mr. Harrington emailed Ms. Guzman, laying out his concerns regarding the ██████████ Agreements, which included the fact that AAFP could not expect Boston Hannah to pay a large royalty each year to AAFP and then remove Boston Hannah's ability to sell advertisements and obtain revenue for the publications.  (Ex. 1, 182:4-7, Ex. 82, 3/8/10 Harrington Email).

AAFP Reply: AAFP does not dispute that Mr. Harrington emailed Ms. Guzman on March 8, 2010, expressing concerns about the alleged restrictions, and stating that Boston Hannah could not be expected to pay the royalty obligation if AAFP removed Boston Hannah's "ability to function and obtain revenue for the publications."  However, BH-SOF 175 is incomplete.  Boston Hannah would have achieved a significant profit from the publications even after losing ██████ of its advertising revenue (the approximate amount Boston Hannah claimed it lost).  *See* SOF 83-85.  Therefore, Mr. Harrington's statements that Boston Hannah could not "function" or "obtain revenue for the publications" was unfounded.

**BH-SOF 176.**  In the 3/8/10 Email, Mr. Harrington also attempted to mitigate the damages caused by AAFP's breach by suggesting that the direct loss caused by the exclusion of the two categories would be paid for by AAFP. (Ex. 82).

AAFP Reply: BH-SOF 176 states a legal conclusion and should be disregarded.  AAFP does not dispute for purposes of this motion that Mr. Harrington stated in the March 3, 2010 email that he assumed AAFP would pay Boston Hannah's alleged loss.  *See* BH Ex. 82.  AAFP disputes Boston Hannah's contention that its demand for full payment by the alleged breaching party can somehow constitute mitigation of damages.

**BH-SOF 177.**  On March 22, 2010, Mr. Harrington emailed Ms. Guzman and again attempted to mitigate the damages caused by the advertising ban. (Ex. 1, 195:10-13; Ex. 83, 3/22/10 Harrington Email).

AAFP Reply: BH-SOF 177 states a legal conclusion and should be disregarded.  AAFP does not dispute for purposes of this motion that Mr. Harrington emailed

109

Ms. Guzman on March 22, 2010.  AAFP disputes Boston Hannah's contention that this email (containing more demands) constituted mitigation of damages.

**BH-SOF 178.**   Boston Hannah's and AAFP's business practice was that, every year, AAFP would provide an invoice and Boston Hannah would provide the payment. (Ex. 1, 333:20-334:5, 334:24-335:5). One of the reasons Boston Hannah did not pay until AAFP produced an invoice was because part of the invoice calculation relating to reimbursable costs was completely in the hands of AAFP to produce. (Ex. 1, 333:20-334:5).

AAFP Reply: AAFP does not dispute that AAFP ordinarily issued invoices to Boston Hannah, but BH-SOF 178 is incomplete and misleading.  Boston Hannah concedes that the 2005 Agreement did not make Boston Hannah's royalty payment obligation contingent on the issuance of an invoice.  SOF 92.  Moreover, Boston Hannah concedes that the royalty payments did not depend upon information in the hands of AAFP.  Harrington 30(b)(6) Dep. (AAFP Ex. 1) at 333:20-334:23.

**BH-SOF 179.**   On February 1, 2010, AAFP sent Boston Hannah a letter with its invoice for the first 2009 royalty payment. AAFP sated "The invoice for the 1st installment is due upon receipt. The second installment is due on completion of the last of the two following publications: Lowering Your Cholesterol and Over-The-Counter Medicines." (Ex. 59).

AAFP Reply: Boston Hannah has failed to provide any admissible evidence in support of BH-SOF 179.   The exhibit cited, BH Ex. 59, is an unsigned letter purportedly written by Ms. Guzman.  Boston Hannah failed to provide any foundation for BH Ex. 59; consequently, it is inadmissible.  BH-SOF 179 should be disregarded in its entirety.

**BH-SOF 180.**   Other than the last invoice sent by AAFP to Boston Hannah, Boston Hannah paid every invoice sent to it by AAFP from 2006-2009. (Ex. 59).

AAFP Reply: BH-SOF 180 is not supported by any admissible evidence and should be disregarded.  BH Ex. 59 is inadmissible because Boston Hannah did not provide a foundation for it.  Moreover, BH Ex. 59 contains no reference to any previous invoice or Boston Hannah's payment thereof.  Therefore, BH-SOF 180 should be disregarded.

**BH-SOF 181.**   The final invoice AAFP presented to Boston Hannah in June of 2010, was for $112,382.46. (Ex. 57). It was not until litigation was initiated that AAFP's attorneys invented an increased amount for which AAFP now seeks for damages, $272,382.46. (Ex. 57; Ex. 84, AAFP's Initial Disclosures; Ex. 85, AAFP's Second Supplemental Disclosures).

AAFP Reply: AAFP does not dispute the first sentence of BH-SOF 181 for purposes of this motion.  However, BH Ex. 57 is inadmissible because Boston Hannah has not provided a foundation for it.  The second sentence is argumentative and an improper opinion statement, and should be disregarded.  AAFP had not invoiced Boston Hannah for the 2010 royalty payment, but Boston Hannah concedes the 2010 royalty payment was required under the 2005 Agreement, and that royalty payments were not contingent upon issuance of invoices.  SOF 88, 92.  As Boston Hannah points out, AAFP properly supplemented its initial disclosures with

110

regard to the damages claimed (*see* BH Ex. 85); therefore, AAFP had the right to also seek recovery of the unpaid amount of 2010 royalties.

Respectfully submitted,

STINSON MORRISON HECKER LLP

By *s/Brian R. Markley*
  Brian R. Markley, KS 17485
   Telephone: (816) 691-3215
   Facsimile: (816) 412-1259
   Email: bmarkley@stinson.com
  Christina D. Arnone, KS 24522
   Telephone: (816) 691-2469
   Facsimile: (816) 412-1005
   Email: carnone@stinson.com
  1201 Walnut, Suite 2200
  Kansas City, Missouri 64106

ATTORNEYS FOR THE
AMERICAN ACADEMY OF FAMILY PHYSICIANS

## Certificate of Service

On October 31, 2011, I filed a copy of the foregoing document using the Court's CM/ECF system, which provides service on George Barton and Stacy Burrows, Law Offices of George A. Barton, P.C., counsel for Boston Hannah International, LLC.

*s/Christina Arnone*
Counsel for American Academy of Family Physicians

111